**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COUNCIL OF THE DISTRICT OF
COLUMBIA,

                Plaintiff,

    v.

VINCENT C. GRAY, in his official capacity
as Mayor of the District of Columbia,

        and

JEFFREY S. DeWITT, in his official capacity
as Chief Financial Officer for the District of
Columbia,

                Defendants.

No. 1:14-cv-00655-EGS

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OR REMAND**

Karen L. Dunn
  D.C. Bar No. 1002520
Alexander I. Platt
  D.D.C. Bar No. D00396
BOIES, SCHILLER & FLEXNER, LLP
5301 Wisconsin Avenue, NW
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  KDunn@bsfllp.com

Brian D. Netter
  D.C. Bar No. 979362
Breanne A. Gilpatrick
  D.C. Bar No. 1018094
MAYER BROWN LLP
1999 K Street, NW
Washington, D.C.  20006-1101
Telephone:  (202) 263-3000
Facsimile:  (202) 263-3300
Email:  bnetter@mayerbrown.com

*Attorneys for Plaintiff Council of the District of Columbia*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 2

      A.      The History of Local Budget Autonomy in the District of Columbia ................. 3

            1.      Budget Autonomy in the Early Years ....................................................... 3

            2.      Congress Grants Home Rule to the District................................................ 4

      B.      The Local Budget Autonomy Act of 2012 ......................................................... 6

            1.      The Problems with the District's Budget System ...................................... 6

            2.      The Local Budget Autonomy Act Becomes Law ..................................... 8

            3.      The Government Accountability Office Issues an Advisory Opinion .................................................................................................... 9

            4.      The Attorney General Advises the Mayor Not to Enforce the Act.......... 10

            5.      Defendants Announce Their Intent to Disregard the Act ........................ 10

            6.      The Council Files Suit and Defendants Remove .................................... 11

            7.      The Council Faces Irreparable Injury ...................................................... 12

ARGUMENT ....................................................................................................... 12

I.      THE COUNCIL IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE THE BUDGET AUTONOMY ACT IS VALID AND BINDING ............. 13

      A.      The Budget Autonomy Act Is Consistent with the Constitution's Appropriations Clause and Implementing Legislation ....................................... 14

            1.      The Miscellaneous Receipts Statute ...................................................... 17

            2.      The Anti-Deficiency Act.......................................................................... 19

            3.      The Purpose Statute ................................................................................ 24

            4.      The Budget and Accounting Act.............................................................. 26

      B.      The Budget Autonomy Act Has No Impermissible Federal Effect .................... 27

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| C. | Congress Did Not Impose Special "Limitations" that Exempt the Local Budget from the Charter Amendment Process | 30 |
| II. | A DECLARATORY JUDGMENT OR, IN THE ALTERNATIVE, A PERMANENT INJUNCTION IS WARRANTED | 34 |
| A. | The Council Faces Irreparable Injury | 34 |
| B. | Aside From a Declaratory Judgment, Other Remedies Are Inadequate | 38 |
| C. | The Balance of Harms Weighs in Favor of Granting the Injunction | 39 |
| D. | The Public Interest Would be Served By an Injunction Compelling Defendants to Comply With the Budget Autonomy Act | 39 |
| III. | IN THE ALTERNATIVE, REMAND IS WARRANTED | 40 |
| A. | The Council's Claim Arises Under District Law | 41 |
| B. | The Anti-Deficiency Act and Budget and Accounting Act Are Beyond the Scope of the Council's Well-Pleaded Complaint | 44 |
| CONCLUSION | | 45 |

# TABLE OF AUTHORITIES

**Page**

**CASES**

*AINS, Inc. v. United States,*
    56 Fed. Cl. 522 (2003), *aff'd,* 365 F.3d 1333 (Fed. Cir. 2004)................................15

*Am. Fed. of Gov't Empls., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.,*
    388 F.3d 405 (3d Cir. 2004)....................................................................17, 18, 20

*Amoco Prod. Co. v. Watson,*
    410 F.3d 722 (D.C. Cir. 2005)..............................................................23

*Ass'n of Realtors, Inc. v. District of Columbia,*
    44 A.3d 299 (D.C. 2012) ......................................................................25

*Banner v. United States,*
    303 F. Supp. 2d 1 (D.D.C. 2004), *aff'd,* 428 F.3d 303 (D.C. Cir. 2005).........................36, 43

*Bliley v. Kelly,*
    23 F.3d 507 (D.C. Cir. 1994)..............................................................44

*Campagna v. United States,*
    26 Ct. Cl. 316 (1891) ......................................................................26

*Caterpillar Inc. v. Williams,*
    482 U.S. 386 (1987)........................................................................41, 45

*Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.,*
    154 F. Supp. 2d 40 (D.D.C. 2001) .........................................................36

*Cincinnati Soap Co. v. United States,*
    301 U.S. 308 (1937).......................................................................15, 20

*City of New Orleans v. Bd. of Comm'rs of Orleans Levee Dist.,*
    640 So. 2d 237 (La. 1994) ................................................................30

*Coleman v. Miller,*
    307 U.S. 433 (1939).......................................................................35, 36

*Core Concepts of Fla., Inc. v. United States,*
    327 F.3d 1331 (Fed. Cir. 2003)............................................................20

*Cropp v. Williams,*
    2003 WL 21904173 (D.C. Super. Ct. 2003) ..............................................36

*Davis v. Ichord,*
    442 F.2d 1207 (D.C. Cir. 1970)..........................................................13, 34

## TABLE OF AUTHORITIES
### (continued)

Page

*Decatur Liquors, Inc. v. District of Columbia*,
  384 F. Supp. 2d 58 (D.D.C. 2005) *rev'd on other grounds*, 478 F.3d 360 (D.C. Cir.
  2007) .................................................................................................................... 33

*Decatur Liquors, Inc. v. District of Columbia*,
  478 F.3d 360 (D.C. Cir. 2007) ......................................................... 41, 42, 43, 44

*Delta Data Sys. Corp. v. Webster*,
  744 F.2d 197 (D.C. Cir. 1984) ................................................................................ 9

*Dimond v. District of Columbia*,
  792 F.2d 179 (D.C. Cir. 1986) ........................................................................ 42, 43, 44

*District of Columbia v. All of Parcel of Land Identified in D.C. as 2626 Naylor Rd., S.E.,
  Washington, D.C. 20020 Square/Lot 5633/0801*, 763 F. Supp. 2d 5 (D.D.C. 2011) ............. 44

*District of Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO*,
  442 A.2d 110 (D.C. 1982) ........................................................................... 28, 29

*District of Columbia v. Greene*,
  806 A.2d 216 (D.C. 2002) ............................................................................. 37, 38

*District Properties Assocs. v. District of Columbia*,
  743 F.2d 21 (D.C. Cir. 1984) ............................................................................ 41

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ................................................................................................. 13

*Feaster v. Vance*,
  832 A.2d 1277 (D.C. 2003) ................................................................................... 38

*FEC v. Akins*,
  524 U.S. 11 (1998) ................................................................................................... 37

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................................ 34

*Gildor v. U.S. Postal Serv.*,
  491 F. Supp. 2d 305 (N.D.N.Y. 2007) .................................................................... 21

*Harrington v. Bush*,
  553 F.2d 190 (D.C. Cir. 1997) ............................................................................... 16

*In re Local Budget Autonomy Emergency Amendment Act of 2012*,
  No. 13–01 (D.C. Bd. Elections & Ethics Jan. 9, 2013) ............................... 9, 27, 44

# TABLE OF AUTHORITIES
### (continued)

**Page**

*J.S.R. ex rel. Rojas Polanco v. Washington Hosp. Ctr. Corp.*,
  667 F. Supp. 2d 83 (D.D.C. 2009) ................................................................40

*Jackson v. D.C. Bd. of Elections & Ethics*,
  999 A.2d 89 (D.C. 2010) ...............................................................14, 33

*Key v. Doyle*,
  434 U.S. 59 (1977)........................................................................44

*Knote v. United States*,
  95 U.S. 149 (1877)....................................................................17, 20

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994)......................................................................40

*Little v. Fenty*,
  689 F. Supp. 2d 163 (D.D.C. 2010) ...........................................42, 43, 44

*M. Steinthal & Co. v. Seamans*,
  455 F.2d 1289 (D.C. Cir. 1971) ..........................................................9

*McIntosh v. Washington*,
  395 A.2d 744 (D.C. 1978) ...............................................................13

*Metro Ry. v. District of Columbia*,
  132 U.S. 1 (1889)..........................................................................4

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977)......................................................................37

*Office of Personnel Mgmt. v. Richmond*,
  496 U.S. 414 (1990)................................................................16, 17, 20

*Pearson v. Shalala*,
  130 F. Supp. 2d 105 (D.D.C. 2001) ......................................................39

*Port Auth. of N.Y. & N.J. v. Dep't of Transp.*,
  479 F.3d 21 (D.C. Cir. 2007) .............................................................31

*Quick Bear v. Leupp*,
  210 U.S. 50 (1908)........................................................................24

*Rainbow Navigation, Inc. v. Dep't of Navy*,
  783 F.2d 1072 (D.C. Cir. 1986) ..........................................................31

**TABLE OF AUTHORITIES**
(continued)                                                                                    **Page**

*Raines v. Byrd,*
    521 U.S. 811 (1997).........................................................................................36

*Republic Nat'l Bank of Miami v. United States,*
    506 U.S. 80 (1992)..........................................................................................24

*Robinson v. District of Columbia,*
    965 F. Supp. 2d 90 (D.D.C. 2013).................................................................13

*Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.,*
    132 F.3d 775 (D.C. Cir. 1998).........................................................................1

*Slattery v. United States,*
    635 F.3d 1298 (Fed. Cir. 2011) (en banc)................................................15, 21

*South Dakota v. Yankton Sioux Tribe,*
    522 U.S. 329 (1998)........................................................................................33

*Tenley & Cleveland Park Emergency Comm. v. D.C. Bd. of Zoning Adjustment,*
    550 A.2d 331 (D.C. 1988)...............................................................................33

*Thomas v. Barry,*
    729 F.2d 1469 (D.C. Cir. 1984)............................................................42, 43, 44

*Transbrasil S.A. Linhas Aereas v. Dept. of Transp.,*
    791 F.2d 202 (D.C. Cir. 1986).......................................................................32

*U.S. House of Representatives v. U.S. Dep't of Commerce,*
    11 F. Supp. 2d 76 (D.D.C. 1998)...................................................................37

*United Biscuit Co. v. Wirtz,*
    359 F.2d 206 (D.C. Cir. 1965)..................................................................17, 20

*United States v. Phila. Nat'l Bank,*
    374 U.S. 321 (1963)........................................................................................33

*US Airways Master Exec., Council, Air Line Pilots Assoc., Int'l v. Am. W. Master Exec.,*
    *Council, Air Line Pilots Assoc., Int'l,*
    525 F. Supp. 2d 127 (D.D.C. 2007).........................................................40, 41

*Vaden v. Discover Bank,*
    556 U.S. 49 (2009)..........................................................................................45

*Whitaker v. Thompson,*
    248 F. Supp. 2d 1 (D.D.C. 2002)...................................................................39

### TABLE OF AUTHORITIES
**(continued)**                                                                          **Page**

*Williams v. Howard Univ.*,
  984 F. Supp. 27 (D.D.C. 1997) ................................................................40

*Wilson v. Turnage*,
  750 F.2d 1086 (D.C. Cir. 1984) ..............................................................32

**CONSTITUTION AND STATUTES**

U.S. Const.:
  Appropriations Clause, Art. I ,§ 9, cl. 7 ............................................. *passim*
  District Clause, Art. I, § 8, cl. 17 .......................................................3, 13

2 U.S.C. § 68–7(b) ....................................................................................18

2 U.S.C. § 182 ...........................................................................................18

7 U.S.C. § 7333(k)(3) ...............................................................................18

12 U.S.C. § 5497(b)(2) .............................................................................18

12 U.S.C. § 5497(c)(2) .............................................................................18

22 U.S.C. § 3712 .......................................................................................18

28 U.S.C. § 1331 ..................................................................................40, 44

28 U.S.C. § 1366 .......................................................................................41

28 U.S.C. § 1447(c) ..................................................................................40

28 U.S.C. § 1931 .......................................................................................18

31 U.S.C. § 665 (1970) .............................................................................23

31 U.S.C. § 717 ...........................................................................................9

31 U.S.C. § 1108(b)(1) .........................................................................26, 27

31 U.S.C. § 1301 .......................................................................................24

31 U.S.C. § 1301(d) ..................................................................................25

31 U.S.C. § 1341 ..................................................................................19, 20

31 U.S.C. § 3302 ....................................................................................5, 17

31 U.S.C. § 3343 .......................................................................................18

**TABLE OF AUTHORITIES**
(continued)                                                    Page

31 U.S.C. § 3718(b) ...........................................................................................17

38 U.S.C. § 8109 ...............................................................................................18

39 U.S.C. § 2003(a) ..........................................................................................17

40 U.S.C. § 321 .................................................................................................18

42 U.S.C. § 1983 ...............................................................................................45

42 U.S.C. § 8256 ...............................................................................................18

42 U.S.C. § 8287 ...............................................................................................18

Balanced Budget Act of 1997,
    Pub. L. No. 105–33, 111 Stat. 251 .............................................................4

Act of May 1, 1820,
    ch. 52, 3 Stat. 567 ......................................................................................19

Act of May 3, 1802,
    ch. 53, 2 Stat. 195 ........................................................................................3

Act of Feb. 21, 1871,
    ch. 62, 16 Stat. 419 ......................................................................................3

Act of June 20, 1874,
    ch. 337, 18 Stat. 116 ....................................................................................3

Consolidated Appropriations Act of 2014,
    Pub. L. No. 113–76, tit. IV, 128 Stat. 5 ...............................................22, 34

Consolidated Appropriations Act of 2012,
    Pub. L. No. 112–74, tit. IV, 125 Stat. 786 ................................................22

D.C. Act 1016 (July 10, 1871) ...........................................................................3

District of Columbia Financial Responsibility and
    Management Assistance Act of 1995, Pub. L. No. 104–8, 109 Stat. 97 ...........6, 31

District of Columbia Organic Act,
    ch. 15, 2 Stat. 103 (1801) ............................................................................3

## TABLE OF AUTHORITIES
### (continued)

Page

Home Rule Act, Pub. L. No. 93–198, 87 Stat. 777................................................................4
    § 102(a), D.C. Code § 1–201.02(a)...................................................4, 13, 30
    § 103(7), D.C. Code § 1–201.03(7) ...................................................31
    § 301, D.C. Code § 1–203.01 ...................................................4
    § 302, D.C. Code § 1–203.02...................................................4
    § 303, D.C. Code § 1–203.03 ...................................................5, 8, 33
    § 303(a), D.C. Code § 1–203.03(a)...................................................5, 8
    § 303(d), D.C. Code § 1–203.03(d) ...................................................5, 14
    § 404(a), D.C. Code § 1–204.04(a)...................................................4, 12, 35, 42, 43
    § 404(e), D.C. Code § 1–204.04(e) ...................................................8
    § 412, D.C. Code § 1–204.12...................................................4
    § 422, D.C. Code § 1–204.22...................................................43
    § 424(d), D.C. Code § 1–204.24d...................................................6, 43
    § 424(d)(2), D.C. Code § 1–204.24d(2)...................................................37
    § 424(d)(10), D.C. Code § 1–204.24d(10) ...................................................5
    § 424(d)(16), D.C. Code § 1–204.24d(16) ...................................................6
    § 446, D.C. Code § 1–204.46...................................................6, 8, 22, 23
    § 446(a), D.C. Code § 1–204.46(a)...................................................26
    § 448(a), D.C. Code § 1–204.48(a)...................................................6
    § 450, D.C. Code § 1–204.50...................................................5, 15, 18
    § 601, D.C. Code § 1–206.01...................................................4, 5, 14
    § 602, D.C. Code § 1–206.02...................................................5, 33
    § 602(a)(2), D.C. Code § 1–206.02(a)(2)...................................................31
    § 602(a)(4), D.C. Code § 1–206.02(a)(4)...................................................42
    § 602(a)(7), D.C. Code § 1–206.02(a)(7)...................................................31
    § 602(a)(8), D.C. Code § 1–206.02(a)(8)...................................................42
    § 602(c)(1), D.C. Code § 1–206.02(c)(1)...................................................4
    § 602(c)(2), D.C. Code § 1–206.02(c)(2)...................................................4
    § 603, D.C. Code § 1–206.03...................................................5
    § 603(a), D.C. Code § 1–206.03(a)...................................................6
    § 603(c), D.C. Code § 1–206.03(c)...................................................31, 33
    § 603(e), D.C. Code § 1–206.03(e)...................................................23

Local Budget Autonomy Act of 2012,
    D.C. Law 19–321, 60 D.C. Reg. 1724 (Feb. 15, 2013) ...................................................1, 6
    § 2(c) ...................................................8
    § 2(e)...................................................8, 9, 26, 35

Minimum Wage Amendment Act of 2013,
    D.C. Law 20–91...................................................29

Payday Loan Consumer Protection Amendment Act of 2007,
    D.C. Law 17–42...................................................29

**TABLE OF AUTHORITIES**
(continued)                                                            Page

Religious Freedom and Civil Marriage Equality Amendment Act of 2009,
    D.C. Law 18–110 ...................................................................................29

Workmen's Compensation Act of 1928,
    ch. 612, 45 Stat. 600 .............................................................................29

Fed. R. Civ. P. 56 ............................................................................................1

Fed. R. Civ. P. 56(a) .....................................................................................13

**OTHER AUTHORITIES**

Budget Autonomy for the District of Columbia: Restoring Trust in our Nation's Capital,
    Hearing Before the H. Comm. on Gov't Reform, 108th Cong. (2003) ...................7

1 Comp. Gen. 704 (1922) ..............................................................................17

2 Comp. Gen. 599 (1923) ..............................................................................17

3 Comp Gen. 296 (1923) ...............................................................................17

13 Comp. Gen. Dec. 700 (1907) ....................................................................17

45 Comp. Gen. 27 (1965) ..............................................................................18

60 Comp. Gen. 323 (1981) ............................................................................21

Stephen R. Cook, *Tough Love in the District: Management Reform Under the District of
    Columbia Financial Responsibility and Management Assistance Act*, 47 AM. U. L.
    REV. 993 (1998) .....................................................................................31

D.C. Council Committee of the Whole, Committee Report on Bill 19–993 ...............32

D.C. Government Organization, Hearings on Self-Determination for the District of
    Columbia, Part 2, 93d Cong., 1st Sess. (1973) ........................................28

GAO, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (2d ed. 2001) ...........................15

GAO, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (3d ed. 2004) ...........................24

GAO, B–324987 (Jan. 30, 2014) ...........................................................10, 26

GAO–05–734SP, *A Glossary of Terms Used in the Federal Budget Process* (Sept. 2005)..........17

H.R. Rep. No. 97–651 (1982) .......................................................................24

**TABLE OF AUTHORITIES**
(continued)                                                                 **Page**

Jason I. Newman & Jacques B. DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act*, 24 AM. U. L. REV. 537 (1975) .......................3

2 STAFF OF H. COMM. ON THE DISTRICT OF COLUMBIA, 93D CONG., HOME RULE FOR THE DISTRICT OF COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY (Comm. Print 1976) ..................................................................................................................19, 28

Kate Stith, *Congress' Power of the Purse*, 97 YALE L.J. 1343 (1988)........................................16

2 Joseph Story, *Commentaries on the Constitution of the United States* (3d ed. 1858) ...............17

2A SUTHERLAND STATUTORY CONSTRUCTION (7th ed. 2007)......................................................32

2B SUTHERLAND STATUTORY CONSTRUCTION (7th ed. 2012)......................................................25

Kenneth E. Vanlandingham, *Municipal Home Rule in the United States*, 10 WM. & MARY L. REV. 269 (1968) ...................................................................................30

13D WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE (3d ed.) .........................................45

Pursuant to Local Civil Rule 7(a) and Federal Rule of Civil Procedure 56, Plaintiff Council of the District of Columbia (the "Council") respectfully submits the following Memorandum of Points and Authorities in support of its Motion for Summary Judgment or Remand.

## INTRODUCTION

For Fiscal Year 2015, the District of Columbia will collect more than $7 billion in local taxes and fees to fund its local government. Those local revenues will comprise the vast majority of the District's annual budget, which funds the District's systems for public education, public health, public works, and public welfare. The taxes and fees will be collected by local officials and deposited into local accounts, without ever passing through the United States Treasury.

This case is about the process for approving expenditures of those locally raised and locally kept revenues. The Local Budget Autonomy Act of 2012 validly amended the District Charter to treat budget legislation in the same manner as all other local legislation. But the District's executive officers—Mayor Vincent C. Gray and Chief Financial Officer Jeffrey S. DeWitt—have announced that they will not honor their obligations under the Act and will actively thwart the Council's efforts to satisfy its obligations under binding law. Their refusal to comply with the Budget Autonomy Act threatens to derail the budget process.

When Congress granted home rule to the District in 1973, it established the District Charter. The Charter is "[s]imilar in certain respects to a state constitution." *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 776 (D.C. Cir. 1998). Like a state constitution, the Charter became effective only upon ratification by District voters. And like a state constitution, the Charter has an amendment process; it is the only part of the Home Rule Act subject to amendment by the District. In giving the District the authority to amend the

Charter, Congress took great care to specify what rules the District could not seek to amend and the process for budgeting local funds was not on the list of limitations.  Nor do federal budget laws prevent the District from spending the local dollars it raises.  Those laws govern Congress's obligation to appropriate funds *out of the U.S. Treasury*, but the District's local funds never pass through the U.S. Treasury—as Congress instructed in 1973, they are kept locally in the D.C. General Fund and replenished each year by local taxes and fees paid by residents of the District.

There is no lawful basis on which the Mayor and CFO may refuse to enforce the Budget Autonomy Act.  The Council is entitled to summary judgment on its claims and to the relief sought in its Complaint—a declaratory judgment that the Budget Autonomy Act is valid or a permanent injunction requiring Defendants to discharge their statutory duties.

In the alternative, the Council has serious doubts as to the availability of federal subject-matter jurisdiction over its Complaint.  Despite the abundance of federal issues lurking in the case, Plaintiff's affirmative claim arises under District laws that do not present a federal question.  Accordingly, the Council requests that the case be remanded to Superior Court.

## STATEMENT OF FACTS

This case is about the District's right to spend the local tax and fee revenue it raises to provide local services within the District, a right accorded to every other home-rule jurisdiction in the country.  Historically, the District had the authority to approve the expenditure of locally raised tax revenues.  Congress took that authority away in 1874, when the District's local government was effectively disbanded.  In 1973, with the Home Rule Act, Congress granted home rule to the District and created a special budgetary scheme.  Specifically, local funds were permanently transferred from the U.S. Treasury to the District's General Fund with the guarantee that local funds shall belong to the District.  Congress then qualified that guarantee with a default rule—subject to the process for amending the District's Charter—that the District budget would

be affirmatively passed by Congress.  While Congress thoughtfully and specifically enumerated rules that could not be altered by the Council through the Charter amendment process, the default budget rule was left subject to revision.  With the 2012 Local Budget Autonomy Act, the District opted out of the default rule and restored its authority to spend locally raised and locally kept revenues.

### A.    The History of Local Budget Autonomy in the District of Columbia

#### 1.    Budget Autonomy in the Early Years

Budget autonomy is not new to the District of Columbia; for much of the District's history, it was the law.  Pursuant to the District Clause of the U.S. Constitution (art. I, § 8, cl. 17), Congress established the District of Columbia in 1801.  *See* District of Columbia Organic Act, ch. 15, 2 Stat. 103 (1801).  The Organic Act preserved the rights of the towns of Georgetown and Alexandria, which were within the federal district (*id.* § 16, 2 Stat. at 108), and in 1802, the City of Washington was incorporated with a local government authorized to provide local services for District residents (*see* Act of May 3, 1802, ch. 53, 2 Stat. 195).

Thereafter, the powers of the Washington city government were gradually expanded (*see* Jason I. Newman & Jacques B. DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act*, 24 AM. U. L. REV. 537, 541 & n.16 (1975)), until 1871, when Congress merged the local governments for the City of Washington, the County of Washington, and the Town of Georgetown (*see* Act of Feb. 21, 1871, ch. 62, 16 Stat. 419).

Like its predecessors, the unified territorial government of 1871 possessed the power to appropriate local funds.  *See, e.g.*, D.C. Act 1016 (July 10, 1871) (appropriating four million dollars for public works projects).  But owing to an apparent dereliction of that duty (*see* Newman & DePuy, *supra*, at 545 n.54), Congress disbanded the territorial government just three years later (*see* Act of June 20, 1874, ch. 337, 18 Stat. 116).  As the Supreme Court would later

explain, under the ensuing system of local government, "[l]egislative powers . . . ceased, and the municipal government [was] confined to mere administration."  *Metro Ry. v. District of Columbia*, 132 U.S. 1, 7 (1889).

## 2.    Congress Grants Home Rule to the District

Local governance returned to the District in 1973, when Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93–198, 87 Stat. 777, now known as the "Home Rule Act" (*see* Balanced Budget Act of 1997, Pub. L. No. 105–33, § 11717, 111 Stat. 251, 786).  The Home Rule Act expressed Congress's intent to relieve itself to "*the greatest extent possible*, . . . of the burden of legislating upon essentially local District matters" by broadly authorizing the Council to exercise legislative authority over "all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this Act."  Home Rule Act §§ 102(a), 302, D.C. Code §§ 1–201.02(a), 1–203.02 (emphasis added).  While broadly delegating legislative authority to the District (*see id.* §§ 404(a), 412, D.C. Code §§ 1–204.04(a), 1–204.12 (authorizing the Council to legislate through specified procedure)), Congress retained for itself the authority to veto District legislation, which becomes law after the passage of 30 legislative days unless Congress enacts a joint resolution disapproving of the legislation (*id.* § 602(c)(1), D.C. Code § 1–206.02(c)(1)).[1] Congress likewise reserved its own authority to legislate for the District on any matter, within or without the Council's legislative domain.  *Id.* § 601, D.C. Code § 1–206.01.

The District of Columbia Charter was enacted by Congress as part of the Home Rule Act and, upon ratification by the District's voters, established the "means of governance of the District."  Home Rule Act § 301, D.C. Code § 1–203.01; *see id.* tit. IV.  The Charter set forth

---

[1] A 60-day review period applies for legislation related to criminal law, criminal procedure, and prisoners.  Home Rule Act § 602(c)(2), D.C. Code § 1–206.02(c)(2).

various default rules for the three branches of the District's government.  They are only default rules because Congress created a process by which the District could amend the Charter.  *See id.* § 303, D.C. Code § 1–203.03.  The amendment process may not be used to abolish any of the District's three branches of government.  *See id.* § 303(a), D.C. Code § 1–203.03(a).  Nor may the amendment process be used to encroach upon Congress's exclusive authority to legislate regarding certain enumerated topics such as federal buildings, federal laws of uniform national application, and the Height Act.  *See id.* §§ 303(d), 601–603, D.C. Code §§ 1–203.03(d), 1–206.01 to .03.  The Charter is the only portion of the Home Rule Act subject to this amendment process.  *Id.* §§ 303(d), 601–603.

Within the Charter, Congress addressed various issues involving the District's budget:

- Section 450 created the General Fund of the District of Columbia, which was within the custody of the Mayor until the creation of the Office of the Chief Financial Officer ("CFO") in 1995.

- Section 450 transferred the District's local funds from the U.S. Treasury to the D.C. General Fund.  Whereas the default rule is that government officials must deposit "money for the Government from any source . . . in the Treasury" (31 U.S.C. § 3302), Section 450 provides instead that "[a]ll money received by any agency, officer, or employee of the District . . . shall be paid promptly to the Mayor for deposit in the appropriate fund"—meaning the General Fund or various special funds that the Council was authorized to create (Home Rule Act § 450, D.C. Code § 1–204.50).  Congress decreed that all such funds "shall belong to the District government." *Id.*  Thus, District tax revenues never pass through the custody of the federal government.  They are collected and deposited by the Office of the CFO.  *See id.* § 424(d)(10), D.C. Code § 1–204.24d(10).

- Section 446 created a default process for approving expenditure of the local funds kept in the District's General Fund and special funds.  Contrary to the ordinary process for enacting legislation—which permitted the Council to approve legislation subject to passive congressional review—the default budget process permitted the Council only to *request* a budget from Congress, which was required to enact affirmative legislation approving expenditures.  That default process replicated the pre-home-rule budget process for the District.[2]

In 1995, the Home Rule Act was amended by Congress to create the Office of the CFO.  *See* District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104–8, 109 Stat. 97, 142 (1995).  With a view toward ensuring "the long-term financial, fiscal, and economic vitality and operational efficiency of the District of Columbia" (*id.* § 2(b)(6)), Congress granted broad powers to the CFO.  The CFO and the Mayor share responsibility for administering the District's finances.  Home Rule Act §§ 448(a), 424(d), D.C. Code §§ 1–204.48(a), 1–204.24d.[3]

## B.  The Local Budget Autonomy Act of 2012

### 1.  The Problems with the District's Budget System

The District's experience under the Home Rule Act's default process for budgeting local funds revealed a series of shortcomings.  *First*, Congress routinely fails to enact an annual

---

[2] Congress elsewhere clarified that the Home Rule Act should not "be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President" and federal agencies with respect to the D.C. budget.  Home Rule Act § 603(a), D.C. Code § 1–206.03(a); *see infra* pp. 20–33.

[3] The CFO's obligations include "[c]ertifying and approving prior to payment of all bills, invoices, payrolls, and other evidences of claims, demands, or charges against the District government, and determining the regularity, legality, and correctness of such bills, invoices, payrolls, claims, demands, or charges."  D.C. Code § 1–204.24d(16).  Moreover, the CFO must certify contracts, leases, collective bargaining agreements, and nonunion pay proposals prior to approval (*id.* § 1–204.24d(14), (27)) and receives "all amounts paid to the District of Columbia from any source" (*id.* § 1–204.24d(10)).

appropriations act by the start of the fiscal year.  Indeed, in the 25 budget cycles between 1990 and 2014, Congress has met the October 1 deadline on only three occasions.  In the other 22 cycles, the District has either begun the year without knowing its full budget or has been forced to initiate shutdown procedures.[4]  *Second*, even in the best of circumstances, the District's budget proposal is virtually certain to be outdated by the time it becomes law.  As then-CFO Natwar Gandhi explained, "[t]he more time that elapses between the formulation of a budget and its execution, the more likely the operating assumptions underlying that budget will not hold true."[5]  Under the Home Rule Act's default process for budgeting local funds, there is at least a six-month delay between the formulation of the budget and its implementation.  *Third*, "[b]ond rating agencies take the uncertainties of the Federal process into account in assessing the District's finances, and discount to a degree whatever ratings the District might otherwise receive."[6]  Thus, the excessive delay between the beginning and end of the budget process has led to lower service delivery levels for "school nurses, prescription drug benefits, police equipment, and staffing."[7]  In sum, the inability of Congress to act swiftly on the District's budget exacts tangible costs on the District's residents.

---

[4] *See FY 2012 and FY 2013 Spending and Performance of the Office of Budget and Planning*, Hearing Before the Comm. of the Whole, Council of D.C. (2013) (attachment to testimony of Gordon McDonald, Deputy CFO, http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/release_content/attachments/Testimony%20--%20FY%202012%20and%202013%20Spending%20Performance%20for%20OBP%20031413.pdf.

[5] *See The Mayor's Proposed Fiscal Year 2012 Budget and Financial Plan*, Hearing Before the Subcomm. on Health Care, D.C., Census, and the Nat'l Archives of the H. Comm. on Oversight and Gov't Reform, 112th Cong. 5 (2011) (statement of Natwar M. Gandhi, CFO), http://oversight.house.gov/wp-content/uploads/2012/01/5-12-11_Gandhi_DC_Budget_Testimony.pdf.

[6] Budget Autonomy for the District of Columbia: Restoring Trust in our Nation's Capital, Hearing Before the H. Comm. on Gov't Reform, 108th Cong. 32 (2003) (statement of Natwar M. Gandhi, CFO).

[7] *Id.* at 10 (statement of Anthony Williams, Mayor).

## 2.    The Local Budget Autonomy Act Becomes Law

In response to these and other concerns, the Council in 2012 approved legislation "[t]o amend the District of Columbia Home Rule Act to provide for local budget autonomy."  D.C. Law 19–321 ("Budget Autonomy Act").

Congress has provided a three-step process for amending the Charter.  *See* Home Rule Act § 303, D.C. Code § 1–203.03.  *First*, an act must be passed by the Council and signed by the Mayor.[8]  *Second*, the act must be submitted to the District's voters in a referendum, and a majority must vote to ratify.  *Third*, the act must be submitted to Congress for a 35-day period of passive review.  An amendment to the Charter becomes effective at the expiration of that 35-day review period unless Congress has enacted a joint resolution disapproving of the amendment.

Leaving in place the Home Rule Act's appropriation of locally raised taxes and fees from the U.S. Treasury to the D.C. General Fund, the Budget Autonomy Act altered the default procedure for budgeting the funds "belong[ing] to the District government."  In particular, under the Act, the District's local budget process matches the process for passing all other legislation— the budget must be approved by an act that is adopted after two readings and then transmitted to Congress for passive review.  *See* Budget Autonomy Act § 2(c), (e).  The Act also specifies a timeline—the Council is required to "adopt the annual budget for the District of Columbia government" "within 70 calendar days . . . after receipt of the budget proposal from the Mayor." *Id.* § 2(e), D.C. Code § 1–204.46.  And because there must be "at least 13 days intervening" between the first and second readings, it follows that the first reading must take place no later than 56 days (which, for fiscal year 2015, is May 29, 2014).  The Budget Autonomy Act leaves in place the system of submission to the President for the "federal portion of the annual budget."

---

[8] Alternatively, a mayoral veto can be overridden by a two-thirds majority of the Council. *See* Home Rule Act §§ 303(a), 404(e), D.C. Code §§ 1–203.03(a), 1–204.04(e).

*Id.*

The Council unanimously adopted the Budget Autonomy Act and—despite his current position—the Mayor signed it.  60 D.C. Reg. 1724 (Feb. 15, 2013).  Following the process for amending the Charter, the Act was then submitted to the D.C. Board of Elections and Ethics for inclusion on the April 2013 ballot.  In response to a Notice of Public Hearing on the ballot language, Attorney General Irvin Nathan expressed his "serious reservations about the legality of the amendment" and suggested that the Board should exclude the referendum from the ballot. Letter from Irvin B. Nathan, Att'y Gen. for D.C., to Kenneth J. McGhie, Gen. Counsel, D.C. Board of Elections & Ethics, at 1 (Jan. 4, 2013) (Exhibit A to Declaration of V. David Zvenyach ("Zvenyach Decl.")).  But after holding a public hearing and evaluating the legal arguments, the Board found "no basis on which to reject" the ballot question.  *In re Local Budget Autonomy Emergency Amendment Act of 2012*, No. 13–01, at 5 (D.C. Bd. Elections & Ethics Jan. 9, 2013).

The voters of the District of Columbia ratified the Act by a margin of 83%–12%, and Congress took no action to disapprove of the amendment to the Charter.  Accordingly, the Budget Autonomy Act became law on July 25, 2013.

**3.     The Government Accountability Office Issues an Advisory Opinion**

After the Budget Autonomy Act became effective, Congressman Ander Crenshaw (R–FL) asked the Government Accountability Office for its opinion as to the validity of the Act. The Government Accountability Office ("GAO") is "an arm of the legislature" from which congressional committees can request non-binding opinions.  *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1305 (D.C. Cir. 1971); 31 U.S.C. § 717.  A court has "no obligation to defer" to the views of the GAO; indeed, because of GAO's legislative function, "there might be a constitutional impediment to such binding effect."  *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 & n.1 (D.C. Cir. 1984).

In a thinly reasoned decision, the GAO reached the conclusion that the Act is without binding legal effect.  The GAO's position was that the Act contravenes two federal budget statutes—the Anti-Deficiency Act and the Budget and Accounting Act.  U.S. GAO, B–324987 (Jan. 30, 2014).  The GAO did not consider or address the arguments made herein by the Council.  Those arguments demonstrate that the Budget Autonomy Act is consistent with these and other federal budget statutes.

### 4.      The Attorney General Advises the Mayor Not to Enforce the Act

On April 8, 2014, Attorney General Irvin Nathan issued a formal opinion advising the Mayor to "decline to implement" the Act and to "advise Executive Branch officials and employees not to do so absent a binding judicial decision to the contrary."  Opinion of the D.C. Attorney General, *Whether the Local Budget Autonomy Act of 2012 is Legally Valid* 2 (Apr. 8, 2014) ("Op. D.C. Att'y Gen.") (Zvenyach Decl. Ex. B).

Consistent with the arguments that he made unsuccessfully to the Board of Elections and Ethics and successfully to the GAO, the Attorney General opined that the Budget Autonomy Act is invalid because it would supposedly (1) alter the "'functions . . . of the United States' in the formation of the District's budget," (2) "change the long-standing roles and procedures of the stated federal entities with respect to the District's 'total budget,'" and (3) "remove[] local District funds from the requirements of the federal Anti-Deficiency Act."  *Id.* at 3–5 (quoting D.C. Code § 1–206.02(a)(3)).

### 5.      Defendants Announce Their Intent to Disregard the Act

In separate letters dated April 11, 2014, the Mayor and the CFO each advised the Council that they would refuse to implement the Budget Autonomy Act.  Based on his view that "[t]he Attorney General's legal opinion is binding on the Executive branch officials in the District government absent a controlling court opinion to the contrary," the Mayor announced that he

would treat the Budget Autonomy Act as a "legal nullity."  Letter from Vincent C. Gray, Mayor, District of Columbia, to Phil Mendelson, Chairman, Council of the District of Columbia 2 (Apr. 11, 2014) ("Gray Letter") (Zvenyach Decl. Ex. C).  In consultation with the CFO, the Mayor advised the Council that he would take specific steps to implement his position:

> First, I will direct all subordinate agency District officials not to implement or take actions pursuant to the Act, which contravenes our Home Rule Charter and other federal law.  Second, I will veto any FY 15 budget transmitted by the Council that is not inclusive of both the local and federal portions of the budget, as required under the Home Rule Act.  Third, as noted, to achieve compliance to the extent I am able with the Home Rule Act, I will transmit to Congress and [the] President the full District budget as it stands after the 56th day following transmission to you of the budget, whether or not the Council has taken a second vote.

*Id.* at 3.

The CFO likewise accepted the Attorney General's recommendation.  He warned the Council not to follow the procedures prescribed by the Budget Autonomy Act and promised not to enforce any such budget unless Congress independently authorized it or "a court of competent jurisdiction sustains the Act's legal validity":

> Absent such actions, I will not make or authorize any payment pursuant to a budget that was approved in conformance with the Act.  I will also direct OCFO employees not to certify contracts or make payments under this budget given the potential civil and criminal penalties to which they, as individuals, would be subject under the federal Anti-Deficiency Act.

Letter from Jeffrey S. DeWitt, CFO, District of Columbia, to Phil Mendelson, Chairman, Council of the District of Columbia 2 (Apr. 11, 2014) ("DeWitt Letter") (Zvenyach Decl. Ex. D).

### 6.    The Council Files Suit and Defendants Remove

On April 17, 2014, the Council filed a Complaint and Motion for Preliminary Injunction in the Superior Court of the District of Columbia.  Dkt. Nos. 1–3, 1–4.  Defendants immediately removed to this Court.  Dkt. No. 1.  On April 21, the Council suggested that subject-matter

jurisdiction was unavailable and moved to remand the action to Superior Court.  Dkt. No. 9.  On April 22, this Court set a summary judgment briefing schedule and directed the parties to address all merits and jurisdictional issues in these briefs.

### 7.    The Council Faces Irreparable Injury

As a result of Defendants' announced refusal to honor the Council's budget, the Council will be injured in a variety of respects absent swift judicial intervention.  *First*, the Mayor's promise to transmit the Council's budget to the President on May 29—after its first reading but before its second reading and final approval—deprives the Council of its authority to legislate for the District.  *See* Home Rule Act § 404(a), D.C. Code § 1–204.04(a).  *Second*, the Council is entitled to the implementation of its duly enacted legislation—here, the Budget Autonomy Act and the fiscal year 2015 budget that it is required to enact—but its legislative will promises to be thwarted by Defendants.  *Third*, the Council is entitled to rely on information from Defendants in the course of formulating its current and future budgets, but Defendants' promise not to enforce the Budget Autonomy Act will deprive the Council of that information.  *Fourth*, Defendants' actions will impede the orderly administration of the District government by undermining the Council's ability to satisfy its statutory obligations and by requiring the Council to incur unnecessary costs in preparing for the contingencies risked by Defendants' conduct.  *Fifth*, Defendants' failure to honor the Council's budget will deprive the Council of funding for its own operations.

### ARGUMENT

The Budget Autonomy Act is valid and binding law that entitles the District to spend its own money through its standard legislative process.  Because Defendants have no legally valid basis to avoid compliance with the Act, the Council is entitled to summary judgment and to the permanent relief sought in its Complaint.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if a reasonable fact-finder could find for the non-moving party; a fact is only 'material' if it is capable of affecting the outcome of the litigation." *Robinson v. District of Columbia*, 965 F. Supp. 2d 90, 93 (D.D.C. 2013).

The Council's cause of action arises under District law, which authorizes declaratory judgments under equitable principles. *See McIntosh v. Washington*, 395 A.2d 744, 748 (D.C. 1978). Such relief is warranted when there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *Davis v. Ichord*, 442 F.2d 1207, 1214 (D.C. Cir. 1970). Permanent injunctive relief has a similar basis in equity. To obtain such relief, a plaintiff must make four showings:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As applied here, the Council's legal claim is meritorious. Summary judgment should be entered in favor of the Council.

## I.     THE COUNCIL IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE THE BUDGET AUTONOMY ACT IS VALID AND BINDING.

The Budget Autonomy Act is binding law and there is no basis on which Defendants are permitted to disregard its requirements. Congress exercised its plenary authority over the District (*see* District Clause, U.S. Const., art I, § 8, cl. 17) to establish the Charter and a process for amending it. Consistent with its goal to relieve itself "to the greatest extent possible, . . . of the burden of legislating upon essentially local District matters" (Home Rule Act § 102(a), D.C.

Code § 1–201.02(a)), Congress gave the District broad power to amend its own Charter.  As

explained *supra*, the Budget Autonomy Act satisfied the Home Rule Act's Charter amendment

procedure.  The Act is also consistent with the substantive limitations on Charter amendment set

forth in Section 303(d) of the Home Rule Act, which provides that the amendment process "may

not be used to enact any law or affect any law with respect to which the Council may not enact

any act, resolution, or rule under the limitations specified in sections 601, 602, and 603."  D.C.

Code § 1–203.03(d).[9]

The Attorney General nevertheless has identified three reasons why the Act is supposedly

invalid, which evidently form the basis for Defendants' announced refusal to implement the Act.

In his view, the Act violates (1) the Anti-Deficiency Act, one of the federal budget laws

implementing the Constitution's Appropriations Clause; (2) Section 602(a)(3) of the Home Rule

Act, which prohibits legislation "which concerns the functions or property of the United States or

which is not restricted in its application exclusively in or to the District"; and (3) Section 603(a)

of the Home Rule Act, which explains how to construe the budget process adopted in 1973.

Defendants are wrong on all three counts.

### A.    The Budget Autonomy Act Is Consistent with the Constitution's Appropriations Clause and Implementing Legislation.

The Constitution mandates that "No Money shall be drawn from the Treasury, but in

---

[9] "Sections 601 to 603 expressly restrict the Council's power to legislate in several specific areas."  *Jackson v. D.C. Bd. of Elections & Ethics*, 999 A.2d 89, 95 n.5 (D.C. 2010).  In particular, Section 601 ("Retention of Constitutional Authority") preserves the authority of Congress to enact legislation for the District on any subject and thereby prohibits the Council from usurping Congress's constitutional authority.  Section 602 ("Limitations on the Council") enumerates specific topics on which the Council may not legislate—for example, the taxation of federal property, the organization of local courts, and the height restrictions for buildings.  And Section 603 ("Budget Process; Limitations on Borrowing and Spending") provides specific restrictions on borrowing and spending (for example, limitations on general obligation bonds and deficit spending) and rules of construction for the budget process.

Consequence of Appropriations made by Law" (U.S. Const. art. I, § 9, cl. 7).  One way for Congress to satisfy this obligation is through an annual appropriations act, but that is not the only way.

As the Supreme Court has said, the Constitution's appropriations requirement "means simply that no money can be paid *out of the treasury* unless it has been appropriated by an act of Congress."  *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (emphasis added).  Congress thus makes an appropriation through any statute that "specifies the payment of funds *out of the general fund of the Treasury.*"  *AINS, Inc. v. United States*, 56 Fed. Cl. 522 (2003) (emphasis added) (citing 1 GAO, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 2–14 (2d ed. 2001)), *aff'd*, 365 F.3d 1333 (Fed. Cir. 2004), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc).

There are any number of federal agencies and programs for which revenues are deposited outside the general fund of the Treasury and for which no annual congressional appropriation is required.  For example, the Federal Deposit Insurance Corporation funds itself through its own annual revenues and there is no question that the Appropriations Clause has been satisfied.  Programs such as Social Security and Medicare hospital insurance have funds separate from the U.S. Treasury that are exempted from annual appropriations.  To be sure, spending on these agencies and programs is still restricted by substantive law, but there is no dispute the Appropriations Clause has been permanently satisfied.

In the Home Rule Act, Congress directed that funds collected by the District government be taken out of the U.S. Treasury, stating that they "shall belong to the District government" and would thereafter be maintained by the District government in the D.C. General Fund.  Home Rule Act § 450, D.C. Code § 1–204.50.  As a result of this congressional directive, the

Constitution's requirement for a congressional appropriation was satisfied as to the District's local revenues.

Of course, like the agencies and programs mentioned above, the District remained subject to statutory limitations on its spending—such as the second-level requirement imposed by Congress that expenditures out of the D.C. General Fund be affirmatively approved by Congress. This second-level requirement was located by Congress only in the District Charter and was thus subject to amendment by the District, effectively establishing a default rule. At all times since Congress granted the Home Rule Charter, the District has been empowered by the Home Rule Act to remove the second-level requirement. In passing the Budget Autonomy Act, it did so. That action did not implicate, nor run afoul of, the Constitution's appropriation requirement or the federal budget laws implementing that requirement.

History, context, and constitutional interpretation support this conclusion. The Constitution's Appropriations Clause embodies two fundamental principles—that Congress must identify public money and determine how to spend it. *See Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427 (1990); Kate Stith, *Congress' Power of the Purse*, 97 YALE L.J. 1343 (1988). But because the Appropriations Clause is not self-executing, four applicable budget laws implement these principles. *Cf. Harrington v. Bush*, 553 F.2d 190, 194–95 (D.C. Cir. 1997) (the Appropriations Clause is "not self-defining and Congress has plenary power to give meaning to the provision"). The Miscellaneous Receipts Statute identifies public money that needs to be appropriated. The Anti-Deficiency Act requires agencies and officials to get Congress's permission to use public money. The Purpose Statute prohibits agencies and officials from using money for a different purpose than Congress approved. And the Budget and Accounting Act specifies the procedures for requesting an appropriation.

The Budget Autonomy Act is consistent with all four applicable statutes and with the principles animating the Appropriations Clause.

### 1.  The Miscellaneous Receipts Statute

The Miscellaneous Receipts Statute, 31 U.S.C. § 3302, defines the broad scope of the public fisc.  *See Richmond*, 496 U.S. at 427; 2 Joseph Story, *Commentaries on the Constitution of the United States*, § 1348 (3d ed. 1858).  The statute provides that, subject to one limited exception related to the collection of legal claims,[10] "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302. "Moneys once in the treasury can only be withdrawn by an appropriation by law."  *Knote v. United States*, 95 U.S. 149, 154 (1877); *see also, e.g.*, 3 Comp Gen. 296 (1923); 2 Comp. Gen. 599, 600 (1923); 13 Comp. Gen. Dec. 700, 703 (1907).

Courts have also recognized that Congress may "choose to . . . loosen its own reins on public expenditure" by making exemptions from the Miscellaneous Receipts Statute.  *Am. Fed. of Gov't Empls., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (*AFGE*).  When Congress "choose[s] to treat some agency revenues outside of the general Treasury fund by statutorily authorizing those revenues to be deposited" elsewhere, it takes "the revenues out of the appropriations cycle."  *Id*.  For example, Congress has created revolving funds, such as the Postal Service Fund, *see* 39 U.S.C. § 2003(a), that are "replenished by moneys from the public [and] constitute[] an on-going appropriation which does not have to be renewed each year." *United Biscuit Co. v. Wirtz*, 359 F.2d 206, 212 (D.C. Cir. 1965); *see also* 1 Comp. Gen. 704 (1922); U.S. GAO, GAO–05–734SP, *A Glossary of Terms Used in the Federal Budget*

---

[10] *See* 31 U.S.C. § 3718(b).

*Process* 88 (Sept. 2005) (explaining that a revolving fund is a form of permanent appropriation). It has also identified certain federal entities that are not financed by appropriations, known as nonappropriated fund instrumentalities or "NAFIs" (*see AFGE*, 388 F.3d at 409), like the Consumer Financial Protection Bureau ("CFPB").  The CFPB is permitted to retain the fees it charges to regulated entities in the Bureau Fund, *see* 12 U.S.C. § 5497(b)(2), but the assets of the Bureau Fund are considered not to be "Government funds or appropriated monies," 12 U.S.C. § 5497(c)(2).  In these situations, Congress has made exemptions from the Miscellaneous Receipts Statute's general rule that all money must be deposited in the U.S. Treasury.[11]

In the Home Rule Act, Congress exempted the District's local revenues from the Miscellaneous Receipts Statute.  Section 450 of the Home Rule Act created the D.C. General Fund and provided that "[a]ll money received by any agency, officer, or employee of the District in its or his official capacity shall belong to the District government and shall be paid promptly to the Mayor for deposit in the appropriate fund."  D.C. Code § 1–204.50.[12]  Congress

---

[11] There are many other examples of exemptions.  *See*, *e.g.*, 42 U.S.C. § 8287 (exempting measured savings from energy savings performance contracts); 42 U.S.C. § 8256 and note (exempting rebates received by federal agencies from utility companies on account of energy-saving measures); 2 U.S.C. § 68-7(b) (exempting fees and other charges collected for services provided by the Senate Office of Public Records); 7 U.S.C. § 7333(k)(3) (exempting fees for certain services collected by the Commodity Credit Corporation); 28 U.S.C. § 1931 (exempting specified portions of filing fees paid to the clerk of court); 38 U.S.C. § 8109 (establishing a revolving fund for parking fees at Department of Veterans Affairs medical facilities that previously were required to go to miscellaneous receipts pursuant to 45 Comp. Gen. 27 (1965)); 31 U.S.C. § 3343 (establishing the Check Forgery Insurance Fund for the purpose of making replacement payments to payees whose Treasury checks have been lost, stolen, or cashed by a forged endorsement); 40 U.S.C. § 321 (establishing the General Services Administration General Supply Fund for the purpose of furniture and equipment for other agencies); 2 U.S.C. § 182 (establishing the Cooperative Acquisitions Program Revolving Fund available to the Librarian of Congress); 22 U.S.C. § 3712 (establishing the Panama Canal Revolving Fund).

[12] This provision of Section 450 exempts money received by the District of Columbia Courts, which is to be deposited in the Treasury of the United States or in Crime Victims Funds. D.C. Code § 1-204.50.

understood that it was "removing these monies from the United States Treasury" (H. Comm. on the District of Columbia, District of Columbia Self-Government and Governmental Reorganization Act, H. Rep. No. 93-482, at 30 (1973)), and that the new General Fund "outside of the Treasury" would be available for "deposit of all city revenues," but not for any "Federal payment" that did not originate from local funds (2 STAFF OF H. COMM. ON THE DISTRICT OF COLUMBIA, 93D CONG., HOME RULE FOR THE DISTRICT OF COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY 1662 (Comm. Print 1976) (Staff Synopsis) (hereinafter, "HOME RULE ACT LEGISLATIVE HISTORY")).

Thus, through the Home Rule Act, Congress transferred local District tax receipts from the Treasury (where they previously resided) and funneled them into the newly created D.C. General Fund. By permitting the Mayor to retain custody of local funds, which would be replenished every year through local taxes and fees, Congress removed those funds from the purview of the Miscellaneous Receipts Statute.

## 2. The Anti-Deficiency Act

The second key statute delineating Congress's constitutional appropriations authority is the Anti-Deficiency Act. *See* 31 U.S.C. § 1341. The central provision of that act provides: "[a]n officer or employee of the United States Government or of the District of Columbia government may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." *Id.* Thus, "[w]hile the Miscellaneous Receipts statute defines the scope of the public fisc, the Anti-Deficiency Act defines the scope of public expenditure." Stith, *supra*, at 1370. Congress first enacted the Anti-Deficiency Act in 1820 (*see* Act of May 1, 1820, ch. 52, § 6, 3 Stat. 567, 568), and the nearly two-centuries-old act prevents federal officials from spending public money beyond or before congressional approval.

By its terms, the Anti-Deficiency Act applies to the District.  And by its terms, the Anti-Deficiency Act prevents the District from "exceeding an amount available in an appropriation or fund for the expenditure or obligation."  31 U.S.C. § 1341.  Thus, the Anti-Deficiency Act prohibits the District from exceeding the amounts available in the D.C. General Fund (and the District's special funds).

The Attorney General has suggested that the Budget Autonomy Act violates the Anti-Deficiency Act on the theory that an *annual* appropriation is required by the Anti-Deficiency Act.  That position fails to account for Congress's decision to remove D.C. local funds from the purview of the Miscellaneous Receipts Statute, which, as has long been understood, satisfies Congress's obligations under the Appropriations Clause and its implementing statutes, including the Anti-Deficiency Act.  *See* Stith, *supra*, at 1379 n.176 ("Exceptions to the requirements of the Miscellaneous Receipts statute . . . provide funding outside of annual appropriations acts.").  And that position fails to appreciate that because "no money can be paid out of the Treasury *unless* it has been appropriated by an act of Congress" (*Cincinnati Soap*, 301 U.S. at 321 (emphasis added)), money paid out of the Treasury at Congress's behest has necessarily been appropriated (*see Richmond*, 496 U.S. at 424; *Knote*, 95 U.S. at 154).

As explained *supra*, it is not uncommon or Congress to create exemptions to the Miscellaneous Receipts Statute's rule that all public funds must be paid into the Treasury.  Where such exemptions have been made, it is the case either that the funds have been permanently appropriated or that the funds did not need to be appropriated because they were not part of the public fisc.  In either case, the Anti-Deficiency Act is satisfied and no annual appropriation is required.  *See AFGE*, 388 F.3d at 412 (noting that "[t]he Miscellaneous Receipts Act need not apply to all government revenues" and explaining the NAFI exception to the

general rule); *United Biscuit*, 359 F.2d at 212–13 (explaining that, by creating a revolving fund, Congress discharged its obligation to approve a new appropriation each fiscal year); *Core Concepts of Fla., Inc. v. United States*, 327 F.3d 1331 (Fed. Cir. 2003) (distinguishing between circumstances in which funds exempted from the Miscellaneous Receipts Statute have been permanently appropriated and those in which the funds have been exempted from appropriations requirements in the first instance); *Gildor v. U.S. Postal Serv.*, 491 F. Supp. 2d 305, 311–12 (N.D.N.Y. 2007) (finding no Appropriations Clause bar to judgment against U.S. Postal Service "because there is a Postal Service Fund, distinct from the United States Treasury"); *see also* 60 Comp. Gen. 323, 325 (1981) (the Office of the Comptroller General "has consistently regarded statutes which authorize collection of receipts and their deposit in a specific fund, and which make the fund available for a specific purpose, as constituting continuing or permanent appropriations.").[13]

When it enacted the Home Rule Act and transferred District local funds into the D.C. General Fund, Congress exempted District local funds from the Miscellaneous Receipts Statute. That action permanently transferred the District's funds to the D.C. General Fund. Each year, the General Fund is replenished with revenues that the District raises through taxes and fees, none of which ever pass through the U.S. Treasury. Thus, these funds are "available in an

---

[13] The distinction between non-appropriated and permanently appropriated funds was relevant prior to *Slattery* because the Federal Circuit had held in a series of cases that the Court of Federal Claims lacked Tucker Act jurisdiction over claims against NAFIs on the theory that there were no appropriated funds from which judgments could be paid. *See* 635 F.3d 1298, 1301 (Fed. Cir. 2011) (en banc) ("Tucker Act jurisdiction does not depend on and is not limited by whether the government entity receives or draws upon appropriated funds."), *cert denied sub nom. McCarron v. United States*, 134 S. Ct. 1276 (2014). The Federal Circuit abrogated that jurisdictional doctrine in *Slattery* but neither affected Congress's ability to create NAFIs nor altered the status of NAFIs with respect to the Miscellaneous Receipts Statute.

appropriation or fund," as the Anti-Deficiency Act requires, and, as long as the D.C. General Fund is not exhausted, that statute is satisfied.

For 40 years, Congress has complied with the Home Rule Act by approving expenditures from the D.C. General Fund.  But those second-order appropriations were not the appropriations *out of the Treasury* required by the Constitution and the Anti-Deficiency Act.  This is plain because the funds never passed through the Treasury at all—and because Congress already satisfied that requirement when it enacted the Home Rule Act and permanently transferred funds from the Treasury into the D.C. General Fund.  Instead, through the D.C. budget process, Congress approved the expenditure *out of the D.C. General Fund* pursuant to a separate statutory mandate in Section 446 of the Home Rule Act.[14]  As described *supra* pp. 6, 8–9, the Home Rule Act left the default rule contained in Section 446 subject to the D.C. Charter amendment process, and the provision has now been revised by the Budget Autonomy Act.  In any event, because Congress transferred the District's local tax revenues to the D.C. General Fund, and because the Fund is replenished by locally raised revenues that never pass through the Treasury, further congressional action is not required to satisfy the Anti-Deficiency Act.

None of this is to say that the Anti-Deficiency Act is *inapplicable* in the District of Columbia.  Under current law, the District is not permitted to obligate or spend amounts in excess of the balance of its funds.

If Defendants' position were correct—and a congressional appropriation out of the D.C. General Fund were required to satisfy the Anti-Deficiency Act—it would undermine Congress's

---

[14] Congress has repeatedly recognized this distinction by using special language when budgeting D.C. local funds.  *See*, *e.g.*, Consolidated Appropriations Act of 2014, Pub. L. No. 113–76, tit. IV, 128 Stat. 5, 207 (2014) ("Local funds are appropriated for the District of Columbia for the current fiscal year out of the General Fund of the District of Columbia"); Consolidated Appropriations Act of 2012, Pub. L. No. 112–74, tit. IV, 125 Stat. 786, 906 (similar).

authority to exempt income from the Miscellaneous Receipts Statute, which it has done on numerous occasions (*see supra* pp. 16–18).[15]

Defendants' position also leaves the original versions of Sections 446 and 603(e) of the Home Rule Act to perform the same function.  As set forth in Section 446 of the original Home Rule Act: "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act."  Home Rule Act § 446 (repealed 2013).  The Home Rule Act then separately specified in Section 603(e) that the Anti-Deficiency Act would continue to apply to the District of Columbia.  *See* § 603(e), D.C. Code § 1-206.03(e) ("Nothing in this Act shall be construed as affecting the applicability to the District government of . . . the so-called Anti-Deficiency Act.").  But those provisions must be interpreted to have separate meaning.  *See Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) ("It is a familiar canon of statutory construction that, if possible, we are to construe a statute so as to give effect to every clause and word.") (internal quotation marks omitted).  Under the Attorney General's approach, these provisions were redundant.  But there is a straightforward way, consistent with constitutional principles and the other federal budget statutes, to accord separate meaning to those provisions—Section 603(e) and the Anti-Deficiency Act (permanently) prohibit the District from obligating or expending *in excess of* the D.C. General Fund.[16]  And Section 446

---

[15] Defendants' position also cannot be correct because it would invalidate investments the District is authorized to make, and has been making, under the Home Rule Act.  When the District invests the funds within the D.C. General Fund, it is putting them at risk for investment default— in a sense, spending the money.  Congress makes no annual authorization of these investments.  Under the Attorney General's theory, any investment default (or even the possibility of one) violates the Anti-Deficiency Act.

[16] At the time the Home Rule Act was enacted, the Anti-Deficiency Act provided: "[n]o officer or employee of the United States shall authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available

(until it was validly amended through the Charter amendment process) additionally prohibited the District from obligating or expending money *within* the D.C. General Fund without congressional approval.

### 3.    The Purpose Statute

While the Anti-Deficiency Act provides that funds must be appropriated out of the Treasury, the Purpose Statute provides that when conditions are placed on an appropriation out of the Treasury, they must not be ignored.  Specifically, the Purpose Statute prohibits the use of federal funds for a purpose other than that specified by the appropriation.  *See* 31 U.S.C. § 1301 ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

Appropriations are often quite general.  Some agencies receive a single appropriation from Congress.  In that circumstance, "[t]he purpose of the appropriation will be to enable the agency to carry out all of its various authorized functions."  1 GAO, Principles of Federal Appropriations Law 4–10 (3d ed. 2004).  Similarly here, Congress appropriated the District's local funds from the Treasury to the D.C. General Fund to enable the District government to carry out its functions.  In Section 450 of the Home Rule Act, Congress established that, with the transfer of funds into the D.C. General Fund, that money would "belong to the District government."  D.C. Code § 1–204.50; *cf. Quick Bear v. Leupp*, 210 U.S. 50, 77 (1908) (explaining that restrictions on government spending logically applied only to "public moneys belonging to the government" rather than to "moneys which belong to the Indians and which is administered for them by the government"); *Republic Nat'l Bank of Miami v. United States*, 506

therein." 31 U.S.C. § 665 (1970).  The Anti-Deficiency Act was understood to apply to the District of Columbia, and subsequent amendments did not intend to alter that relationship. *See* H.R. Rep. No. 97–651, at 25 (1982).

U.S. 80, 91 (1992) (opinion of Blackmun, J.) ("The Appropriations Clause governs only the disposition of money that belongs to the United States.").

The D.C. Court of Appeals has construed Section 450 to confer "'all powers and duties incidental and necessary to make such legislation effective'" and has rejected the theory that Congress conferred only those powers expressly stated. *Ass'n of Realtors, Inc. v. District of Columbia*, 44 A.3d 299, 304–05 (D.C. 2012) (holding that the power to create special funds set forth in Section 450 includes the unstated powers to reallocate and eliminate those funds) (quoting 2B SUTHERLAND STATUTORY CONSTR. § 55.4 (7th ed. 2012)).  It follows that the purpose of the appropriation of local funds to the D.C. General Fund was to fund the District's local government, the powers of which are specified elsewhere in the Charter.

The GAO has expressed the view that no expenditures from the D.C. General Fund have been approved because 31 U.S.C. § 1301(d) provides that "[a] law may be construed to make an appropriation out of the treasury . . . only if the law specifically states that an appropriation is made or that such a contract may be made."  U.S. GAO, B–324987, *supra*, at 9–10.  But Congress's appropriation of the District's local funds to the D.C. General Fund was unambiguous.  The GAO did not address the crucial distinction between "an appropriation out of the treasury" (the concern of the Purpose Statute) and appropriations out of the D.C. General Fund (the concern of the Budget Autonomy Act).  Through the exemption of D.C. local funds from the Miscellaneous Receipts Statute, Congress permanently transferred those funds out of the Treasury, so there was no requirement for an additional appropriation "out of the treasury," and § 1301(d)'s specificity requirement could not have been violated.  *See Campagna v. United States*, 26 Ct. Cl. 316, 317 (1891) ("An appropriation is *per se* nothing more than the legislative authorization prescribed by the Constitution that money may be paid out *at the Treasury*.")

(emphasis added).  Although the Purpose Statute prohibits the District from spending its money to fund another agency's projects, it does not prohibit the District from changing the default process for approving expenditures from the D.C. General Fund.

### 4.    The Budget and Accounting Act

When appropriations are required, the Budget and Accounting Act provides the procedure for requesting those appropriations.  In particular, "[t]he head of each agency shall prepare and submit to the President each appropriation request for the agency."  31 U.S.C. § 1108(b)(1).  But nothing in the Budget and Accounting Act purports to define when an appropriation request is required.  It merely specifies what must be done to request an appropriation.  Thus, although the GAO took the position that "portions of the Budget Autonomy Act stand in direct conflict with . . . the Budget and Accounting Act" (U.S. GAO, B–324987, *supra*, at 9–10), that viewpoint evidently stemmed from its erroneous conclusion that Congress is required to make annual appropriations of D.C.'s local funds.  But, as explained above, no such requirement exists—Congress already appropriated the funds out of the Treasury in the Home Rule Act.[17]

Indeed, even Congress's practice *prior to* the Budget Autonomy Act contemplates that the District is not requesting an annual appropriation of its *local* funds within the meaning of the Budget and Accounting Act.  The Office of Management and Budget instructs agencies to submit information in support of appropriations requests, making clear that its instructions "apply to the District of Columbia, which must submit information in support of *Federal*

---

[17] Pursuant to the Budget Autonomy Act, the Mayor is required to submit to the President the District's annual appropriation request for the "federal portion of the annual budget."  Budget Autonomy Act § 2(e), D.C. Code § 1–204.46(a).  Nothing in the Budget Autonomy Act alters the requirement that the federal portion of the District's budget must comply with the Budget and Accounting Act.

payments to the District," but not *local* payments.  OMB Circular No. A–11 (2013), at 25–1.

Likewise, OMB's procedures for monitoring spending and government cash flow require

periodic reports from the D.C. Courts, which receive a federal appropriation, but not from the

District government generally.  *Id.* at 135–1 to 2.  This makes sense, as these requirements are

intended to enable the Treasury Department to realistically estimate how much it needs to

borrow to operate the Government and the District's local funds are irrelevant to that calculation.

In sum, the Budget Autonomy Act is in full harmony with the Constitution's

Appropriations Clause, the interpretive principles animating that Clause, and the four main

implementing statutes.  Defendants' position, on the other hand, is not compatible with these

principles and statutes because it cannot meaningfully account for Congress's permanent

appropriation of local funds out of the Treasury and into the D.C. General Fund, which satisfied

the Appropriations Clause, the Anti-Deficiency Act, and the Purpose Statute and rendered

inapplicable the Budget and Accounting Act.

### B.        The Budget Autonomy Act Has No Impermissible Federal Effect.

The Attorney General separately objects that the Budget Autonomy Act violates Section

602(a)(3), which limits legislation that "concerns the functions or property of the United States

or which is not restricted in its application exclusively in or to the District." D.C. Code § 1–

206.02(a)(3).  But the limitation on controlling "functions . . . of the United States" has been

correctly interpreted to "withhold from local officials the authority to affect or to control

decisions made by federal officials in administering federal laws that are national in scope as

opposed to laws that relate solely to the District of Columbia." *District of Columbia v. Greater*

*Wash. Cent. Labor Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982) (emphasis added).

As Congress understood when it enacted the Home Rule Act:

The functions reserved to the federal level would be those related

27

> to federal operations in the District and to property held and used
> by the Federal Government for conduct of its administrative,
> judicial, and legislative operations; and for the monuments
> pertaining to the nation's past.  The functions would include
> physical planning of these federal areas, construction and
> maintenance of federal buildings, and administration of federal
> park areas (NCPC would retain its purely federal functions).

1 HOME RULE ACT LEGISLATIVE HISTORY, *supra*, at 182.[18]  The Budget Autonomy Act simply

and obviously does not fit this description.  The Act concerns the ability of a local government to

spend locally raised and locally kept revenues on local government services.

The Attorney General argues that the Budget Autonomy Act "would affect [sic] a sea

change in the 'functions . . . of the United States' in the formation of the District's budget."  Op.

D.C. Att'y Gen., *supra*, at 3.  This basic claim—that Section 602(a)(3) prohibits legislation

altering the federal government's role in supervising the District—was considered and rejected

by the D.C. Court of Appeals in *Greater Washington Central Labor Council*.

In that case, the court evaluated Council legislation regarding workers' compensation for

private-sector employees.  The Workmen's Compensation Act of 1928, ch. 612, 45 Stat. 600,

incorporated the workers' compensation standards of the federal Longshoreman's Act to private

employees in the District.  That meant that the District's workers' compensation system was

operated by the federal Department of Labor.  Through the Workers' Compensation Act of 1979,

---

[18] *See also* D.C. Government Organization: Hearings on Self-Determination for the
District of Columbia, Part 2, 93d Cong., 1st Sess. 52 (1973) (statement of John Nevius, former
Chairman of the pre-home-rule City Council):

> For the purposes of identifying these Federal functions, we are
> speaking basically of three things: First, the function regarding
> Federal buildings and properties; second, the conduct of Federal
> business—and there you get into the whole complicated matter of
> Federal functions versus local functions or Federal interests versus
> local interests, admittedly not easy to distinguish—and third, the
> function of international relations and matters concerning the
> diplomatic corps.

D.C. Law 3–77, the Council sought to transfer responsibility for administering the program to

District officials.  In holding that the transfer of responsibilities to the District government was

within the Council's power, the court relied on the facts that the Department of Labor's

involvement in workers' compensation was based on a law applicable only to the District and

that no federal funds were involved in the administration of that act.

There is no meaningful distinction between the law considered in that case and this one.

Here, too, the Budget Autonomy Act is local in scope, passed by the local government and

governs the local expenditure of local dollars; it does not govern the disposition of federal funds.

It simply does not fit within Section 602(a)(3)'s exclusion, which was designed to "safeguard the

operations of the *federal* government on the *national* level" (*Greater Wash. Cent. Labor Council*,

442 A.2d at 116 (emphasis added)), not matters of local governance.

Indeed, if the Budget Autonomy Act were interpreted to fall within the ambit of Section

602(a)(3), then the Council would be virtually powerless to regulate.  Any local law that had

even an incidental effect on federal government processes or programs would be off-limits.  But

virtually all Council legislation has some effect on the federal government, either by altering

entitlement to federal benefits (*e.g.*, Religious Freedom and Civil Marriage Equality Amendment

Act of 2009, D.C. Law 18–110), affecting federal authority (*e.g.*, the District's criminal law,

which is enforced by federal officials), or relieving Congress of regulatory burdens (*e.g.*,

Minimum Wage Amendment Act of 2013, D.C. Law 20–91; Payday Loan Consumer Protection

Amendment Act of 2007, D.C. Law 17–42).  The Attorney General's theory would read the

Charter amendment procedure out of the Home Rule Act, because any local law that relieved

Congress "of the burden of legislating upon essentially local District matters" would violate

Section 602(a)(3) by taking a burden away from Congress.  But this is precisely what Congress

intended to do to "the greatest extent possible" when it enacted the Home Rule Act.   Home Rule Act § 102(a), D.C. Code § 1–201.02(a).[19]

### C.   Congress Did Not Impose Special "Limitations" that Exempt the Local Budget from the Charter Amendment Process.

Finally, despite the Attorney General's assertions (Op. D.C. Att'y Gen., *supra*, at 4), nothing in the Home Rule Act prohibits the Council from altering the local budget process.   The critical provision is Section 603(a), which provides:

> Nothing in this Act *shall be construed as making any change in existing law*, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia Government.

D.C. Code § 1–206.03(a) (emphasis added).

Section 603(a) explains how "*this* Act shall be construed."   Congress elsewhere defined the term "Act" "to refer to *this* Act" and not to subsequent amending legislation.   Home Rule Act § 103(7), D.C. Code § 1–201.03(7) (emphasis added).[20]   And by identifying how the Home Rule

---

[19] The Attorney General's effort to constrain the District's legislative authority to municipal affairs evokes the long-ago discredited doctrine of *imperium in imperio*.   Under that early home-rule model, municipalities would be granted exclusive authority—free from state interference—as to municipal matters.   But because identifying municipal matters was arbitrary, the *imperio* model proved unworkable and was considered a dead letter as early as 1912.   *See* Kenneth E. Vanlandingham, *Municipal Home Rule in the United States*, 10 WM. & MARY L. REV. 269, 289 (1968).   By the 1960s, the model for home-rule grants permitted legislation on a wide range of topics subject to greater scrutiny by the state.   *See City of New Orleans v. Bd. of Comm'rs of Orleans Levee Dist.*, 640 So. 2d 237, 243 (La. 1994); National Municipal League, Model State Constitution § 8.02 (6th ed. 1963).   The Home Rule Act reflects the National Municipal League model—with a grant of legislative authority conditioned by sovereign review. Under that approach, the Attorney General's line-drawing exercise is categorically unavailable.

[20] Although the editors of various codifications of the Home Rule Act have replaced "Act" with "chapter," Congress referred only to the "Act."   "[I]t is well established that language revisions in codifications will not be deemed to alter the meaning of the original statute." *Port*

Act should be *construed*, Congress did not provide that it could not be *changed*.  To the contrary, Congress understood that the Charter would be amended from time to time, and set up a process for considering and approving amendments.  When it wanted to prohibit certain amendments, it was explicit:  "The Council shall have no authority to . . . [l]end the public credit for support of any private undertaking" or to "[e]nact any act, resolution, or regulation with respect to the Commission on Mental Health."  Home Rule Act § 602(a)(2), (7), D.C. Code § 1–206.02(a)(2), (7).

If it so intended, Congress could have provided that "the Council shall have no authority to make any change" in budgeting procedures, replicating language it chose for the numerous limitations.  But it did no such thing.  Nor is it the case that Congress was merely inattentive to budgeting procedures.  Congress did provide limitations on the Council's budget authority—just not limitations that foreclose the local expenditure of locally raised funds.  Section 603(c) prohibits the Council from approving a budget in which expenditures exceed expected revenues.  D.C. Code § 1–206.03(c).  And Congress amended the Charter to impose additional mandatory restrictions on the District's budget process when it created the financial control board.  *See* District of Columbia Financial Responsibility and Management Assistance Act, 109 Stat. 97; *see also* Stephen R. Cook, *Tough Love in the District: Management Reform Under the District of Columbia Financial Responsibility and Management Assistance Act*, 47 AM. U. L. REV. 993 (1998).  But in Section 603(a), Congress chose only to describe how the "Act" should be "construed" relative to existing law.  *Cf. Transbrasil S.A. Linhas Aereas v. Dept. of Transp.*, 791 F.2d 202, 205 (D.C. Cir. 1986) (when "different terms are used in a single piece of legislation, [a] court must presume that Congress intended the terms to have different meanings") (quoting

---

*Auth. of N.Y. & N.J. v. Dep't of Transp.*, 479 F.3d 21, 41 (D.C. Cir. 2007) (quoting *Rainbow Navigation, Inc. v. Dep't of Navy*, 783 F.2d 1072, 1076 (D.C. Cir. 1986)).

*Wilson v. Turnage,* 750 F.2d 1086, 1091 (D.C. Cir. 1984)); *see also* 2A SUTHERLAND

STATUTORY CONSTR. § 46.06, at 194 (7th ed. 2007) ("The use of different terms within similar

statutes generally implies that different meanings were intended.").

Looked at another way, Congress's decision to create in the Charter an amendable

document militates against finding limitations where none are specifically identified.  By

allowing the District the authority to amend its own Charter, Congress purposefully enabled the

local government to account for changes over time.  For example, the Budget Autonomy Act was

passed following seventeen consecutive years of balanced budgets in the District and sixteen

consecutive clean year-end financial audits.[21]  For the past ten years, Congress has made no

change to the local portion of the budget submitted by the District for its review.[22]  And the

District's fiscal stewardship has been recognized by financial markets in the form of higher bond

ratings and lower interest rates on borrowing.[23]  Times have changed since 1973, as

demonstrated by the popular will behind this amendment, which was adopted by a unanimous

Council, signed by the Mayor, ratified by 83% of voters, and passively approved by Congress.

All of this is consistent with Congress's original intent to establish an amendable Charter and to

grant the District home rule.

Thus, the Council's action in *amending* the Charter does nothing to undermine the

construction of Congress's *original* Charter and is consistent with Congress's decision to create

the Charter in the first instance.  Moreover, the Council interpreted Section 603(a) as a rule of

---

[21] *See* Letter from former Virginia Representative Thomas M. Davis III & former District Mayor Anthony A. Williams to Phil Mendelson, Chairman, Council of the District of Columbia (Sept. 24, 2013).

[22] *See* D.C. Council Committee of the Whole, Committee Report on Bill 19–993, Local Budget Autonomy Act of 2012, at 3 (Dec. 4, 2012).

[23] *See id.* at 4.

construction, *not* limitation, and "[t]he D.C. Council's interpretation of its responsibilities under the Home Rule Act is entitled to great deference" from reviewing courts. *Tenley & Cleveland Park Emergency Comm. v. D.C. Bd. of Zoning Adjustment*, 550 A.2d 331, 334 n.10 (D.C. 1988); *accord Decatur Liquors, Inc. v. District of Columbia*, 384 F. Supp. 2d 58, 63 (D.D.C. 2005) *rev'd on other grounds*, 478 F.3d 360 (D.C. Cir. 2007).

The Council's reading of Section 603(a) is also the best reading of that provision; indeed, when the D.C. Court of Appeals enumerated the limitations referenced by Section 303 in *Jackson*, it did *not* identify Section 603(a). 999 A.2d at 95 n.5 (citing D.C. Code §§ 1–206.02(a)(1)–(8), 1–206.03(c)).

Overall, Sections 601, 602, and 603 support the conclusion that the District was permitted to alter the local budget process both because such an amendment was not expressly prohibited (while other specific taxing, budgeting, and spending actions were) and because no general limitation contained within those Sections applies.[24]

---

[24] Against this, the Attorney General suggests that Congress, by passing appropriations legislation in 2014 that contemplated future affirmative appropriations by Congress, spoke in favor of his position. *See* Op. D.C. Att'y Gen., *supra*, at 8 n.14. This is not a fair characterization. *First*, Congress did expressly speak to the validity of the Act, but not in favor of the Attorney General's position; Congress approved the Act when it declined to override the amendment during the 35-day review period. *Second*, there is no reason to believe that the opinion of Congress in 2014 is probative of Congress's legislative intent in 1973, when it enacted the Home Rule Act, and certainly no reason to believe it is more probative than the text of the Act itself. *See, e.g.*, *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 355 (1998) ("We have often observed, however, that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'") (quoting *United States v. Phila. Nat'l Bank,* 374 U.S. 321, 348–49 (1963)). Further, even if the opinion of Congress in *2014* were probative of Congress's legislative intent in *1973*, the Attorney General's evidence of congressional intent is inapposite. The Attorney General points to the appropriations bill for Fiscal Year 2014 passed belatedly in January 2014, after the Budget Autonomy Act took effect. *See* Consolidated Appropriations Act of 2014, Pub. L. No. 113–76, Div. E, tit. IV, 128 Stat. 5, 207. But the Council made its budget request for Fiscal Year 2014 *before* the Budget Autonomy Act became effective, so the new procedures would not have been triggered. Congress also provided emergency budget autonomy in the event of a federal government shutdown, which the Attorney

## II.   A DECLARATORY JUDGMENT OR, IN THE ALTERNATIVE, A PERMANENT INJUNCTION IS WARRANTED.

The Budget Autonomy Act is valid and binding on District officials.  That showing alone is sufficient to warrant entry of a declaratory judgment.  Given the ramifications for the District, there can be no dispute that this case presents a substantial controversy, that the parties have adverse legal positions, or that the parties' positions are sufficiently entrenched to warrant resolution at this time.  *See Davis*, 442 F.2d at 1214.

A declaratory judgment would render a permanent injunction unnecessary because the Council has every reason to believe that the Defendants would honor this Court's judgment.  *See Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) ("we may assume it is substantially likely that . . . executive and congressional officials would abide by an authoritative interpretation . . . by the District Court, even though they would not be directly bound by such a determination").  But if the Court were to deem declaratory relief unavailable or insufficient—or if Defendants will not commit to complying with this Court's judgment pending appeal—the remaining requirements for permanent injunctive relief are satisfied on the undisputed facts of this case.

### A.   The Council Faces Irreparable Injury.

The Council has at least five interests that will be irretrievably undermined if the Mayor and CFO are permitted to disregard the Budget Autonomy Act during this budget cycle.  *First*, the Mayor's promise to transmit to the President legislation that has not secured final approval from the Council deprives the Council of its authority to legislate for the District.  *Second*, Defendants' conduct will deprive the Council of the meaning and efficacy of its votes.  *Third*,

---

General interprets as an indication that Congress viewed a separate appropriation as necessary.  But by January 2014, the Attorney General had already expressed his view that the Budget Autonomy Act was invalid and should not be enforced.  Congress's appropriations rider resolved the uncertainty that was interjected into the situation by the Attorney General's own declaration.

their conduct will deprive the Council of information it requires. *Fourth*, their conduct will impede the orderly administration of the District government. *Fifth*, their conduct will deprive the Council itself of the funding it needs to operate.

**1.** In his April 11 letter, the Mayor announced that he would "transmit to the Congress and [the] President the full District budget as it stands after the 56th day following transmission to [the Council] of the budget, whether or not the Council has taken a second vote." Gray Letter, *supra*, at 2. The Mayor transmitted the budget draft on April 3, so the Mayor's letter means that he will send a budget to the President on May 29, 2014.

Pursuant to the Budget Autonomy Act, the Council has 70 days in which to enact a budget. The first reading is set to take place on May 28, 2014, and final passage cannot occur until 13 days have intervened. Accordingly, the Mayor is vowing to send *unenacted* legislation to the President, as if that speaks for the District.

Under the Charter, "the legislative power granted to the District . . . is vested in and shall be exercised by the Council" (Home Rule Act § 404(a), D.C. Code § 1–204.04(a)), and the Council may enact a budget only after two readings (D.C. Code § 1–204.46). The Mayor's plan to circumvent the Charter and to transmit legislation that has not reached final approval will imminently deprive the Council of its exclusive legislative authority.

**2.** The Council sustains irreparable injury through Defendants' announced refusal to implement the Council's legislation. In *Coleman v. Miller*, 307 U.S. 433 (1939), the U.S. Supreme Court held that Kansas state legislators who had voted against ratifying an amendment to the federal Constitution had suffered an injury—and therefore had standing—as to the Lieutenant Governor's effort to break a tie vote, where the senators' votes against ratification "[had] been overridden and virtually held for naught although . . . their votes would have been

sufficient to defeat ratification." *Id.* at 438.  The Court later reaffirmed that "legislators whose

votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to

sue if that legislative action goes into effect (or does not go into effect), on the ground that their

votes have been completely nullified." *Raines v. Byrd*, 521 U.S. 811, 823 (1997).

This Court has found that members of the Council have "a plain, direct and adequate

interest in maintaining the effectiveness of their votes." *Chavous v. D.C. Fin. Responsibility &*

*Mgmt. Assistance Auth.*, 154 F. Supp. 2d 40, 46 (D.D.C. 2001) (quoting *Raines*, 521 U.S. at 821–

22)); *see also Banner v. United States*, 303 F. Supp. 2d 1 (D.D.C. 2004) (finding that the Council

was injured by Congress's refusal to permit it to enact certain legislation), *aff'd*, 428 F.3d 303,

(D.C. Cir. 2005).  Applying the same standard, Superior Court found injury under the *Coleman*

standard in *Cropp v. Williams*, 2003 WL 21904173, at *1 (D.C. Super. Ct. 2003).  In that case,

the court found that all members of the Council were injured by the mayor's "announced refusal

to execute legislation duly enacted by the Council."  Citing *Chavous*, *Cropp* found that injury

exists where (1) a legislator votes to enact a specific legislative act; (2) there are sufficient votes

to enact that act; (3) the legislative act is "completely nullified," "overridden," and "deprived of

all validity"; and (4) the legislator lacks a legislative remedy.  *Id.* at *3 (quoting *Raines*, 521 U.S.

at 823).

The Council satisfies the *Coleman* standard with respect to both the Budget Autonomy

Act and the Fiscal Year 2015 budget.  The Council unanimously approved the Budget Autonomy

Act and is required by law to enact the Fiscal Year 2015 budget.  Defendants have announced

that they will treat the Budget Autonomy Act as a "legal nullity" (Gray Letter, *supra*, at 2; *see*

*also* DeWitt Letter, *supra*, at 1), and will not honor the Fiscal Year 2015 budget enacted

thereunder.  The Council does not have further legislative recourse beyond the Charter

amendment it has already implemented.

Absent judicial intervention, the Council's injury is irreparable. *See District of Columbia v. Greene*, 806 A.2d 216, 223 (D.C. 2002) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)).

**3.**     The Supreme Court has held that the withholding of information is a cognizable injury. *FEC v. Akins*, 524 U.S. 11 (1998).  Here, the Council is supposed to collaborate with the Mayor and the CFO in passing the budget. *See, e.g.*, D.C. Code § 1–204.24d(2) (requiring CFO to prepare a five-year financial plan to accompany final budget); *id.* § 1–204.24d(25) (requiring CFO to prepare fiscal impact statement for enacted legislation); *id.* § 1–204.24d(26) (specifying that CFO and Mayor share responsibility for formulating budget materials for submission to Council).  Defendants, however, have vowed to treat the Budget Autonomy Act as a nullity and are determined to thwart the Council's efforts to implement the law.  Defendants' unwillingness to participate in the budget process necessarily will deprive the Council of information, and that deprivation of information is an irreparable injury. *See U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998).

**4.**     Given that the Budget Autonomy Act is binding and that the Council intends to treat it as such, Defendants' announced refusal to honor the Act would prove highly disruptive to government services absent judicial intervention.  Defendants' letters of April 11, 2014, appear to recognize that this is so, even though their preferred recourse appears to be that the Council join them in refusing to follow a validly enacted law, which was signed by the Mayor, ratified by an overwhelming number of voters, and reviewed by Congress.  Gray Letter, *supra*, at 3; DeWitt Letter, *supra*, at 2.  Rather than disregard the law, the Council sees judicial intervention as

necessary to avoid the disruption that will be caused by Defendants' refusal to honor the Act.

The D.C. Court of Appeals has found irreparable injury in a teachers' strike set to cause "major chaos in the school system" (*Feaster v. Vance*, 832 A.2d 1277, 1288 (D.C. 2003)) and in the "unnecessary expenditure of public moneys that will not be recoverable" (*Greene*, 806 A.2d at 223). Both concerns are implicated here. For the local government to function, the legislative and executive branches must agree on the process for obligating and expending funds. As things currently stand, the Council is obligated by statute to enact a budget for Fiscal Year 2015, and Defendants intend not to honor that budget. Judicial intervention is required to avoid that injury. Moreover, Defendants' announced refusal to implement the Council's budget will cause unnecessary governmental expenditures. Just as the uncertainty in Congress's approach to the District's budget has caused the District (and the Council in particular) to incur costs for planning and mediating additional risks, if the budget process were not resolved in a timely fashion, the Council would experience additional costs that could not be redressed through litigation.

**5.**      Finally, the Council relies upon the annual budgeting process to provide its own budget. Defendants' refusal to enforce the Council's budget therefore means that the Council will lose its own funding. The unwarranted deprivation of those funds would be irreparable.

**B.**      <u>**Aside From a Declaratory Judgment, Other Remedies Are Inadequate.**</u>

As indicated above, the Council respectfully submits that a declaratory judgment without coercive process would be sufficient to align Defendants' conduct with the Budget Autonomy Act (at least after the appellate process is exhausted). If, however, a declaratory judgment were unavailable, injunctive relief would be necessary because there would be no adequate alternative remedy at law. Plainly, this is not a case in which money damages would suffice to remedy the Council's numerous injuries; only specific performance of Defendants' statutory obligations

would be sufficient.

### C.      The Balance of Harms Weighs in Favor of Granting the Injunction.

The balance of harms strongly favors entry of injunctive relief.  Indeed, the balance in this case is entirely one-sided.  As detailed above, the Defendants' refusal to enforce the law will cause a variety of severe and irreparable harms to the Council and the District at large.  In contrast, Defendants would not experience any harm by complying with their statutory duties.

### D.      The Public Interest Would be Served By an Injunction Compelling Defendants to Comply With the Budget Autonomy Act.

Finally, injunctive relief is warranted because the public interest would not be disserved by a permanent injunction.

As a general rule, "it is clearly in the public interest to ensure that governmental agencies . . . fully comply with the law." *Pearson v. Shalala*, 130 F. Supp. 2d 105, 119 (D.D.C. 2001); *see also Whitaker v. Thompson*, 248 F. Supp. 2d 1, 16 (D.D.C. 2002) (same).  In this particular case, the public interest in enforcing the Budget Autonomy Act is profound.  The Budget Autonomy Act rights a historical wrong.  It is fundamentally unfair that the residents of the Nation's capital can spend their own money only by submitting a request to a representative body in which they have been deprived of a voting representative.

As detailed above, the need for affirmative congressional approval of local expenditures exacts real costs on District residents.  Important initiatives are delayed, excessive rates of interest are charged, and local government is saddled with needless inefficiencies.  That the public interest lies with local budget autonomy is unmistakable—the District's elected representatives approved the Act unanimously, the Mayor signed it, and the voters ratified it by a margin of 83%–12%.

The public interest would not be disserved by compelling compliance with the Act.  As

demonstrated *supra*, the Budget Autonomy Act is valid.  Because the validity of the Act is a pure

question of law, the Council's showing of likelihood of success on the merits means that it is

further entitled to a declaratory judgment upholding the Act.  As such, an order vindicating the

votes of the Council, the Mayor, and the voters of the District would be entirely in the public

interest.  Indeed, both the Mayor and the CFO confirmed in their letters to the Council that their

concerns about the Budget Autonomy Act would vanish in the face of a judicial decision

upholding the Act.  *See* Gray Letter, *supra*, at 2; DeWitt Letter, *supra*, at 2.

## III.   IN THE ALTERNATIVE, REMAND IS WARRANTED.

Federal courts exercise limited subject-matter jurisdiction.  A case must be remanded

"[i]f at any time before final judgment it appears that the District Court lacks subject matter

jurisdiction."  28 U.S.C. § 1447(c); *see J.S.R. ex rel. Rojas Polanco v. Washington Hosp. Ctr.

Corp.*, 667 F. Supp. 2d 83, 85 (D.D.C. 2009).  The law presumes that "a cause lies outside [the

court's] limited jurisdiction" (*Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377

(1994)), particularly when a case is removed from a state court (*see, e.g.*, *Williams v. Howard

Univ.*, 984 F. Supp. 27, 29 (D.D.C. 1997)).  "The court must resolve any ambiguities concerning

the propriety of removal in favor of remand."  *US Airways Master Exec., Council, Air Line Pilots

Assoc., Int'l v. Am. W. Master Exec., Council, Air Line Pilots Assoc., Int'l*, 525 F. Supp. 2d 127,

132 (D.D.C. 2007).

Federal-question jurisdiction under 28 U.S.C. § 1331 is available only if (1) "the

plaintiff's right to relief necessarily depends on a question of federal law"; and (2) "the question

of federal law is substantial."  *US Airways*, 525 F. Supp. 2d at 132.  "[A] case may *not* be

removed to federal court on the basis of a federal defense, . . . even if the defense is anticipated

in the plaintiff's complaint, and even if both parties concede that the federal defense is the only

question truly at issue."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).

Federal courts lack jurisdiction over claims based upon "laws applicable exclusively to the District of Columbia." 28 U.S.C. § 1366.  Thus, "[w]hen Congress acts as the local legislature for the District of Columbia and enacts legislation applicable *only* to the District of Columbia and tailored to meet specifically local needs, its enactments should—absent evidence of contrary congressional intent—be treated as local law."  *District Properties Assocs. v. District of Columbia*, 743 F.2d 21, 27 (D.C. Cir. 1984). Because the Council's claim falls squarely within this category, the Motion to Remand should be granted.

### A.  The Council's Claim Arises Under District Law.

The Council's right to relief arises under local law.  The Council's Complaint asserts an entitlement to relief based on (1) the obligations of the Mayor and CFO set forth in the District Charter; and (2) the Budget Autonomy Act, a locally-enacted provision that amended the Charter.  Both are applicable exclusively to the District of Columbia, which means that federal-question jurisdiction is unavailable.

Four cases have evaluated whether claims arising under the Home Rule Act present questions suitable for federal jurisdiction—and on three of those occasions, subject-matter jurisdiction has been found to be lacking:

*First*, in *Decatur Liquors*, 478 F.3d 360, the D.C. Circuit found itself without subject-matter jurisdiction to review a challenge to the District's alcoholic beverage laws on the theory that the Council had failed to heed the requirement—introduced by Congress in the original Home Rule Act and located within the District's Charter—that all legislation must be read twice before it is passed (*see* D.C. Code § 1–204.12(a)).  The court reasoned that, "[a]lthough the Home Rule Act contained elements of federal law" "[l]aws passed by Congress that are applicable exclusively to the District of Columbia are not federal law for jurisdictional purposes, so any claims based on such laws are necessarily local." *Decatur Liquors,* 478 F.3d at 362–63.

*Second*, in *Dimond v. District of Columbia*, 792 F.2d 179 (D.C. Cir. 1986), the D.C. Circuit found no federal-question jurisdiction over plaintiffs' claim that the District's no-fault auto insurance law violated provisions of the Home Rule Act that prevent the Council from passing legislation relating to the D.C. or federal courts. *Id.* at 188 (referring to provisions now codified at D.C. Code § 1–206.02(a)(4), (8)). The court reasoned that, even though the Home Rule Act provisions relate to the functions of the federal courts, they "would appear to apply exclusively to the District of Columbia," which makes federal-question jurisdiction unavailable.

*Third*, in *Little v. Fenty*, 689 F. Supp. 2d 163 (D.D.C. 2010), plaintiffs filed suit alleging, *inter alia*, that the District's recognition of foreign same-sex marriages violated the Home Rule Act in light of the Defense of Marriage Act of 1996, because the Home Rule Act "prohibits the D.C. City Council from enacting any Act to amend or repeal any Act of Congress." Complaint at 6, *Little*, 689 F. Supp. 2d 163, ECF No. 1 (No. 1:09-cv-02308-CKK). Citing *Decatur*, the district court found that it had no federal-question jurisdiction over that claim.

*Fourth*, in *Thomas v. Barry*, 729 F.2d 1469 (D.C. Cir. 1984), the D.C. Circuit affirmed the exercise of jurisdiction over a claim arising under a provision of the Home Rule Act outside the District Charter directing the transfer of certain employees from the U.S. Department of Labor to the District Government. In that case, a class of those employees sought reinstatement of federal civil service benefits; in that context, the court found because the Home Rule Act "extends beyond the narrow sphere of the District of Columbia to various federal employees and to the actual structure of the Department of Labor," an exercise of federal-question jurisdiction was warranted. *Id.* at 1471. The court explained that the relevant portion of the Home Rule Act could not be considered local law because "[a] state or local statute cannot direct the federal government to affect transfers or to abolish positions altering its structure." *Id.*

These cases stand jointly for the proposition that the Home Rule Act supplies federal-question jurisdiction only in the narrow circumstance where Congress has undertaken direct regulation of the federal government beyond the scope of what a state or local government may do.  But even District requirements limiting the District's regulation of federal concerns (as in *Dimond* and *Little*) are local matters for purposes of federal-question jurisdiction.  That makes sense because, where the District is concerned, federal concerns typically are lurking in the background, even where they do not amount to a substantial federal question.  *See also Banner* 303 F. Supp. 2d at 18 & n.15.

Here, the Council's Complaint is like *Decatur Liquors*, *Dimond*, and *Little*, and unlike *Thomas*.  The Council's claim to relief is premised on the local obligations of local officials, as triggered by the budget process for local funds in the District Charter—the state constitution equivalent that became local law only after it was ratified by the people of the District.  The CFO's announced refusal to authorize payments or to certify contracts violates his obligations under D.C. Code § 1–204.24d—obligations that apply to him but to no federal officials.  *See* Dkt. No. 1–3, ¶ 26.  The Mayor's decision to direct subordinates not to comply with the Act violates his obligation to be "responsible for the proper execution of all laws relating to the District"—an obligation that applies to the District's Mayor alone.  D.C. Code § 1–204.22; *see* Dkt. No. 1–3, ¶ 20.  The Mayor's announced intent to preempt the Council's legislative process by treating the once-read budget as the final budget violates the two-reading requirement of D.C. Code § 1–204.12(a) and usurps the Council's exclusive authority to exercise the District's delegated powers of legislation (*id.* § 1–204.04(a)).

Even if the Council's claim were viewed as arising under the Budget Autonomy Act itself—as opposed to the specific Home Rule Act provisions that Defendants are violating as a

result of that Act and which serve as the basis of the Council's claim for relief—federal-question

jurisdiction would still be unavailable.  The Budget Autonomy Act is *local* legislation, and no

court has found local legislation to constitute the "law[] . . . of the United States."  28 U.S.C.

§ 1331; *cf. Key v. Doyle*, 434 U.S. 59, 61 (1977) ("a law applicable only in the District of

Columbia is not a 'statute of the United States' for purposes of 28 U.S.C. § 1257(1)"); *see also*

*District of Columbia v. All of Parcel of Land Identified in D.C. as 2626 Naylor Rd., S.E.,*

*Washington, D.C. 20020 Square/Lot 5633/0801*, 763 F. Supp. 2d 5, 8–9 (D.D.C. 2011)

(remanding an action where it was "clear from plaintiff's Complaint that [it was] asserting a right

created by District, not federal law" and where "District rather than federal law creates plaintiff's

cause of action.").

Defendants' notice of removal cites two cases in support of their claim to jurisdiction

based on the Home Rule Act.  *First*, they cite *Thomas* for the proposition that "the D.C. Circuit

long ago ruled that the Home Rule Act is a 'hybrid statute' that impacts both the local and

federal government, sufficient to support federal-question jurisdiction."  Dkt. No. 1, at 2 (quoting

*Thomas*, 729 F.2d at 1471).  But *Decatur Liquors*, *Dimond*, and *Little* plainly belie the assertion

that *any* claim premised on the Home Rule Act presents a federal question and, indeed, as

explained *supra*, those cases collectively support the conclusion that a substantial federal

question is not presented in this case.  *Second*, they cite *Bliley v. Kelly*, 23 F.3d 507 (D.C. Cir.

1994).  But that case is simply inapposite.  It does not address whether a claim arising under the

Home Rule Act can support federal-question jurisdiction; that case arose under a federal statute,

42 U.S.C. § 1983.

**B.**      **The Anti-Deficiency Act and Budget and Accounting Act Are Beyond the**
            **Scope of the Council's Well-Pleaded Complaint.**

In the alternative, Defendants contend that the Anti-Deficiency Act and the Budget and

Accounting Act warrant this Court's invocation of federal-question jurisdiction.  But those statutes are not the basis for the *Council's* claim; they are, rather, defenses that *Defendants* wish to interpose.  Indeed, it is the position of the Council that the Budget Autonomy Act is consistent with the Anti-Deficiency Act and does not implicate the procedures required by the Budget and Accounting Act.  *See supra* at 14–27.  Potential defenses are irrelevant when evaluating the availability of federal-question jurisdiction.

On this score, Defendants' notice of removal is telling.  Although they contend that the *case* implicates the Anti-Deficiency Act and the Budget and Accounting Act, they identify only one paragraph in the Complaint (¶ 63), which does not mention those statutes.  The absence of those federal questions from "the face of the plaintiff's properly pleaded complaint" (*Caterpillar*, 482 U.S. at 392) confirms that there is no federal-question jurisdiction here.  *See generally* 13D WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 3566 (3d ed.).

Defendants principally rely on the Council's Motion for Preliminary Injunction, which addresses and rebuts Defendants' federal *defenses*, but that does not mean that those defenses are part of the Council's well-pleaded complaint.  The Complaint itself mentions neither the Anti-Deficiency Act nor the Budget and Accounting Act.  But even if it did, it would not matter: "Federal jurisdiction cannot be predicated on an actual or anticipated defense."  *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009).

## CONCLUSION

The Court should enter summary judgment in favor of the Council and award declaratory or injunctive relief.  In the alternative, the case should be remanded to Superior Court.

Dated: April 25, 2014

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP
MAYER BROWN LLP

By: */s/ Karen L. Dunn (with permission)*

   Karen L. Dunn
     D.C. Bar No. 1002520
   Alexander I. Platt
     D.D.C. Bar No. D00396
   BOIES, SCHILLER & FLEXNER, LLP
   5301 Wisconsin Avenue, NW
   Washington, D.C.  20015
   Telephone:  (202) 237-2727
   Facsimile:  (202) 237-6131
   Email:  KDunn@bsfllp.com

By:  */s/ Brian D. Netter*

   Brian D. Netter
     D.C. Bar No. 979362
   Breanne A. Gilpatrick
     D.C. Bar No. 1018094
   MAYER BROWN LLP
   1999 K Street, NW
   Washington, D.C.  20006-1101
   Telephone:  (202) 263-3000
   Facsimile:  (202) 263-3300
   Email:  bnetter@mayerbrown.com

*Attorneys for Plaintiff Council of the District of Columbia*