EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COUNCIL OF THE DISTRICT OF COLUMBIA,

                     Plaintiff,

  v.

VINCENT C. GRAY, *et al.*,

                    Defendants.

Civil Action No.1:14-cv-00655-EGS

## BRIEF OF *AMICI CURIAE* DISTRICT OF COLUMBIA
## CONCERNED LEGAL PROFESSIONALS IN SUPPORT OF
## PLAINTIFF COUNCIL OF DISTRICT OF COLUMBIA

*Amici curiae*, concerned legal professionals in the District of Columbia ("Concerned D.C.

Legal Professionals"), respectfully submit this brief in support of Plaintiff Council of the District

of Columbia.[1]

## I.     INTERESTS OF THE *AMICI CURIAE*

Concerned D.C. Legal Professionals have a keen interest in the governance and rights of

the residents of Washington, D.C., the place where they practice their professions, and where

---

[1] The views expressed are those of the Concerned D.C. Legal Professionals, not necessarily those of the District of Columbia Bar or of its Board of Governors, or those of the Washington Bar Association of the District of Columbia, or other organizations with which the *amici* may be affiliated. *Amici* include:

- Marc Fleischaker of Arent Fox LLP;
- Ronald C. Jessamy of Ronald C. Jessamy, PLLC;
- Carolyn B. Lamm of White & Case LLP;
- Charles A. Miller of Covington & Burling LLP;
- Paul M. Smith of Jenner & Block LLP;
- Daniel Solomon of the Naomi & Nehemiah Cohen Foundation; and
- Bruce V. Spiva of The Spiva Law Firm PLLC.

A listing of the *Amici*, along with brief in Support of Plaintiff Council of the District of Columbia biographies, are included in Concerned District of Columbia Legal Professionals' Motion for Leave to File Brief as *Amici Curiae*.

many of them, and many of their clients, live and call home.  They have assumed leadership

roles in initiatives to expand and enhance self-government for citizens of the District.

Accordingly, they have a unique interest in the right of the District's citizens to determine how

their local tax dollars are spent, as well as in the efficacy of legal processes that promote the

ability of District citizens to govern themselves.

Concerned D.C. Legal Professionals will not address the full merits of the dispute before

the Court.  Rather, this brief will provide an overview of the history leading to the Home Rule

Act and highlight the broad authority granted to the District of Columbia to establish and fund

local governmental activity, providing to the Court a contextual lens through which to view this

dispute.

## II.     THE DISTRICT OF COLUMBIA'S JOURNEY BACK TO HOME RULE

> [The Home Rule Act] will give the people of the District of
> Columbia the right to elect their own city officials and to govern
> themselves in local affairs . . . rights and privileges which have
> long been enjoyed by most of their countrymen.

> - President Richard Nixon

President Richard Nixon signed the Home Rule Act into law on December 24, 1973.  *See*

District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-

198, 87 Stat. 777 (*see* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 11717, 111 Stat. 251,

786).[2]  This was not District citizens' first taste of self-governance and the right to elect their

local leaders.  After enjoying self-rule for nearly three-quarters of a century,[3] Congress abolished

---

[2]  In 1997, Congress changed the title of this statute to "District of Columbia Home Rule Act."  It had traditionally been, and now typically is, called the "Home Rule Act."

[3]  *See* An Act to Incorporate Inhabitants of the City of Washington, in the District of Columbia, ch. 53, 2 Stat. 195 (approved May 3, 1802) (incorporating Washington, D.C., and establishing a 12-member council elected by District

(footnote cont.)

the District's locally-elected government in 1874; thereafter, three Presidentially-appointed Commissioners ruled the District for nearly a century.  *See* An Act Providing a Permanent Form of Government for the District of Columbia, 20 Stat. 102 (approved June 11, 1878) (repealed 1967).  As a result, the District's citizens have the unfortunate distinction of being "the only American citizens who have had the right of self-government taken away from them by the Congress."  *See* 2 Staff of H. Comm. on the District of Columbia, 93d Cong., 1st Sess., Home Rule for the District of Columbia:  Background and Legislative History 1206 ("Home Rule History") (remarks of Representative Diggs).

While the disenfranchisement of the District's citizens in 1874 was ostensibly a response to financial mismanagement, District residents publicly recognized it as an occasion to limit the influence of African-American voters within Washington, D.C.'s local government.  *See, e.g.*, John Henderson, *Why Home Rule Was Taken from D.C.*, The Wash. Star, Nov. 22, 1973 § G, at 2.  This disenfranchisement continued for nearly a century despite regular calls to reinstate self-rule.  Similar to the fate of other voting rights and civil rights legislation, District home rule fell victim to the post-Reconstruction legislative paralysis that gripped Congress on these subjects.

The end of World War II brought with it a revitalized Civil Rights Movement, and denying the citizens of the District the basic right of self-governance became increasingly untenable.  Indeed, every president beginning with President Truman called for local self-government for District residents.  In 1949, in support of "a bill to give home rule to the people of the District of Columbia," President Truman wrote that "[t]he people of the District of

(footnote cont. from previous page)
residents and an appointed mayor).  Congress revised the form of elected government for the District several times over the next seven decades, but it included an elected government throughout that time.

Columbia should not be placed in a different status from that of the people of all other American cities and almost all democratic capitals of the world insofar as local self-government is concerned. . . . We should take adequate steps to assure that citizens of the United States are not denied their franchise merely because they reside at the Nation's Capital." *See* Letter from President Truman to the Speaker of the House (July 25, 1949).

The Senate passed bills for District self-government in the 81st (1949-1951), 82nd (1951-1953), 84th (1955-1957), and 85th (1957-1959) Congresses, but the bills did not pass the House of Representatives where the racial politics of the 1950s continued to play out. *See* Home Rule History at 1064-78 (Congressional Action on District of Columbia Home Rule, 1947-1973—A Descriptive Survey). The Civil Rights Movement and ferment in the 1960s ushered in an era of change, and a recognition that the lack of voting rights and political autonomy in the District of Columbia was no longer acceptable in the world's oldest democracy.

In 1967, President Lyndon B. Johnson took the first major step towards creating a District government more responsive to its citizens by presenting to Congress a plan to reorganize the District's government.  The three Presidentially-appointed Commissioners who had ruled the District since 1874 were replaced by a nine-member council, a single mayor-commissioner, and an assistant to the mayor-commissioner.  These positions were all appointed by the President, but the reorganization recognized the need, and provided the framework, for a new government in the District.  *See* Reorganization Plan No. 3 of 1967, 81 Stat. 948 (1967).

In 1971, Congress established two courts, the Superior Court and the District of Columbia Court of Appeals, to assume responsibility for local matters, taking away the jurisdiction of federal courts to hear cases of distinct local interest.  The establishment of the

District's courts gave the District local governance and autonomy over its court system similar to that enjoyed in all of the states in the U.S.  The progress underway throughout the country on civil and voting rights, the reorganization of the District government, and the restructuring of the D.C. court system signaled a new day for the consideration of D.C. self-governance, free from the prejudice that previously had characterized it.

Change was in the offing.  A bi-partisan consensus was forming in Congress.  The country could no longer turn a blind eye to the injustice of denying the citizens of the District the right to self-governance enjoyed by all other citizens.  As then-Senator Hubert H. Humphrey, a hero to the Civil Rights Movement, argued in support of "Home Rule" for the District: "[n]owhere in America should the basic principle of democracy be more firmly established than in the Nation's Capital."  *See* Staff of H. Comm. on the District of Columbia, 93d Cong., 2d Sess., Home Rule for the District of Columbia: Background and Legislative History of H.R. 9056, H.R. 9682, and Related Bills Ch. 3, at 2803.  Notwithstanding our country's ideals, for more than 90 years, from 1874 until the Home Rule Act, that basic principle was missing.  As Senator Humphrey emphasized, "[b]y some cruel irony, a nation founded as a haven from tyranny and oppression denie[d] to the citizens of the Nation's Capital the basic rights of democracy." *Id.*

By the early 1970s, that historical anomaly could not be explained away and its consequences ignored.  Congress and the President were primed to act—and they did.  The incremental steps taken by President Johnson were replaced by a devolution of power to the citizens of the District almost as complete as its name suggests, the Home Rule Act.

### III.    THE HOME RULE ACT GRANTS D.C. RESIDENTS THE RIGHT TO SELF-GOVERNANCE

Against this background, in 1973, Congress enacted the "Home Rule Act" to "grant to the inhabitants of the District of Columbia <u>powers of local self-government</u>; modernize, reorganize, and otherwise improve the governmental structure of the District of Columbia; and, <u>to the greatest extent possible</u>, consistent with the constitutional mandate, <u>relieve Congress of the burden of legislating upon essentially local District matters</u>."  *See* Home Rule Act §§ 102(a), 302, D.C. Code §§ 1-201.02(a), 1-203.02 (emphasis added).

After extended hearings, both houses of Congress passed the Home Rule Act in 1973. President Nixon echoed the law's purpose when he signed it into law on December 24, 1973:

> I first voted for home rule as a Member of the House of Representatives in 1948, and I have endorsed the enactment of home rule legislation during both my terms as President.
>
> One of the major goals of this Administration <u>is to place responsibility for local functions under local control and to provide local governments with the authority and resources they need to serve their communities effectively</u>.  The measure I sign today represents a significant step in achieving this goal in the city of Washington.  <u>It will give the people of the District of Columbia the right to elect their own city officials and to govern themselves in local affairs</u>. As the Nation approaches the 200th anniversary of its founding, it is particularly appropriate <u>to assure those persons who live in our Capital City rights and privileges which have long been enjoyed by most of their countrymen</u>.

President Nixon's Statement on Signing the District of Columbia Self-Government and Governmental Reorganization Act (Dec. 24, 1973) (emphasis added).

Its very name evidences its purpose and intent:  the District of Columbia Self-Government and Governmental Reorganization Act.  As the Supreme Court has said, "[a]mong other things which may be considered in determining the intent of the legislature is the title of

the act." *See Holy Trinity Church v. United States*, 143 U.S. 457, 462 (1892).  Thus, in enacting

the Home Rule Act, Congress sought to give the U.S. citizens living in the District the rights all

other American citizens enjoy:  the right to determine how they are governed and by whom.  The

natural extension of this authority is the ability to decide how local dollars are spent within the

District.  The Home Rule Act was not a clever ruse to give the appearance of self-governance

while withholding the essential prerogatives of self-government.

Essential to the Home Rule Act is the District's Home Rule Charter.  The Charter, which

is set forth in Title IV of the Home Rule Act, establishes the structure, responsibilities, and

authority of the District government.  *See* D.C. Code §§ 1-204.01 to 1-204.115.  "The Home

Rule Act and the District Charter [] serve as a constitution for the District."  *Jackson v. District*

*of Columbia Bd. of Elections & Ethics*  999 A.2d 89, 123 (D.C. 2010).  The Charter confers

broad authority upon the District to oversee its local affairs and established the District

government that we see today.

Before the Charter became the District's governing document, it had to be, by the

provisions of the Home Rule Act itself, accepted by a referendum passed by the citizens of the

District.  *See* Home Rule Act § 701, D.C. Code §1-207.01.  This step reinforced the basic tenet

of the Charter:  that is, self-government.  The Home Rule Act did not impose a particular form of

government on the District but left it to D.C. citizens to either accept or reject that which was

proposed by the Home Rule Act.  D.C. residents were required to ratify the Home Rule Act

through a referendum process within five months after December 24, 1973.  After more than 90

years without a say in how their leaders were chosen, this referendum process vested in District

residents the right to choose their form of government.  Through this referendum process in

1974, the District's residents accepted the authority that Congress specifically delegated to them. Congress also included in the Home Rule act a means by which District voters could amend the Charter, the District's constitutional document.[4]  Thus, District residents approved the Home Rule Act by referendum—and did so with the understanding that the referendum process provided a procedure for amending the Charter.  The referendum process is in keeping with the power given to the citizens of the states to amend their governing documents.

The Home Rule Act expressly and unambiguously sets out the procedure for amending the Charter.  The process grants to the District the essential means to control its own governance. *See* Home Rule Act § 303, D.C. Code § 1-203.03; *see also Jackson,* 999 A.2d at 100-01 ("[T]hrough section 303 of the Home Rule Act, Congress gave a broad grant of legislative power *to the Council . . . .*" (emphasis added)).  Under the three-step process in the Home Rule Act, after the Council passes a proposed Charter amendment, the Mayor signs it, and District voters ratify it, it is then submitted to Congress for a 35-day period  of *passive* review.  Unless Congress adopts a joint resolution disapproving the referendum during that 35-day review period and the President signs that resolution, the Charter amendment becomes law.  Thus, in enacting the Home Rule Act, Congress gave the District and its voters authority to amend its Charter, subject to certain express exceptions and always subject to Congressional disapproval.  As was the case here, if Congress does not disapprove the amending referendum passed by District voters, it becomes law.  In this regard, the Home Rule Act does not admit any doubt:  the power of District

---

[4] As passed in 1973, the Home Rule Act allowed District voters to amend the Charter by referendum, subject to a concurrent resolution by Congress approving that amendment.  In 1984, Congress amended the Home Rule Act to give District residents the full right to amend the Charter without requiring additional action by Congress.  Pub L. 98-473, § 131(b), 98 Stat. 1837 (Oct. 12, 1984).

citizens to amend the Charter can be withheld, or a Charter amendment reversed, only by a duly enacted act of Congress.  That did not happen here.

Aside from the Home Rule Act's plain language, its legislative history demonstrates Congress's intent to provide the District with this ability to amend the Charter.  When interpreting the Home Rule Act, courts must place a "central focus" on the "intent of Congress." *See Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections & Ethics*, 441 A.2d 889, 904 (D.C. 1981) (internal quotation marks omitted).  The original Senate version of the Home Rule bill that was sent to the House expressly prevented the Council from amending the Charter.  *See* S. 1435, 93d Cong., § 325 (d) (as passed by Senate, July 10, 1973) ("The Council shall have no authority to pass any act contrary to the provisions of this Act.").  However, after representatives of the House and Senate met in conference to resolve the differences between their respective versions of the bill, the Charter amendment process was made part of the Act.  *See* H.R. Rep. No. 93-703, at 12 (1973) (Conference Report) (including § 303).  The record is clear that Congress fully considered and intended for the Council and District voters to be able to amend their foundational governing documents—and must have expected that they would, on occasion, do so. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978) ("The pointed omission of the type of qualifying language previously included in . . . legislation reveals a conscious decision by Congress . . . .").

The right of the District's citizens to determine how their local tax dollars are spent is essential to their self-governance.  Historically, the ability of citizens to govern themselves has been inextricably tied to the ability to control the expenditure of local tax dollars.  To the Founders of our country meeting in Philadelphia, no grievance against the Crown resonated more

than withholding from the colonists the right to exercise control over how their money was spent. *See Declaration of the Causes and Necessity for Taking Up Arms* (1775) ("[Parliament] ha[s] undertaken to give and grant our money without our consent, though we have ever exercised an exclusive right to dispose of our own property.").  The text of the Home Rule Act leaves no question regarding its objective—that is, to vest in District residents the ability to expand and improve the extent of home rule it confers.  It enabled the District to accomplish this result by amending its Charter, allowing it to create a budget process that best serves the needs of the District while reserving to Congress the ability to change that process if national interests were implicated.  It sought the right balance between truly local and national interests.

The Home Rule Act manifests no intention or desire to continue to subordinate the District to Congress's preferences regarding how local revenue is spent.  The Home Rule Act should not be seen as a sleight of hand intended to give the illusion of self-governance while retaining for Congress the true incidents of power over the District and its budget.

## IV.   THE HOME RULE ACT AND THE DISTRICT OF COLUMBIA CHARTER SHOULD BE INTERPRETED CONSISTENT WITH THEIR PURPOSE TO EFFECT SELF-GOVERNANCE

*Amici curiae* believe that the Home Rule Act is clear that Congress delegated authority to the District and its citizens to amend the Charter.  To the extent that the Court considers the scope of the Council's and District voters' authority to amend the Charter, the Court should interpret the Home Rule Act and Charter in a manner consistent with their purpose—to provide self-governance for the District's citizens.  It is a basic tenet of statutory construction that "statutes must be construed in the light of their purpose."  *See Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940).  As stated in the Home Rule Act, its purpose is "to grant to the inhabitants of

the District of Columbia powers of local self-government . . . to the greatest extent possible [and to] relieve Congress of the burden of legislating upon essentially local District matters." *See* Home Rule Act §§ 102(a), 302, D.C. Code §§ 1-201.02(a), 1-203.02.

Consistent with these general purposes, the Budget Autonomy Act (BAA) does no more than grant District citizens the same power afforded to citizens and local governments across the country—to determine how their tax dollars are spent—and, in doing so, it clearly advances the purposes of the Home Rule Act. It relieves the District of the necessity of seeking Congressional approval over matters of which Congress itself sought to be relieved. Should Congress want to restore a review process over the District budget, the Home Rule Act itself provides the means. There is simply no reason to believe that Congress intended to implicitly withhold authority that it had expressly delegated to the citizens of the District.

No one disputes that D.C. citizens and the District's Council enacted the BAA through the referendum amendment process outlined in Section 303 of the Home Rule Act. *See* Home Rule Act § 303, D.C. Code § 1-203.03. The opposing side's argument appears to be that Congress intended the broad grant of authority to amend the Charter to be used only for less essential purposes. Because the Home Rule Act itself does not express such a sentiment, the argument assumes that Congress would never have given the District authority over its own budget. It is an argument that loses force the more one reviews the history of the Home Rule Act. Congress knew what it was doing, and its words well and fully express its intent.

After earlier versions of the same Home Rule bill did not include a power to amend the Charter, Congress expressly inserted such a power in the Home Rule Act as passed (and signed into law). The citizens of the District voted overwhelmingly to adopt the Home Rule Act and,

after more than 90 years of powerlessness, to accept the authority Congress imparted to them, but under the condition that there was a procedure for amending the Charter.  In granting this authority, Congress gave the power to amend the Charter to those people who live under it.  Now that the District's citizens have validly exercised the power granted to them, this Court should recognize and affirm their right to do so.  This promotes the rule of law by enforcing the procedure expressly authorized under the Home Rule Act and promotes the purposes of the Home Rule Act by bolstering the ability of the District's citizens to govern themselves with regard to local matters, and their local tax dollars.

## V.      CONCLUSION

The path to self-governance and home rule for the residents of the nation's capital has been long and arduous (and remains incomplete).  Its most recent phase culminated in the Home Rule Act which expressed the values and aspirations of many Presidents and a Congress that sought to correct a historical wrong.  The Home Rule Act and the Charter should be read broadly to grant the full rights of self-government to the District, consistent with the Constitution and the recognized national needs of the District as the seat of our central government.  No other purpose or limitations ought to be presumed.  Should the will of the citizens of the District be rejected, their will should be rejected in the manner prescribed in the Home Rule Act, by a duly enacted law.

The expressed intent of the citizens of the District should not be subordinated to the assumed will or concerns of some; but only as the Home Rule Act provides, to the expressed will of both Houses of Congress and the President of the United States.  No other resolution of this dispute fairly reflects, and serves, the history and the citizens of the District.

Dated:  May 2, 2014

Respectfully submitted,

/s/ Lorelie S. Masters


Lorelie S. Masters (D.C. Bar 358686)
Karl J. Sandstrom (D.C. Bar 346338)
PERKINS COIE LLP
700 Thirteenth Street, NW
Washington, DC  20005
202-654-6200
LMasters@perkinscoie.com
KSandstrom@perkinscoie.com

*Counsel to Amici Curiae, Concerned D.C. Legal Professionals*


Sabahat Chaudhary  (D.C. Bar 977121)
Jonathan L. Cloar (D.C. Bar 1018494)
PERKINS COIE LLP
700 Thirteenth Street, NW
Washington, DC  20005
202-654-6200

*Of Counsel*