## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**COUNCIL OF THE DISTRICT OF COLUMBIA,**

      **Plaintiff,**

  **v.**

**VINCENT C. GRAY, in his official capacity as Mayor of the District of Columbia,**

**and**

**JEFFREY S. DeWITT, in his official capacity as Chief Financial Officer for the District of Columbia,**

      **Defendants.**

**Civil Action No. 1:14-cv-00655-EGS**

## BRIEF FOR AMICI CURIAE DC APPLESEED CENTER FOR LAW & JUSTICE, DC VOTE,  D.C. FOR DEMOCRACY, DC FISCAL POLICY INSTITUTE, AND LEAGUE OF WOMEN VOTERS OF THE DISTRICT OF COLUMBIA IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## SOURCE OF AUTHORITY TO FILE AMICI CURIAE BRIEF

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, this Amici Curiae Brief is respectfully submitted in support of the Motion for Summary Judgment filed by Plaintiff Council of the District of Columbia ("Council"). The Plaintiff and the Defendants have consented to the submission of this Brief by DC Appleseed Center for Law and Justice ("DC Appleseed"), DC Vote, D.C. for Democracy, DC Fiscal Policy Institute, and League of Women Voters of the District of Columbia (together, "Amici").

## THE AMICI

DC Appleseed is a nonprofit organization dedicated to solving pressing public policy problems facing the District of Columbia ("District") area. DC Vote is a national organization dedicated to securing voting representation and full equality for the disenfranchised residents of the District. D.C. for Democracy is the District's largest unaligned progressive group of activists, community leaders, and everyday voters working for positive change in our local government and full citizenship rights through statehood for the people of Washington, D.C. The DC Fiscal Policy Institute conducts research and public education on budget and tax issues in the District, with a particular emphasis on issues that affect low- and moderate-income residents. The League of Women Voters of the District of Columbia is a nonpartisan political organization that encourages informed and active participation of citizens in government, whose goal is to influence public policy through education and advocacy.

## AMICI'S INTEREST

For far too long, District residents have been denied vital democratic rights that other residents of the United States enjoy. These include not just the lack of voting representation in Congress, but also the ability for the District's leaders to enact a local budget for the District

without congressional involvement.  Amici and others have long worked to remedy this injustice through litigation, public education, and pleas to Congress to enact legislation giving District residents greater rights of self-determination.  More recently, D.C. self-determination advocates have welcomed and supported a new strategy to advance that cause—through locally passed initiatives, including the 2013 Charter amendment referendum at issue in this case.

District voters overwhelmingly approved the 2013 Charter amendment—known as the Budget Autonomy Act—in a referendum on April 23, 2013.  The Budget Autonomy Act amended section 446 of the District's Charter.  Until passage of the amendment, section 446 provided that the District could not spend any of its funds—including those derived entirely from local tax revenue and fees—until Congress authorized the District to do so.  The linkage of the District's local budget process to Congress's annual appropriations process has vexed the District for decades, causing unnecessary costs and delays as the District was forced to wait for Congress to appropriate its local budget through the highly-politicized and dysfunctional congressional appropriations process.  The Budget Autonomy Act amended section 446 to authorize the District to appropriate its annual local budget without waiting for affirmative congressional action.  The amendment became binding law on July 25, 2013 upon expiration of the thirty-five day congressional review period that is applicable for all proposed amendments to the District's Charter.

However, the District's victory at the ballot box, and its success in having the amendment become law following the congressional review period, are now in peril because the Mayor and Chief Financial Officer ("CFO") have made clear their intention not to implement the law on the ground that the District's Attorney General has advised them that it is "patently illegal."  As explained in the Council's motion for summary judgment and addressed further in this Brief, the

Attorney General's position is not well-founded and should not be accepted by this Court.

For Amici, this case is about more than the Attorney General's opinion of the Budget Autonomy Act.  It is about the  rule of law itself.  And it is about the role of voters in making law.  Once the Council passed the Budget Autonomy Act, the people ratified it, and it became binding law pursuant to the congressional review process set out in the Home Rule Act, the District's executive branch was bound to implement it unless the Attorney General could establish that the law is "patently illegal."   This narrow exception to the requirement of enforcement is one that the Attorney General has not and cannot meet.  Moreover, because the Budget Autonomy Act became binding law pursuant to the review that Congress took through its constitutional authority under the District Clause, the Attorney General's refusal to implement the Act was itself unconstitutional.

Further, the Attorney General's position fails to accord the respect and weight due voters in this jurisdiction.  In fact, the right of voters to make or change law pursuant to established processes is basic to our democracy and was duly followed with regard to the Budget Autonomy Act.  As the Supreme Court recently made clear, "[o]ur constitutional system embraces … the right of citizens … through the political process … [to] act in concert to try to shape the course of their own times … to make freedom ever greater and more secure."  *Schuette v. Coalition to Defend Affirmative Action*, No. 12-682, 2014 WL 1577512, at \*15 (U.S. Apr. 22, 2014) (Kennedy, J.).  Rejecting the actions of citizens who have acted through the political process "disserves" these "First Amendment dynamics" and ignores the fundamental principle in our Constitution that "favors decisionmaking through the democratic process." *Id.* at \*30 (Breyer, J., concurring).  Because Defendants' decision not to implement the Budget Autonomy Act puts all of these fundamental principles at risk, Amici request that the Court grant the Council's motion

for summary judgment and order the Defendants to enforce the law.

In support of their request, Amici make three arguments below. First, Amici offer additional points beyond those made in the Council's motion that show that the Budget Autonomy Act is clearly valid. Second, Amici explain why the Defendants are required to enforce the Budget Autonomy Act as a matter of well-established law and that a narrow exception for refusing enforcement cannot be met in this case. Finally, Amici show that Defendants' refusal to enforce the Act contravenes Congress's decision not to veto the law during the congressional review period and would therefore violate the District Clause of the United States Constitution.

## ARGUMENT

**I.  The Attorney General's Opinion that the Budget Autonomy Act Violates the Anti-Deficiency Act Is Based on a Misreading of the Law and a Misunderstanding of its Purpose.**

In his April 8, 2014 opinion declaring the Budget Autonomy Act "null and void," the Attorney General opined that the Budget Autonomy Act is invalid because it violates the "congressional appropriations requirements established under Article 1, section 9, clause 7 of the Constitution [the Appropriations Clause]," including the Anti-Deficiency Act. *See* Pl. Mot. for Summ. J. on Remand, Ex. B, EDF No. 11-5 ("Op. D.C. Att'y Gen."). It appears that the Attorney General misunderstands the Appropriations Clause and the Anti-Deficiency Act[1] and their interplay with the Home Rule Act.[2]

### A.  The Budget Autonomy Act is consistent with the Anti-Deficiency Act.

Prior to enactment of the Home Rule Act, the Anti-Deficiency Act prohibited the District from spending funds without a congressional appropriation. The Home Rule Act contains three

---

[1] 31 U.S.C. § 1341, *et seq.*

[2] Home Rule Act, Pub. L. No. 93-198, 87 Stat. 777 § 102 (1973) (codified at D.C. Code § 1-201.02).

provisions relevant to the Anti-Deficiency Act's continued application to the District.  First, section 450 provided that the District's local funds (*e.g.*, those generated by local taxes and other local measures, and not from funds granted by Congress) would be maintained in the District's General Fund rather than in the U.S. Treasury where these funds had been held prior to the Home Rule Act.  Home Rule Act § 450, D.C. Code § 1-204.50.  Second, section 446 imposed specific anti-deficiency measures on the District that are similar, though unique, to the anti-deficiency requirements set forth in the federal Anti-Deficiency Act.  Prior to passage of the Budget Autonomy Act, section 446 provided that "no amount [of the District's budget] may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act."  Home Rule Act § 446, D.C. Code § 1-204.46 (1973).  Third, section 603(e) contains a rule of construction explaining that nothing in the Act "shall be construed" to affect the applicability of the federal Anti-Deficiency Act to the District.  Home Rule Act § 603(e), D.C. Code § 1-206.03(e).

As the Council explains in its motion for summary judgment, section 450's transfer of control over the District's local funds to the District was critical because the Appropriations Clause of the United States Constitution and its implementing statutes, including the Anti-Deficiency Act, are only concerned with the expenditure of funds "*drawn from the Treasury*." U.S. Const., art. I, § 9, cl. 7.  The Anti-Deficiency Act thus does not restrict the District from spending its own local funds since these funds are not "drawn from the Treasury."

The Council's interpretation of the application of the Anti-Deficiency Act to the District is further confirmed by a review of Congress's codification of the Anti-Deficiency Act in 1982 when Congress, for the first time, expressly included the "District of Columbia government" in

the Anti-Deficiency Act.[3]  As amended in 1982, the Anti-Deficiency Act provides: "An officer or employee of the United States Government or of the District of Columbia government may not … make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."  31 U.S.C. § 1341.

The legislative history of the 1982 codification makes clear that the inclusion of the "District of Columbia government" in the Anti-Deficiency Act was not meant "to be interpreted as construing the extent to which the District of Columbia Self-Government and Government Reorganizational Act (Pub. L. 93-198, 87 Stat. 774) [the Home Rule Act] supersedes the provisions codified in this title."  H.R. Rep. No. 97-651, at 25 (1982).  In other words, in making the Anti-Deficiency Act expressly applicable to the District, Congress expressly recognized that that Act might apply differently in the District, owing to the terms of the Home Rule Act.

In fact, it is section 446 of the Home Rule Act itself that provides the means for implementing budgetary control measures, such as anti-deficiency requirements, in the District. Section 446 added additional requirements that were not in the Anti-Deficiency Act. Specifically, the Anti-Deficiency Act and section 446 both establish the general rule that obligations or expenditures may not exceed the amount available in an appropriation or fund. Section 446 went further than the Anti-Deficiency Act by providing that the District: (1) may only expend or obligate funds that have been approved by an *Act of Congress*; and (2) can only obligate or expend these funds according to that Act.  Home Rule Act, Pub. L. No. 93-198, § 446, 87 Stat. 777 (codified as amended at D.C. Code § 1-204.46 (2013)).  The latter two

---

[3] The prior version of the Anti-Deficiency Act provided: "No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any purpose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law."  31 U.S.C. § 665 (1970).

requirements do not appear in the Anti-Deficiency Act.

This legislative history and construction of section 446 and the Anti-Deficiency Act, along with Congress's act of removing the District's local funds from the ambit of the Appropriations Clause, show that section 446 contains the relevant language prohibiting the District from spending its local funds without an appropriation.  *See United States v. Stewart*, 311 U.S. 60, 64 (1940) ("[A]cts in pari materia are to be taken together, as if they were one law." (citation omitted)); *cf. Great N. Ry. Co. v. United States*, 315 U.S. 262, 276-77 (1942) ("[S]ubsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject." (citations omitted)).  While section 446 provided that the appropriate legislative authority must come from a congressional appropriation, the Home Rule Act authorized the District to amend this section.  Home Rule Act § 303, D.C. Code § 1-203.03. With passage of the Budget Autonomy Act, the District used this authority to amend section 446 to grant itself the ability to spend its locally-derived revenues pursuant to a Council-enacted appropriation.

This interpretation of section 446 of the Home Rule Act and the Anti-Deficiency Act is buttressed by a plain reading of the version of the Anti-Deficiency Act that Congress codified in 1982.  Unlike earlier versions of the Anti-Deficiency Act,[4] the 1982 version does not specify that the appropriation authorizing expenditures must be one made by Congress.  Instead, the 1982 version simply provides that there must be "an appropriation or fund for the expenditure or obligation."  31 U.S.C. § 1341.  Thus, the plain text of the Anti-Deficiency Act shows that District officers or employees can spend local funds pursuant to an appropriation by the Council.

---

[4] *See, e.g.*, Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1214, 1257-58 ("No Department of the Government shall expend, in any one fiscal year, any sum in excess of appropriations made by Congress for that fiscal year, or involve the Government in any contract or obligation for the future payment of money in excess of such appropriation unless such contract or obligation is authorized by law.").

Further, the Budget Autonomy Act's amendment of section 446 is perfectly consistent with the basic purpose of the Anti-Deficiency Act, which is to ensure that government officials and employees obligate and expend public funds pursuant to appropriate legislative authorization.[5] Here, the District can only expend its local funds pursuant to a legislative authority, *i.e.*, a Council-enacted appropriation.

### B. Recent congressional actions confirm that the District can appropriate its own local funds without a congressional appropriation.

This interpretation of section 446 is also confirmed by two recent congressional acts. Specifically, in 2006 and 2009, Congress granted the District supplemental budget autonomy by authorizing the District to spend its excess local revenue without waiting for Congress to appropriate these funds.[6] Rather than appropriating the funds, Congress *authorized* the Council to "obligate and expend" excess revenue under certain circumstances in the 2006 and 2009 laws.[7] Such an "authorization" is distinct from an appropriation because "[t]he mere authorization of an appropriation does not authorize expenditures on the faith thereof or the making of contracts obligating the money authorized to be appropriated." GAO, *Principles of*

---

[5] According to the Government Accountability Office ("GAO"), the purpose of the Anti-Deficiency Act is "to provide effective control over the use of appropriations so as to prevent the incurring of obligations at a rate which will lead to deficiency (or supplemental) appropriations and to fix responsibility on those officials of Government who incur deficiencies or obligate appropriations without proper authorization or at an excessive rate." GAO, Principles of Federal Appropriations Law 6-34-35 (3d ed. Feb. 2006) (quoting Senate Committee on Government Operations, *Financial Management in the Federal Government*, S. Doc. No. 87-11, at 45-46 (1961)).

[6] In 2006, Congress gave the District this authority in the District of Columbia Omnibus Authorization Act, Pub. L. No. 109-356, § 101(a), 120 Stat. 2019, 2020 (2006) (codified at D.C. Code § 1-204.46a). That authority expired at the end of fiscal year 2007. In 2009, Congress again gave the District this authority in the Financial Services and General Government Appropriations Act, Pub. L. No. 111-8, § 817, 123 Stat. 524, 699 (codified at D.C. Code § 47-369.02). There is no expiration date on this authority.

[7] Specifically, the 2006 law permitted "the amount appropriated as District of Columbia funds under budget approved by Act of Congress as provided in such section [to] be increased." 2005 District of Columbia Omnibus Authorization Act, Pub. L. No. 109-356, § 101(a), 120 Stat. 2019, 2020 (2006) (codified at D.C. Code § 1-204.46a).

*Federal Appropriations Law*, 2-40 (3d ed. Jan. 2004) (citation omitted).

This authorization-appropriation distinction is important because it means that Congress has twice given the District the authority to expend its own revenues without Congress first appropriating those revenues to the District.   And Congress did so without providing an exception to the Anti-Deficiency Act's "appropriation or fund" requirement or conforming the District's new budget authority to the Anti-Deficiency Act.[8]   Indeed, the Anti-Deficiency Act did not even come up during the congressional debates on the 2006 and 2009 legislation. *See, e.g.*, 155 Cong. Rec. S2789-03 (2009), 2009 WL 562433; 152 Cong. Rec. H6973-01 (2006), 2006 WL 2728173; 151 Cong. Rec. H11588-01 (2005), 2005 WL 3434210.

The only way to harmonize the 2006 and 2009 legislation with the Anti-Deficiency Act is to read these acts as authorizing *District* expenditures of local funds pursuant to a *District* appropriation or fund.   Stated differently, unless the 2006 and 2009 acts are to be rendered null and void by the Anti-Deficiency Act, which Congress clearly did not intend, Congress must have contemplated that the Anti-Deficiency Act's "appropriation or fund" requirement could be met through a District-created "appropriation or fund."

The 2006 and 2009 congressional acts demonstrate that the District can indeed obligate and spend its local revenue without congressional appropriation, and do so without violating the Anti-Deficiency Act.   Like the 2006 and 2009 laws, the Budget Autonomy Act authorizes the Council to obligate and expend local revenue without a prior congressional appropriation.   If the Budget Autonomy Act violates the Anti-Deficiency Act, the 2006 and 2009 laws also violate the Anti-Deficiency Act.   This outcome would ignore three basic canons of statutory construction:

---

[8] *See* 31 U.S.C. § 1341 (prohibiting District of Columbia officers or employees from making or authorizing "an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation").

(1) Congress is presumed to have been aware of the Anti-Deficiency Act when it adopted these laws;[9] (2) since Congress knew how to require a *congressional* appropriation, as evidenced by that requirement appearing in section 446, a similar requirement should not be read into the Anti-Deficiency Act where it does not appear;[10] and (3) Congress cannot be presumed to have enacted nullities in 2006 and 2009.[11]

## II.    Defendants Cannot Establish that There Is A Basis for Them Not to Enforce the Budget Autonomy Act.

Rather than initiating judicial review of the Budget Autonomy Act, the Mayor and CFO decided unilaterally to nullify the Budget Autonomy Act by refusing to implement it, thus necessitating this suit.   Governing case law and the structure and duties of the branches of government in the District require that the executive branch enforce duly enacted laws. Nonetheless, in refusing to implement the Budget Autonomy Act, the Mayor and CFO relied on a narrow exception to the general rule that officials must uphold and implement enacted  laws. The Defendants' refusal to effectuate the Budget Autonomy Act is premised on an opinion of the District's Attorney General that the Act is "patently illegal."   As shown above and in the Council's motion for summary judgment, the Mayor and CFO cannot demonstrate that the Budget Autonomy Act is invalid,  much less excuse their non-enforcement on the ground that the Act is "patently illegal."

---

[9] *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").

[10] *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations omitted)).

[11] *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))).

**A. Executive branch officers have no authority to unilaterally refuse to enforce a law that was duly enacted by the legislative branch.**

It is a basic tenet of American jurisprudence that executive branch officers are generally obligated to enforce a law that is duly enacted until the judiciary declares it invalid.  *See, e.g.*, 16 C.J.S. Const. Law § 365 ("[E]xecutive officers have no power to declare a statute or ordinance unconstitutional or to disregard the terms of the statute in the absence of a judicial determination that it is unconstitutional, based solely upon the official's opinion that the governing statute is unconstitutional.").  Courts in this circuit and elsewhere have repeatedly affirmed this principle of law.  *See, e.g., Panitz v. District of Columbia*, 112 F.2d 39, 41-42 (D.C. Cir. 1940) (stating that "consideration for the orderly, efficient functioning of the process of government …makes it impossible to recognize in administrative officers any inherent power to nullify legislative enactments because of personal belief that they contravene the constitution"); *National Revenue Corp. v. Violet*, 807 F.2d 285, 288 (1st Cir. 1986) (voiding a state court's judgment declaring a state statute unconstitutional on the basis of the State Attorney General's position that the statute was unconstitutional, stating that "[f]or an attorney general to stipulate that an act of the legislature is unconstitutional is a clear confusion of the three branches of government; it is the judicial branch, not the executive, that may reject legislation");  *People ex rel. Manville v. Leddy*, 123 P.2d 824, 825 (Colo. 1912) ("Every enrolled bill, signed by the proper officers and filed with the Secretary of State, however repugnant to the Constitution, has the appearance, semblance, and force of law, [and] the general rule is that public officials shall obey its terms until someone, whose rights it invades, complains, and calls in the aid of the judicial power to pronounce it void as to him, his property, or his rights.").

The Supreme Court of California's 2004 opinion in *Lockyer v. City of San Francisco*, 95 P.3d 459 (Cal. 2004), is particularly instructive with regard to this principle.  In *Lockyer*, the

court reviewed San Francisco public executive officials' decision to disregard California's ban on same-sex marriage and register marriages of same-sex couples based on the officials' opinion that the state's ban on same-sex marriage was unconstitutional.  In a thorough opinion exploring the historical, legal, and policy reasons behind the rule that an executive official cannot unilaterally nullify a law based on his or her personal belief that it is unconstitutional, the court declared the officials' actions *ultra vires* and issued writs of mandamus directing the officials to cease issuing marriage licenses for same-sex couples.  *Id.* at 472.[12]

To determine whether the officials had exceeded their authority, the court first had to determine the scope of the pubic officials' authority.  *Id.* at 475-76.  According to the court, this analysis begins and ends with the text of the statute that the officials are required to administer.  *Id.* at 476.  There is no "implied or inherent authority to refuse to follow an applicable statute whenever the official personally believes the statute to be unconstitutional."  *Id.*  The court's holding was rooted in a "classic understanding of the separation of powers doctrine—that the legislative power is the power to enact statutes, the executive power is the power to execute or enforce statutes, and the judicial power is the power to interpret statutes and to determine their constitutionality"—as well as a fundamental tenet of our political system, that our nation is "'a government of laws, and not of men.'"  *Id.* at 463 (quoting 4 Works of John Adams 6 (Charles Francis Adams ed. 1851)).

The basic principle espoused in *Lockyer* and other cases—that executive branch officers must enforce the law—applies with equal force in the District. The District's Charter itself supports the basic premise that District executive branch officials must implement the law.  The

---

[12] In addition, the court declined the officials' invitation to undertake a complete de novo analysis of the merits of the underlying issue—the constitutionality of California's then-ban on same-sex marriage—because it was irrelevant to the court's determination of whether the officials were obligated to comply with the statute.  *Id.*

Charter incorporates the "familiar tripartite structure of government" where the legislative branch passes laws, the executive branch carries them out, and the judicial branch decides their constitutionality. *Wilson v. Kelly*, 615 A.2d 229, 231 (D.C. 1992); *see also* D.C. Code § 1-204.22 ("The Mayor shall be responsible for the proper *execution* of all laws relating to the District." (emphasis added)). Further, the District's Code expressly acknowledges that the District government "recognizes the principle of separation of powers in the structure of the District of Columbia government." D.C. Code § 1-301.44(b).

This duty of the District's executive branch officials to enforce duly enacted statutes is further confirmed by a review of the statutes that delineate the Mayor's, CFO's, and Attorney General's authority to review the legality of laws passed by the Council. As the California Supreme Court explained in *Lockyer*, the scope of executive branch officials' authority is derived from the statute that grants them authority to act, and they enjoy no implied or inherent authority to refuse to follow an applicable statute notwithstanding their personal views regarding a statute's constitutionality. *Lockyer*, 95 P.3d at 476.

Neither the Mayor nor the CFO has the statutory authority to refuse to implement laws related to the District's budget process. The Mayor's authority with respect to the budget process is set forth in various provisions in D.C. Code §§ 1-204.41 to 1-204.53. Among other things, the Mayor is authorized to submit proposed annual budgets to the Council and proposed supplemental or deficiency budget requests (D.C. Code § 1-204.42); submit the federal portion of the budget passed by the Council to the President (D.C. Code § 1-204.46); and implement appropriate procedures to insure that budget, accounting, and personnel control systems and structures are synchronized for budgeting and control purposes on a continuing basis (D.C. Code § 1-204.47). The Mayor is not authorized to determine whether a budget enacted by the Council

violates the Constitution, the Anti-Deficiency Act, or any other law.

The CFO's authority with respect to the budget process is set forth in D.C. Code § 1-204.24d.  In relevant part, D.C. Code § 1-204.24d directs the CFO to "[s]upervis[e] and assum[e] responsibility for financial transactions to … ensure that appropriations are not exceeded" and to "[a]pportion[] the total of all appropriations and funds made available during the year for obligation so as to prevent obligation or expenditure in a manner which would result in a deficiency or a need for supplemental appropriations during the year…"  D.C. Code § 1-204.24d(6), (13).  Section 1-204.24d does not confer on the CFO the authority to determine whether the underlying appropriation violates the Constitution, the Anti-Deficiency Act, the Home Rule Act, or any other law.

Here, the Budget Autonomy Act was duly enacted in the District.  The Act was approved by both the Council and the Mayor.  It was overwhelmingly approved by District voters in a referendum on April 23, 2013.  And it became binding law on July 25, 2013 upon expiration of the thirty-five day congressional review period.  Defendants, as executive branch officials of the District, are bound to implement the Act.

**B. Defendants cannot rely on an exception to the rule of law that they must   enforce a duly enacted statute.**

In *Lockyer*, *supra*, the California Supreme Court noted that there are some circumstances when an executive official may decline to enforce a law.  95 P.3d at 487.  One example is when the "invalidity of the statute is so patent or clearly established that no reasonable official could believe the statute is constitutional."  *Id.*[13]  As an example of a patently illegal law, the court

---

[13] Without undertaking an in-depth analysis of the merits of the statute at issue, the *Lockyer* court noted that the underlying law at issue—California's ban on same-sex marriage—was not patently illegal because there was no California case law on point and there were sharp divisions in out-of-state decisions that considered similar constitutional challenges.  *Id.*

cited a hypothetical state law requiring segregated schools. *Id.*[14]   As further explained in this Brief and in the Council's motion for summary judgment, the Budget Autonomy Act is not patently illegal (and, in fact, is clearly within the Council's authority), and accordingly does not fit within the narrow exception to general enforcement.[15]

In his April 8, 2014 opinion letter to the Mayor, the Attorney General declared that the Budget Autonomy Act is "patently illegal." *See,* Op. D.C. Att'y Gen. at 6 ("Despite the Act's

---

[14] During the Board of Elections' hearing on the Budget Autonomy Act in January 2013, the Attorney General cited racially-restrictive covenant laws as an example of a patently illegal law that the Board could decline to place on the ballot and stated that the Budget Autonomy Act rose to this level of patent illegality. *Board of Elections Regular Board Meeting* 113-15 (Jan. 7, 2013) (statement of Irvin Nathan, Attorney General). The Attorney General's position was meritless, and the Board rejected it. *See In re Local Budget Autonomy Emergency Amendment Act of 2012,* No. 13-01; *see also Board of Elections Regular Board Meeting* 132–33 (statement of Deborah Nichols, Chair, D.C. Bd. of Elections) ("And the case, for me, really kind of does not apply to this situation. I don't think it rise – I don't think we're talking about racially-restrictive legislation here as opposed to trying to give the city the right to appropriate its own [money].").

[15] Some courts have also recognized an exception to the general rule for instances where officials will incur personal liability for the expenditure of funds in accordance with an expenditure. *See Lockyer,* 95 P.3d at 483. This exception does not apply here because there is no legitimate risk that District officials will incur personal liability for disbursing funds pursuant to the Budget Autonomy Act.

Nor is there merit to the Attorney General's contention that implementation of the Budget Autonomy Act will expose District officials to criminal prosecution under the Anti-Deficiency Act. The criminal provisions of the Anti-Deficiency Act are only applicable for "knowing[] and willful[]" violations of the Act, 31 U.S.C. § 1350, and to establish a "knowing[] and willful[]" violation, the government must prove that that a defendant acted in bad faith and did not hold a reasonable belief that their conduct was legal—a standard that clearly cannot be met here. *See, e.g., United States v. Dahlstrom,* 713 F.2d 1423, 1427 (9th Cir. 1983) (defendant could not be found to have willfully violated a statute regarding a tax shelter program because interpretation of the statute was "highly debatable" as applied to the defendant's conduct); *see also United States v. Mann,* 884 F.2d 532, 535, 537 (10th Cir. 1989) (government failed to establish a "willful" violation of the tax code where the defendant relied on his good-faith belief that he did not have to pay taxes although the defendant's views fell "somewhere on a continuum between untrue and absurd"). Moreover, the United States has *never* brought criminal charges against an individual for violating the Anti-Deficiency Act although criminal penalties have been part of the Act since 1905. *See* GAO, Principles of Federal Appropriations Law (Redbook) 6-144 ("[I]t appears that no officer or employee has ever been prosecuted, much less convicted, for a violation of the Antideficiency Act.").

The Attorney General's additional contention that the Budget Autonomy Act exposes District officials and employees to administrative penalties under 31 U.S.C. § 1349 is also unavailing because the *District's* Executive Branch is solely responsible for imposing administrative sanctions on District officials and employees. *See* D.C. Code § 1-204.22 (Mayor is responsible for "administer[ing] all laws related to the appointment, promotion, discipline, separation, and other conditions of employment of personnel in the Office of the Mayor, personnel in executive departments of the District, and members of boards, commissions, and other agencies").

patent illegality under the Home Rule Act and other federal laws …); *id.* at 9 ("Given the Act's patent invalidity, I recommend that you decline to implement it and recommend that you advise Executive Branch officials and employees not to do so absent a binding judicial decision to the contrary."). Defendants cannot rely on the Attorney General's opinion as a basis to disregard the law.

The Attorney General's authority to issue opinions is derived from Reorganization Order No. 50—a pre-Home Rule Act Order that has been incorporated into D.C. Code § 1-301.81. Reorganization Order No. 50 provides that the Attorney General's "opinions, *in the absence of specific action by the [Mayor] or Council to the contrary*, or until overruled by controlling court decision, shall be the guiding statement of law, to be followed by all District officers and employees in the performance of their official duties."  Reorganization Order 50, Part II (June 26, 1953) (emphasis added).  Thus, Reorganization Order No. 50 expressly acknowledges that the Attorney General's opinions do not trump the Council's actions to the contrary.  In this case, the Council had acted contrary to the Attorney General's opinion as it had passed the Budget Autonomy Act after receiving an opinion by its own counsel that the Budget Autonomy Act was "legally sufficient."  *See* Exhibit A hereto, Memorandum from V. David Zvenyach to Chairman Phil Mendelson dated Nov. 9, 2012.

Moreover, Defendants reliance on the Attorney General's opinion that the Budget Autonomy Act is "patently illegal" is misplaced.  The Council's own counsel has opined that the Budget Autonomy Act is in fact legal, as has the District's Board of Elections. *See id.*; *In re Local Budget Autonomy Emergency Amendment Act of 2012*, No. 13-01.  In order to be "patently" illegal, the Act would have to be obviously illegal or, in the words of the *Lockyer* court, so clearly illegal "that no reasonable official could believe that [the law is] valid."

*Lockyer*, 95 P.3d at 487; *see also id.* n.31 (citing *Schmid v. Lovette*, 154 Cal. App. 3d 466, 474 (1984) (holding that California Constitution did not require public community college officials to continue to apply a statute requiring public employees to sign an anti-Communist-Party loyalty oath when comparable statutes had been held unconstitutional by both federal and state supreme court decisions)); Merriam-Webster.com, http://www.merriam-webster.com/dictionary/patent (defining "patent" as "obvious or clear").   As demonstrated above, as well as in the Council's motion for summary judgment, the Budget Autonomy Act is fully compliant and consistent with governing law and in no case could it fairly be deemed to be "patently illegal."

In sum, Defendants cannot meet the high burden of establishing that an exception to the general rule of enforceability applies because the Budget Autonomy Act is consistent with the Appropriations Clause, the federal budget laws implementing the Appropriations Clause, and the Home Rule Act, and is not patently illegal on its face.   Defendants were therefore duty bound to follow it.[16]

---

[16] The Obama Administration's recent handling of the Defense of Marriage Act ("DOMA") is an example of how executives are supposed to treat laws they believe are illegal.  After the Department of Justice determined that Section 3 of DOMA could not withstand constitutional scrutiny, the Attorney General announced that the Department could not defend the law in court.  Recognizing the limits of the Executive Branch's authority, the Obama Administration  continued to enforce Section 3 of DOMA until the Supreme Court ruled it unconstitutional.  Indeed, Attorney General Holder's statement announcing its decision to decline to defend DOMA made clear that "Section 3 of DOMA will continue to remain in effect unless Congress repeals it or there is a final judicial finding that strikes it down, and the President has informed me that the Executive Branch will continue to enforce the law."  Press Release, U.S. Dep't of Justice, Statement of the Attorney General on Litigation Involving the Defense of Marriage Act (Feb. 23, 2011), *available at* http://www.justice.gov/opa/pr/2011/February/11-ag-222.html.

**C.   The Mayor and CFO are obligated to implement the Budget Autonomy Act under the District Clause of the United States Constitution.**

There is a separate, additional reason that the Mayor and CFO cannot refuse to enforce the Budget Autonomy Act:  this action would contravene Congress's decision not to veto the law during the congressional review period and would therefore violate the District Clause of the United States Constitution.

Under the District Clause of the U.S. Constitution, Congress has authority "[t]o exercise exclusive Legislation in all Cases whatsoever" over the District.  U.S. Const. art. I, § 8, cl. 17.  Pursuant to this authority, Congress has created a mechanism for the District to amend its Charter by a public referendum.  Home Rule Act § 303, D.C. Code § 1-203.03.  Congress, however, retained its ultimate legislative authority over the District by putting in place a thirty-five-day review period when it can overturn a proposed amendment by passage of a joint resolution.  *Id.*  Congress's decision *not* to overturn a Charter amendment that the District presents to it for review is an exercise of the authority Congress retained for itself pursuant to the District Clause.  Accordingly, the District is constitutionally obligated to comply with Congress's decision to allow the Budget Autonomy Act to become law.

This Court has recognized that Congress's failure to veto the Budget Autonomy Act constitutes an exercise of Congress's authority under the District Clause.  *See Techworld Dev. Corp. v. D.C. Preservation League*, 648 F. Supp. 106, 114 (D.D.C. 1986), *vacated on other grounds*, No. 86-5630, 1987 WL 1367570 (D.C. Cir. June 2, 1987) (Congress's failure to veto demonstrates its "tacit approval" of the District's action); *Barnes v. District of Columbia*, 611 F. Supp. 130, 135 (D.D.C. 1985) (Congress's failure to veto constitutes "implicit approval" of the District's action).  Chief Justice John Roberts has made the same observation.  *See Jackson v. District of Columbia Bd. of Elections & Ethics*, 559 U.S. 1301, 1301 (2010) (sitting as the

Circuit Justice Chief Justice John Roberts denied petitioners' request for a stay of the District's Religious Freedom and Civil Marriage Equality Amendment Act while a petition for certiorari was pending, noting that Congress's decision not to veto the law "weigh[ed] against granting applicants' request for a stay, given that the concern is that action by the Council violates an Act of Congress.").  Thus, the Mayor and the CFO cannot simply disregard Congress's decision to allow the Budget Autonomy Act to become law based on a unilateral determination that the law is illegal.

The conclusion that Congress's decision not to veto the Budget Autonomy Act was an exercise of Congress's authority under the District Clause is also consistent with judicial decisions finding that congressional inaction, in certain circumstances, creates an inference of congressional acquiescence.  For example, in *Kimbrough v. United States*, 552 U.S. 85 (2007), the United States Supreme Court analyzed Congress's failure to exercise its disapproval authority over proposed changes to the United States Sentencing Commission's Guidelines.[17] The Court in *Kimbrough* found that Congress's failure to exercise its disapproval authority over a Sentencing Commission amendment showed that Congress "tacit[ly] accept[ed]" the amendment. 552 U.S. at 106.  The Court explained that, while it "[o]rdinarily . . . resist[s] reading congressional intent into congressional inaction[,] . . . in this case, Congress failed to act on a proposed amendment to the Guidelines in a high-profile area in which it had previously exercised its disapproval authority. . . ."[18]  *Id.*  Like the Sentencing Commission amendment at

---

[17] The Sentencing Guidelines amendment process roughly tracks the District Charter amendment process: the Sentencing Commission submits proposed amendments to Congress; after a review period, the amendments automatically go into effect unless Congress passes a joint resolution of disapproval.  28 U.S.C. § 994(p).

[18] *See also United States v. Munoz-Realpe*, 21 F.3d 375, 377 (11th Cir. 1994) ("By allowing the [Sentencing Guidelines] amendment to take effect, Congress has given its imprimatur to the new definition of 'cocaine base.'" (citation omitted)); *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 478 n.225 (D.C. Cir. 1982) (discussing legislative veto and observing, "it is not at all clear, however,

issue in *Kimbrough*, the Budget Autonomy Act was a "high-profile" action that clearly drew Congress's attention—as evidenced by the fact that the House subcommittee responsible for the District's budget included language in a committee report expressing the Committee's view that the Budget Autonomy Act had "no legal effect."[19]   These decisions counsel that Congress's decision not to veto the Budget Autonomy Act evidences Congress's "tacit acceptance" of the Act.

Congress had the opportunity to veto the Budget Autonomy Act during the thirty-five day congressional review period, but declined to do so.  Congress's failure to act was an exercise of its retained authority under the District Clause of the United States Constitution.  Accordingly, the Mayor's and CFO's refusal to implement the Budget Autonomy Act contravenes Congress's action and thus violates the District Clause.

## CONCLUSION

On April 23, 2013, the people of the District of Columbia took action to secure one of the most basic rights of self-determination—the ability of a local government, and those who elect that government, to control how that government spends its own tax revenue.  The District achieved this victory by following the Charter amendment process set out in section 303 of the Home Rule Act, which expressly precludes the District from amending certain parts of its Charter but unmistakably *does not* contain section 446 on this list of prohibitions.

Rather than follow the voice of the people and comply with the letter of the law, the Mayor and CFO have staked out  an untenable position: that they can simply refuse to implement a law that was duly enacted by the District's legislative branch, approved by the people of the

---

why failure to veto is not some evidence of compliance with congressional intent, if a decision to veto becomes a conclusive determination of a violation of congressional intent"), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983).

[19] H.R. Rep. 113-72, at 39 (July 23, 2013); 2013 WL 3814685.

District, and ratified by Congress.   The Mayor's and CFO's position—and the Attorney

General's opinion on which it is premised—not only departs from the most basic precepts of our

constitutional system—respect for the rule of law and separation of powers—it also

fundamentally misreads the relevant laws.   For these reasons, this Court should grant the

Council's motion for summary judgment and direct the Mayor and CFO to implement the

Budget Autonomy Act.

Dated: May 2, 2014                              Respectfully submitted,

                                                */s/ Barbara S. Wahl*
                                                Barbara S. Wahl, Esq. (D.C. Bar #297978)
                                                ARENT FOX LLP
                                                1717 K Street, NW
                                                Washington, DC  20036-5342
                                                T: 202-857-6000
                                                F: 202-857-6395
                                                barbara.wahl@arentfox.com

                                                *Attorney for Amici Curiae DC Appleseed Center for*
                                                *Law & Justice, DC Vote, D.C. for Democracy, DC*
                                                *Fiscal Policy Institute and League of Women Voters of*
                                                *the District of Columbia*

Of Counsel:
Jon S. Bouker, Esq. (D.C. Bar #452984)
Aaron Brand, Esq. (D.C. Bar #997052)
ARENT FOX LLP
1717 K Street, NW
Washington, DC  20036-5342
T: 202-857-6000
F: 202-857-6395
jon.bouker@arentfox.com
aaron.brand@arentfox.com