**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COUNCIL OF THE DISTRICT OF
COLUMBIA,

          Plaintiff,

    v.

VINCENT C. GRAY, in his official capacity
as Mayor of the District of Columbia,

      and

JEFFREY S. DeWITT, in his official capacity
as Chief Financial Officer for the District of
Columbia,

        Defendants.

No. 1:14-cv-00655-EGS

Hon. Emmet G. Sullivan

**CONSOLIDATED REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT OR REMAND AND MEMORANDUM IN OPPOSITION
TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Karen L. Dunn
  D.C. Bar No. 1002520
Alexander I. Platt
  D.D.C. Bar No. D00396
BOIES, SCHILLER & FLEXNER, LLP
5301 Wisconsin Avenue, NW
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  KDunn@bsfllp.com

Brian D. Netter
  D.C. Bar No. 979362
Breanne A. Gilpatrick
  D.C. Bar No. 1018094
MAYER BROWN LLP
1999 K Street, NW
Washington, D.C.  20006-1101
Telephone:  (202) 263-3000
Facsimile:  (202) 263-3300
Email:  bnetter@mayerbrown.com

*Attorneys for Plaintiff Council of the District of Columbia*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

I.     DEFENDANTS HAVE FAILED TO IDENTIFY ANY VALID BASIS ON
WHICH TO REFUSE ENFORCEMENT OF THE BUDGET AUTONOMY ACT ........ 3

    A.     The Budget Autonomy Act Is Consistent With The Constitution's
Appropriations Clause And Implementing Legislation ........................................ 3

        1.     The Appropriations Clause and its implementing statutes are
satisfied before and after the Budget Autonomy Act................................. 4

        2.     Historical practice confirms the separate treatment of federal and
local funds ................................................................................................. 8

    B.     The Budget Autonomy Act Is A Valid Exercise Of The Charter
Amendment Process........................................................................................... 11

        1.     The Charter was designed to be subject to a broad amendment
power........................................................................................................ 11

        2.     The authority to amend the Charter included the possibility of
amendments to the budget process ......................................................... 14

        3.     The Budget Autonomy Act has no impermissible federal effect............. 18

        4.     Section 603(a) is no obstacle to the Budget Autonomy Act ................... 23

II.     IN THE ALTERNATIVE, REMAND IS WARRANTED ............................................ 29

CONCLUSION................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page**

CASES

*AINS, Inc. v. United States*,
  365 F.3d 1333 (Fed. Cir. 2004)..................................................................5

*Am. Council of Life Ins. v. District of Columbia*,
  645 F. Supp. 84 (D.D.C. 1986) ..................................................................19

*Assassination Archives & Research Ctr. v. Dep't of Justice*,
  43 F.3d 1542 (D.C. Cir. 1995) ...................................................................24

*Barnes v. District of Columbia*,
  611 F. Supp. 130 (D.D.C. 1985) ................................................................17

*Bismullah v. Gates*,
  551 F.3d 1068 (D.C. Cir. 2009) .................................................................10

*Brizill v. D.C. Board of Elections & Ethics*,
  911 A.2d 1212 (D.C. 2006) ........................................................................20

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937)......................................................................................4

*Core Concepts of Fla., Inc. v. United States*,
  327 F.3d 1331 (Fed. Cir. 2003)................................................................5, 6

*CSX Transportation, Inc. v. Williams*,
  2005 WL 902130 (D.D.C. Apr. 18, 2005), *rev'd per curiam on other grounds*,
  406 F.3d 667 (D.C. Cir. 2005) ..............................................................19, 20

*Decatur Liquors, Inc. v. District of Columbia*,
  384 F. Supp. 2d 58 (D.D.C. 2005), *rev'd on other grounds*,
  478 F.3d 360 (D.C. Cir. 2007) ...................................................................25

*Decatur Liquors v. District of Columbia*,
  478 F.3d 360 (D.C. Cir. 2007) ...................................................................29

*Dimond v. District of Columbia*,
  792 F.2d 179 (D.C. Cir. 1986) ...................................................................29

*District of Columbia v. Carter*,
  409 U.S. 418 (1973)....................................................................................22

---

[*] Authorities on which we chiefly rely are marked with an asterisk.

ii

## TABLE OF AUTHORITIES
### (continued)
Page

*District of Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO,*
442 A.2d 110 (D.C. 1982) ...............................................................18, 19, 20, 27

*District of Columbia v. Sullivan,*
436 A.2d 364 (D.C. 1981) ................................................................................21

*Hassett v. Welch,*
303 U.S. 303 (1938)..........................................................................................25

*In re Local Budget Autonomy Emergency Amendment Act of 2012,*
No. 13–01 (D.C. Bd. Elections & Ethics Jan. 9, 2013) ......................................10

*INS v. Chadha,*
462 U.S. 919 (1983).........................................................................................16

*Jackson v. D.C. Bd. of Elections & Ethics,*
559 U.S. 1301 (2010).................................................................................17, 18

*Jackson v. D.C. Bd. of Elections & Ethics,*
999 A.2d 89 (D.C. 2010) ...............................................................18, 23, 26, 27

*Kelsey v. Weinberger,*
498 F.2d 701 (D.C. Cir. 1974).........................................................................10

*Knote v. United States,*
95 U.S. 149 (1877).............................................................................................4

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986).........................................................................................24

*Loeffler v. Menifee,*
326 F. Supp. 2d 454 (S.D.N.Y. 2004)..............................................................25

*McConnell v. United States,*
537 A.2d 211 (D.C. 1988) .....................................................................19, 20, 27

*Nevada v. Department of Energy,*
400 F.3d 9 (D.C. Cir. 2005) ..............................................................................6

*Office of Personnel Mgmt. v. Richmond,*
496 U.S. 414 (1990)...........................................................................................4

*Ratzlaf v. United States,*
510 U.S. 135 (1994)..........................................................................................14

## TABLE OF AUTHORITIES
### (continued)

Page

*Reeside v. Walker*,
  52 U.S. (11 How.) 272 (1850) ...................................................................................4

*Seegars v. Ashcroft*,
  297 F. Supp. 2d 201, 237 (D.D.C. 2004), *aff'd in part and rev'd in part on other*
  *grounds sub nom. Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005) .........................23, 24

*Techworld Dev. Corp. v. D.C. Preservation League*,
  648 F. Supp. 106 (D.D.C. 1986), *vacated per curiam as moot*,
  1987 WL 1367570 (D.C. Cir. June 2, 1987).................................................................19

*Tenley & Cleveland Park Emergency Comm. v. D.C. Bd. of Zoning Adjustment*,
  550 A.2d 331 (D.C. 1988) ...................................................................................25

*Terry v. Reno*,
  101 F.3d 1412 (D.C. Cir. 1996) ...........................................................................24

*Thomas v. Barry*,
  729 F.2d 1469 (D.C. Cir. 1984) ...........................................................................29

*U.S. Dep't of Navy v. FLRA*,
  665 F.3d 1339 (D.C. Cir. 2012) .............................................................................4

*United States v. McNinch*,
  242 F.2d 359 (4th Cir. 1957), *aff'd in part and rev'd in part*, 356 U.S. 595 (1958) ..............25

CONSTITUTION AND STATUTES

U.S. Const.:
  *Appropriations Clause, Art. I, § 9, cl. 7 ...................................................................3, 4, 9
  Amend. XIII....................................................................................................14
  Amend. XIV....................................................................................................14
  Amend. XV....................................................................................................14

18 U.S.C. § 4126 ...............................................................................................5

*31 U.S.C. § 1108(b) ...........................................................................................3

*31 U.S.C. § 1301(d) ...........................................................................................3

*31 U.S.C. § 1341(a)(1).........................................................................................3

*31 U.S.C. § 3302(b) ...........................................................................................3

31 U.S.C. § 5136...............................................................................................5

## TABLE OF AUTHORITIES
### (continued)

Page

33 U.S.C. § 923 (1982) ..............................................................................................20

33 U.S.C. § 939 (1982) ..............................................................................................20

42 U.S.C. § 10222(c) ...................................................................................................6

42 U.S.C. § 10222(e) ...................................................................................................6

50 U.S.C. § 98h (1980) ...............................................................................................6

D.C. Code § 47–309 (1973) ........................................................................................9

D.C. Code § 47–310 (1973) ........................................................................................9

Act of Oct. 12, 1984,
    Pub. L. No. 98–473, 98 Stat. 1837 ........................................................................16

Congressional Budget and Impoundment Control Act of 1974,
    Pub. L. No. 93–344, 88 Stat. 297 ..........................................................................16

Consolidated Appropriations Act of 2014,
    Pub. L. No. 113–76, tit. IV, 128 Stat. 5 ..................................................................9

District of Columbia Appropriation Act of 1972,
    Pub. L. No. 92–202, 85 Stat. 682 (1971) ..............................................................10

*Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774 (1973):
    § 102(a), D.C. Code § 1–201.02(a) .......................................................................21
    § 303(b), 87 Stat. at 784 ..................................................................................16, 23
    § 442(a), D.C. Code § 1–204.42(a) .......................................................................26
    § 446, D.C. Code § 1–204.42(a) .................................................................. *passim*
    § 450, D.C. Code § 1–204.50 ..............................................................................5, 6
    § 602(a), D.C. Code § 1–206.02(a) .......................................................................23
    § 602(a)(3), D.C. Code § 1–206.02(a)(3) ..................................................... *passim*
    § 603(a), D.C. Code § 1–206.03 ................................................................... *passim*
    § 603(b), D.C. Code § 1–206.03(b) .......................................................................23
    § 603(c), D.C. Code § 1–206.03(c) .......................................................................23
    § 603(f)(2), D.C. Code § 1–206.03(f)(2) ...............................................................23

*Initiative, Referendum, and Recall Charter Amendment Act of 1977, D.C. Law 2–46 .............21
    D.C. Code § 1–204.101(b) ..............................................................................21, 26
    D.C. Code § 1–204.105 .........................................................................................21

### OTHER AUTHORITIES

B-193573, 1979 WL 11668 (Comp. Gen.) .................................................................5

# TABLE OF AUTHORITIES
## (continued)

Page

B-197118, 1980 WL 17286 (Comp. Gen.) .................................................................................5, 6

59 Comp. Gen. 215 (1980) ...............................................................................................5

63 Comp. Gen. 331 (1984) ...............................................................................................5

64 Comp. Gen. 756 (1985) ...............................................................................................5

BUREAU OF ACCOUNTS, U.S. DEP'T OF TREAS., COMBINED STATEMENT OF RECEIPTS, EXPENDITURES, AND BALANCES OF THE UNITED STATES GOVERNMENT FOR THE FISCAL YEAR ENDED JUNE 30, 1972.................................................................................10

BUREAU OF FISCAL SERV., U.S. DEP'T OF TREAS., COMBINED STATEMENT OF RECEIPTS, OUTLAYS, AND BALANCES: 2013 COMBINED STATEMENT, http://fms.treas.gov/annualreport/index.html............................................................9

D.C. Council Committee of the Whole, Committee Report on Bill 19–993 .................................10

*Effect of Modification or Repeal of Constitutional or Statutory Provision Adopted by Reference in Another Provision*, 168 A.L.R. 627 (1947) ....................................................25, 26

Fiscal Mgmt. Serv., Dep't of Treasury, Treasury Financial Manual (2011) .................................10

1 GAO, Principles of Federal Appropriations Law (3d ed. 2004)..............................................4, 5

2 GAO, Principles of Federal Appropriations Law (3d ed. 2006)...................................................8

H.R. 9682, 93d Cong. (passed by House as amend. to S. 1435, Oct. 10, 1973)............................13

H.R. Rep. No. 98–635 (1984)..........................................................................................16

Mem. from Melissa D. Williams, Asst. Att'y Gen., to Gabe Klein, District Dep't of Transp. re Streetcar Project (Mar. 5, 2010) .............................................................20

*Jason I. Newman & Jacques B. DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act*, 24 Am. U. L. Rev. 537 (1975)...................................................................................................12, 13, 24

OMB Circular No. A–11 (2013)........................................................................................8

S. 1435, 93d Cong. (as passed by Senate, July 12, 1973).............................................................12

*STAFF OF H. COMM. ON THE DISTRICT OF COLUMBIA, 93D CONG., HOME RULE FOR THE DISTRICT OF COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY (Comm. Print 1976) ..................................................................................................... *passim*

**TABLE OF AUTHORITIES**
**(continued)**                                                    **Page**

Statement of Irvin B. Nathan, Att'y Gen. of D.C., Before the D.C. Bd. of Elections (Jan. 7, 2013) ................................................................................................................................17

**INTRODUCTION**

In 1973, Congress passed the Home Rule Act, the centerpiece of which was the District Charter, the only part of the Home Rule Act subject to amendment.  In making the Charter subject to amendment, Congress opted for a broad amendment power, constrained both by a multi-step amendment process involving the Council, the Mayor, the voters, and the Congress and by specific, express limitations on the District's authority to amend.  The Budget Autonomy Act was a valid exercise of the District's amendment authority.

In this action, Defendants bear a weighty burden as they seek to nullify a law that was passed unanimously by the Council, signed by the Mayor, ratified overwhelmingly by voters, and reviewed by Congress, all in accordance with the process set forth by the Home Rule Act.  Ultimately, it is a burden Defendants cannot meet because their reasons for refusing to comply with the Home Rule Act are at odds with its text, purpose, and legislative history and the various federal budget statutes on which they rely.

As to the Constitution's Appropriations Clause and its implementing statutes, the core problem with Defendants' position is best illustrated by the fact that they cannot account for the fact that the District's local revenues reside in the D.C. General Fund, outside the U.S. Treasury, and never even pass through the Treasury.  Laws requiring the appropriation of funds out of the Treasury simply do not constrain the disposition of funds that are not in the Treasury; and the Anti-Deficiency Act is satisfied so long as "no appropriation or fund," in this case the D.C. General Fund, is outspent.  Congress's role in annually approving the District's budget was a function of the Charter—and not the Appropriations Clause—and the Charter has now been amended.

As to the Home Rule Act, the core problem with Defendants' position is best illustrated by the fact that they avoid discussion of the Charter's amendment authority and the placement of

Section 446 within the Charter.  Defendants focus almost exclusively on the decision of

Congress in 1973 not to grant budget autonomy.  But they avoid the real question in this case,

which is not whether Congress in 1973 granted budget autonomy; it is whether Congress granted

an amendment power that was validly exercised in 2013 to change the process for approving

District expenditures.  Under Defendants' position, no amendments to the Charter would ever be

warranted.

But Congress, seeking to relieve itself to the greatest extent possible of the burdens of

local governance, did not seek to freeze the law in 1973.  It gave the District broad amendment

authority over provisions within its Charter, qualified by a list of expressly stated and specific

limitations to that amendment power—a list that did not include the local expenditure of local

dollars.  And it crafted an amendment process that, like the U.S. Constitution, made amendments

widely available but difficult to achieve.  It took forty years—and numerous incremental steps—

for budget autonomy to become law in the District.  Because Defendants cannot show that the

Budget Autonomy Act is legally invalid under either federal budget statutes or the Home Rule

Act, they should be ordered to comply.[1]

---

[1] This consolidated memorandum replies to Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (Dkt. No. 14) ("Opp."). As a formal matter, because Defendants' Cross-Motion addresses only issues presented by the Council's Motion for Summary Judgment, the Council incorporates by reference its Motion as a basis for denying Defendants' Cross-Motion.

**ARGUMENT**

I.     **DEFENDANTS HAVE FAILED TO IDENTIFY ANY VALID BASIS ON WHICH
       TO REFUSE ENFORCEMENT OF THE BUDGET AUTONOMY ACT.**

       A.     **The Budget Autonomy Act Is Consistent With The Constitution's
              Appropriations Clause And Implementing Legislation.**

       In our opening brief (at 14–27), we explained that the Budget Autonomy Act comports

with the Constitution's Appropriations Clause and its implementing statutes.  The Constitution

requires an appropriation for all funds "drawn from the Treasury."  Appropriations Clause, U.S.

Const. art. I, § 9, cl. 7.  Congress identified the funds subject to that requirement by directing that

public money from "any source" be deposited "in the Treasury."  Miscellaneous Receipts

Statute, 31 U.S.C. § 3302(b).  But Congress specifically directed that particular funds here—the

District's local revenues—be kept out of the Treasury, thereby discharging constitutional

appropriations obligations as to those funds.  We further showed how the deposit of District

funds into the D.C. General Fund satisfies the Anti-Deficiency Act (which limits spending to

"amount[s] available in an appropriation or fund," 31 U.S.C. § 1341(a)(1)) and the Purpose

Statute (which prohibits the Executive from altering the purpose of "an appropriation out of the

treasury," 31 U.S.C. § 1301(d)), and renders the Budget and Accounting Act (which specifies

procedures for "submit[ting] . . . each appropriation request," 31 U.S.C. § 1108(b)) inapplicable

as to local funds.

       Defendants part ways at the very first step of the analysis.  They attribute no significance

to the transfer of the District's local funds to the D.C. General Fund.  Instead, they contend that

the Budget Autonomy Act violates federal appropriations statutes because Congress is required

by those statutes to make annual appropriations *out of the D.C. General Fund*.  But there is no

support for that position in the Constitution or federal appropriations statutes.  That is why

Defendants are unable to articulate a theory that accounts for Congress's decision to move the

District's funds out of the Treasury.  By contrast, our interpretation—which draws distinctions between local and federal funds for federal budgeting purposes—is consistent with governing law and with the historical treatment of the District's budget.

> **1.     The Appropriations Clause and its implementing statutes are satisfied before and after the Budget Autonomy Act.**

As we explained in our opening brief (at 22), the Appropriations Clause, by its terms, imposes obligations only as to money in the U.S. Treasury: "No Money shall be drawn *from the Treasury*, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7 (emphasis added).  The Supreme Court has described this requirement as "straightforward and explicit," meaning "'simply that no money can be paid *out of the Treasury* unless it has been appropriated by an act of Congress.'"  *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (emphasis added) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).  The inextricable link between the Appropriations Clause and the Treasury has been recognized again and again.  *See, e.g.*, *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850) ("However much money may be *in the Treasury* at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned.") (emphasis added); *Knote v. United States*, 95 U.S. 149, 154 (1877) ("Moneys *once in the treasury* can only be withdrawn by an appropriation by law.") (emphasis added); *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) ("funds *from the Treasury* may not be expended except pursuant to congressional appropriations") (emphasis added).

The logic of this "straightforward and explicit" command of the Appropriations Clause—that money can leave the Treasury only if it has been appropriated—means that if money has left the Treasury, it necessarily has been appropriated.  *Accord Richmond*, 496 U.S. at 424; *Cincinnati Soap*, 301 U.S. at 321; *Knote*, 95 U.S. at 154; *see also* 1 GAO, PRINCIPLES OF

FEDERAL APPROPRIATIONS LAW 2–18 (3d ed. 2004) ("Once the money is in the Treasury, it can be withdrawn only if Congress appropriates it.").

Defendants offer little by way of response.  Because they cannot dispute that, by virtue of Section 450, the District's local funds never pass through the Treasury, they contend that Section 450 does not "say anything about appropriations or authorize expenditures."  Opp. 19.  But all that was required was for Congress to pay money out of the Treasury, which it plainly did.  The Appropriations Clause does not require Congress to use magic words.  *See, e.g.*, 1 PRINCIPLES OF FEDERAL APPROPRIATIONS LAW, *supra*, at 2–16 ("[I]t is not necessary that the statute actually use the word 'appropriation.'"); *accord* 63 Comp. Gen. 331, 335 (1984).  Even when Congress does not refer to an "appropriation," a permanent appropriation occurs when Congress directs that particular funds be paid out of (or kept out of) the Treasury.  *See* 1 PRINCIPLES OF FEDERAL APPROPRIATIONS LAW, *supra*, at 2–16 to 20 (providing examples); *see also, e.g.*, 64 Comp. Gen. 756 (1985) (Tennessee Valley Authority); 59 Comp. Gen. 215 (1980) (mobile home inspections); B-197118, 1980 WL 17286 (Comp. Gen.) (National Defense Stockpile); B-193573, 1979 WL 11668 (Comp. Gen.) (St. Lawrence Seaway Development Corporation).  Money outside the Treasury has been found *not* to be an appropriation only when the funds have been determined to be *exempt* from the appropriations laws.[2]  Congress satisfied the Appropriations

---

[2] *See Core Concepts of Fla., Inc. v. United States*, 327 F.3d 1331 (Fed. Cir. 2003) (recognizing that Federal Prison Industries revenues are exempt from the appropriations process, *see* 18 U.S.C. § 4126); *AINS, Inc. v. United States*, 365 F.3d 1333 (Fed. Cir. 2004) (recognizing that U.S. Mint & Public Enterprise Fund revenues are exempt from the appropriations process, *see* 31 U.S.C. § 5136).  Defendants object that the District is not a nonappropriated fund instrumentality.  Opp. 25–26.  But that misses our point, which is that funds outside the Treasury are simply not subject to additional requirements under the Appropriations Clause, whether they have been permanently appropriated or exempted from public fisc.

Clause when, through Section 450, it redirected the District's local revenues from the Treasury and placed them into the D.C. General Fund.[3]

The thrust of Defendants' argument appears to be that Congress required annual congressional appropriations (from the D.C. General Fund) in Section 446. Opp. 20. That is true, of course. But the question is not whether Congress constrained the District's expenditures of local funds in 1973. It obviously did. *The key question is whether those constraints are necessary to satisfy the federal appropriations statutes that Defendants rely upon as their basis to disregard the new law*. They are not. The federal statutes implementing the Appropriations Clause were satisfied when Congress, in the words of Defendants, "separate[d] the District's General Fund from the U.S. Treasury" (Opp. 19), and, in the case of the Anti-Deficiency Act, continue to be satisfied so long as the District does not outspend its General Fund. The additional requirement to appropriate funds out of the D.C. General Fund annually was just that—an additional requirement located in the District Charter and subject to the amendment process.[4] Congress's annual appropriation out of the D.C. General Fund was thus not "a

---

[3] Defendants cite *Nevada v. Department of Energy*, 400 F.3d 9 (D.C. Cir. 2005), to suggest that Congress does not permanently authorize spending when it creates a special fund but makes that fund "subject to appropriations." Opp. 24. But *Nevada* involved a special fund "in the Treasury of the United States" (42 U.S.C. § 10222(c)), so it does not speak to a situation where money has been taken *out of the U.S. Treasury*. Moreover, *Nevada* did not find a violation of the Anti-Deficiency Act; it relied exclusively on the statute creating the fund, which expressly made expenditures "subject to appropriations." *Id.* § 10222(e). Here, the requirement for appropriations out of the D.C. General Fund appeared only in the District Charter, which was amended by the Budget Autonomy Act.

[4] Even after Congress satisfies its obligations under the Appropriations Clause and its implementing statutes, it is free to impose additional requirements on the expenditures of funds, as it did with the original Section 446. *See, e.g.*, B-197118 (concluding that moneys in the National Defense Stockpile Transaction Fund constituted a permanent appropriation notwithstanding the fact that Congress had made expenditures "available only for the acquisition of replacement materials" (quoting 50 U.S.C. § 98h (1980)); *see also Core Concepts*, 327 F.3d at 1336 (concluding that moneys in the Federal Prison Industries fund were not subject to appropriations requirements even though Congress had made expenditures available "only

needless exercise" (Opp. 22); it was required by the Home Rule Act until such time as the Home
Rule Act was amended.

      Under Defendants' position, the obligation to annually appropriate funds *out of the D.C.
General Fund* arises under the federal appropriations laws.  But it is difficult to understand how
that could be.  The Constitution speaks of "Money . . . drawn *from the Treasury*," the Purpose
Statute refers to "mak[ing] an appropriation *out of the Treasury*," and the Anti-Deficiency Act is
satisfied whenever there is an "*appropriation* or *fund*."  Defendants do not explain how those
statutory terms can be defined to require annual appropriations out of the D.C. General Fund as
to money that has never even passed through the Treasury.

      Moreover, Defendants' decision to argue so vehemently (Opp. 19–25) that no permanent
appropriation out of the Treasury has taken place is curious because it would mean that
Congress's annual appropriations out of the D.C. General Fund violated the Appropriations
Clause.  An appropriation out of the Treasury is, under the Appropriations Clause and its
implementing statutes, a condition precedent to the ability to spend money out of a separate fund.
But Congress's annual appropriations out of the D.C. General Fund, as previously required by
the Charter, were not appropriations out of the Treasury.  Therefore, Defendants' denial of a pre-
existing appropriation out of the Treasury would mean that when Congress spent money out of
the D.C. General Fund, it did so without having satisfied constitutional appropriations
requirements.

      Indeed, the critical difference between our position and Defendants' is that ours comports
with the text and purpose of each applicable statute and understands the role each plays in
effectuating the Constitution's command.  Defendants' position ignores critical terms—like

---

pursuant to accountable warrants or certificates of settlement issued by the General Accounting
Office").

"Treasury" in the Purpose Statute and "fund" in the Anti-Deficiency Act—and renders Section 446 of the Home Rule Act entirely superfluous.  As we explained in our opening brief, if the federal appropriations statutes already required annual appropriations by Congress out of the D.C. General Fund, then there would have been no need for Congress to repeat the requirement in Section 446.  Defendants respond that there is no redundancy because "[t]he Anti-Deficiency Act imposes sanctions on overspending, and Section 446 does not."  Opp. 20 n.11.  But to argue that Section 446 is subsumed by the Anti-Deficiency Act is to *concede* that it is superfluous.  That alone proves that Defendants' interpretation cannot be correct.[5]

### 2.      The Budget Autonomy Act is consistent with a long history of separate treatment for federal and local funds.

The text, purpose, and history of the Appropriations Clause and its implementing statutes establish conclusively that the constraints placed on the District's budget process in Section 446 were matters of local law rather than constitutional imperative.  Defendants find this to be a "novel" concept (Opp. 19, 26, 35), but in fact, there is a long history of federal actors treating the District's local funds as separate from federal funds.

In the opening brief (at 26–27), we explained that the Office of Management and Budget requires the District to follow the procedures of the Budget and Accounting Act only for "*Federal* payments to the District" but not *local* payments.  OMB Circular No. A–11 (2013), at 25.1 (emphasis added).  Defendants offer no response.  And we explained that Congress historically has used special language to emphasize that it was not appropriating funds out of the

---

[5] Defendants recklessly assert that District employees risk civil or criminal sanctions for violation of the Anti-Deficiency Act.  Setting aside the fact that there has never been a prosecution under the Anti-Deficiency Act (2 GAO, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 6–144 (3d ed. 2006)), this fear mongering is an exercise in question begging.  District employees would have liability only if there were a violation of the Anti-Deficiency Act.  If the Budget Autonomy Act is valid, there is no such violation and, hence, there is no liability.

Treasury but instead was appropriating local funds "out of the General Fund of the District of Columbia." *E.g.*, Consolidated Appropriations Act of 2014, Pub. L. No. 113–76, tit. IV, 128 Stat. 5, 207. Again, Defendants offer no response.

These practices have deep historical roots. The Constitution's Appropriations Clause is accompanied by the Statement and Account Clause. Together, they provide: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." U.S. Const. art. I, § 9, cl. 7. The Treasury publishes its Statement and Account annually. Consistent with our position that the District's local funds have been appropriated out of the Treasury—and inconsistent with Defendants' position that they have not—the Treasury accounts for *federal* payments to the District as "public Money" but does not account for the District's local funds. *See* Bureau of Fiscal Serv., U.S. Dep't of Treas., Combined Statement of Receipts, Outlays, and Balances: 2013 Combined Statement, http://fms.treas.gov/annualreport/index.html (identifying federal payments to the District under the header "Independent Agencies" but excluding local funds).

Far from being "novel," such separate treatment predates the passage of the Home Rule Act. The pre-Home-Rule D.C. Code distinguished between appropriations of federal money and local revenues. *See* D.C. Code § 47–309 (1973) ("All taxes collected shall be paid into the Treasury of the United States, and the same, *as well as* the appropriations to be made by Congress for the expenses of the District of Columbia, shall be disbursed for the expenses of said District.") (emphasis added); *id.* § 47–310 ("All moneys appropriated for the expenses of the government of the District of Columbia, *together with* all revenues of the District of Columbia from taxes or otherwise, shall be deposited in the Treasury of the United States."). Prior to the

Home Rule Act, even though both federal and local dollars were located in the Treasury,

Congress used special language to approve the District's local budget.  *Compare* District of

Columbia Appropriation Act of 1972, Pub. L. No. 92–202, 85 Stat. 682, 682 (1971) (federal

payment is "appropriated, out of any money in the Treasury not otherwise appropriated"), *with*

*id.* (local budget is "appropriated . . . out of the general fund of the District of Columbia").  And

prior to the Home Rule Act, the Treasury's annual Statement and Account included only *federal*

payments within the list of budget accounts with annual appropriations and listed the District's

local funds (which were kept in a special fund) as a "Deposit Fund Account" (BUREAU OF

ACCOUNTS, U.S. DEP'T OF TREAS., COMBINED STATEMENT OF RECEIPTS, EXPENDITURES, AND

BALANCES OF THE UNITED STATES GOVERNMENT FOR THE FISCAL YEAR ENDED JUNE 30, 1972, at

495, 525, 530)—a term that refers to "monies that do not belong to the Federal Government"

(Fiscal Mgmt. Serv., Dep't of Treasury, Treasury Financial Manual § 1535 (2011)).  Thus, while

the Home Rule Act moved money out of the Treasury—thereby making clear that Congress had

no further duties under the Appropriations Clause and its implementing statutes—that action

reflected a continuation of the historical practice to regard the District's local funds as distinct

from federal money.[6]  And in eliminating the separate requirement for congressional action with

---

[6] In footnotes, Defendants suggest that the Budget Autonomy Act authorized the Council to appropriate federal funds in supplemental budgets.  Opp. 10 n.4, 12 n.6.  Not so.  Read in context, the same local/federal divide applies to supplemental budgets as applies to annual budgets.  That was the understanding of the Council when it passed the Act (*see* D.C. Council Committee of the Whole, Committee Report on Bill 19–993, Local Budget Autonomy Act of 2012, at 1, 9–10 (Dec. 4, 2012)) and the D.C. Board of Elections and Ethics when it formulated the referendum's ballot question (*see In re Local Budget Autonomy Emergency Amendment Act of 2012*, No. 13–01, at 3 (D.C. Bd. Elections & Ethics Jan. 9, 2013)).  The reference to supplemental budgets must be interpreted to protect its validity.  *Kelsey v. Weinberger*, 498 F.2d 701, 708 (D.C. Cir. 1974).  In any event, that provision—which is severable from the remainder of the Act (*Bismullah v. Gates*, 551 F.3d 1068, 1071 (D.C. Cir. 2009))—is not currently the subject of any dispute between the parties.

regard to the District's local funds, the Budget Autonomy Act is consistent with this historical practice.

**B.     The Budget Autonomy Act Is A Valid Exercise Of The Charter Amendment Process.**

The Budget Autonomy Act amended Section 446, which was located in the District Charter, subject to amendment.  Defendants' position is that this amendment is inconsistent with the Home Rule Act.  But their position substantially relies on the assumption that because Congress enacted Section 446 in the first place, Congress intended for Section 446 to be immune from future amendment.  The text, purpose, and history of the Home Rule Act—including Congress's decision to locate Section 446 within the amendable District Charter—conclusively demonstrate that Defendants' assumption is in error.  Accordingly, it is no basis upon which they can now refuse to follow the law.

**1.     The Charter was designed to be subject to a broad amendment power.**

When Congress introduced home rule for the District, the Charter was its centerpiece.  As a freestanding document within the Home Rule Act, the Charter was designed to spell out "what the government can do" and to establish that the authority of the District government is limited "by and in its relationship with the people." 1 STAFF OF H. COMM. ON THE DISTRICT OF COLUMBIA, 93D CONG., HOME RULE FOR THE DISTRICT OF COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY 981–82 (Comm. Print 1976) (statement of Rep. Brock Adams, Chairman of Subcomm. on Gov't Relations of H. Comm. on D.C.) (hereinafter HOME RULE ACT LEGISLATIVE HISTORY).  That is why Congress deemed it essential for District voters to accept the Charter as their own through a ratification process; without that process, the "whole exercise in trying to simply create a democratic government here like you have in every other city in the United States would be faulty."  *Id.*; *see also* 3 *id.* at 2802 (statement of Sen. Pete Domenici)

(explaining that the Charter was necessary to facilitate an "operational system of government" and that "[t]his charter would only be functional if it were to receive the necessary citizen input").

Although the Charter was a central element of both the House and Senate bills, initially it was not clear whether amendments to the Charter would be initiated by the District.  While the Senate bill provided broader rights to the District in the Charter—including, for example, the right to spend local funds—it also prohibited amendments to the Charter except for two narrow exceptions.[7]  The House bill, by contrast, provided narrower rights overall but included a broad amendment power.[8]

The Charter amendment process was among the issues left for resolution by the Conference Committee.  The House saw its approach to the Charter as the "sounder position" (4 HOME RULE ACT LEGISLATIVE HISTORY, *supra*, at 2931 (staff memo for Chairman Adams)), representing "an integral part of the entire House scheme" (*id.* at 2887 (notes of Chairman Adams as to major issues in controversy)).  As such, the House staff "strongly urge[d]" House conferees to take a "firm position" on the House proposal, which was to "allow[] [the] local council to amend *all* provisions of [the] Charter."  *Id.* at 2899 (House staff recommendations for Nov. 1, 1973) (emphasis added).  As a *backup plan*, to be proposed only in the case of an "impasse," the House staff recommended receding to the Senate provision but allowing "the Council to amend more provisions than in the current Senate version, such as sec. 421, and pt.

---

[7] Under the Senate's bill, the Council could initiate a Charter amendment only as to (1) the size of the Council and the qualifications for election to that office; and (2) the method for electing the Mayor and the qualifications for election to that office.  *See* Jason I. Newman & Jacques B. DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act*, 24 AM. U. L. REV. 537, 678 (1975) (summarizing S. 1435, 93d Cong. §§ 325(d), 304, 401(d) (as passed by Senate, July 12, 1973)).

[8] *See id.*

D." *Id.* Part D of the House bill (and the resulting Home Rule Act) covers "District Budget and Financial Management," including Section 446. *See* H.R. 9682, 93d Cong. §§ 441–55 (passed by House as amend. to S. 1435, Oct. 10, 1973), *reprinted in* 3 HOME RULE ACT LEGISLATIVE HISTORY, *supra*, at 2475–79. Thus, headed into Conference, the history shows that if the House could not secure its first choice option (the broadest possible authority for amending the Charter), it wanted to make sure to secure its second choice option (amendment authority extending to more provisions than the Senate bill, and including Part D concerning the District Budget, which encompassed Section 446).

The House provision ultimately prevailed. *See* 4 HOME RULE ACT LEGISLATIVE HISTORY, *supra*, at 2932 (reflecting "[a]greement[] reached . . . to House concept [on] charter amendments"). Indeed, the House approach generally prevailed—"[t]he conference bill [was] essentially the House bill with some Senate modifications." *Id.* at 2937 (summary of Conference Report by Majority Whip).

Thus, in addition to "establish[ing] a legal structure similar to a state constitution or municipal charter which would take precedence over normal laws, ordinances, or regulations" and "provid[ing] a single, unified statement of the structure of the new government," Congress opted to "single out that part of the home rule bill which was to be voted on by the local electorate" and, importantly for our purposes, to "create a governmental framework which could be amended by local citizens as conditions and times changed." Newman & DePuy, *supra* note 7, at 576–77 (describing the four-fold purpose of the Home Rule Act).

While this last purpose—creating a Charter that could be amended by local citizens as times changed—has long been recognized in both the text and legislative history of the Home Rule Act, Defendants fail to acknowledge it. One theme that continues throughout their

submission to this Court is the expectation that an amendable document should be frozen in time,

its evolution limited to what the enacting Congress preferred as a policy matter.[9]  But that

expectation is antithetical to the functioning of the Charter, as the 93d Congress itself made

clear.  Defendants repeatedly stress the point that the 93d Congress was not prepared to give

budget autonomy to the District.  *E.g.*, Opp. 29–34.  This obvious point is not in dispute.  The

more important point is that the 93d Congress *was* prepared to give *amendment authority* to the

District and did so, fully aware of the issue regarding budget autonomy and fully aware that

provisions placed within the Charter would be subject to amendment.

> **2.      The Charter amendment authority included the possibility of
> amending the local budget process.**

Beyond the clear textual fact, explained *supra* and in our opening brief, that Congress

decided to subject the District's budget process to amendment by locating it within the broadly

amendable Charter, there is other historical evidence that such amendments are within the scope

of that authority.

*First*, although resort to legislative history is not required because Section 446 is located

within the District Charter as a textual matter (*see, e.g.*, *Ratzlaf v. United States*, 510 U.S. 135,

147–48 (1994) ("we do not resort to legislative history to cloud a statutory text that is clear")),

legislative history demonstrates Congress's awareness that the District's budget process would

be subject to the Charter's amendment provisions.  As discussed above, it was the position of the

House (which disfavored an outright grant of budget autonomy) that if it were not possible to

---

[9] Defendants appear to argue that because congressional control over annual
appropriations was an element of the compromise that led to the passage of the Home Rule Act,
Congress could not have permitted an amendment to the budget process.  But ratification of the
Constitution was based on a series of compromises that were subsequently changed through the
amendment process.  *See, e.g.*, U.S. Const. amends. XIII, XIV, XV.  In any event, history shows
that reserving the ability to amend Part D, which includes Section 446, was important to the
House as it worked on the compromise bill.

subject *all* provisions to amendment, it was particularly important to permit the amendment of

the Charter as to the part governing "District Budget and Financial Management." 4 HOME RULE

ACT LEGISLATIVE HISTORY, *supra*, at 2899; *see supra* pp. 12–13.  And the House made a

conscious decision to embed the provisions governing the District budget into the amendable

Charter.  1 HOME RULE ACT LEGISLATIVE HISTORY, *supra*, at 515 (statement of Chairman

Adams) ("we are in the District Budget and borrowing parts, which we anticipate to be put into a

District Charter").

      *Second*, the legislative history shows, contrary to Defendants' contention (Opp. 32), that

the subcommittee responsible for the markup of the House bill specifically contemplated that

inclusion within the Charter meant that the amendment process would apply:

> Mr. SENGER.  I wonder if we should put lines in there that say that the fiscal year of the District of Columbia shall be the same as the Federal fiscal year, established by the Federal, rather than going back to having amended the change.
>
> . . .
>
> Mr. HOGAN.  *I think you could change it by Charter.*
>
> Mr. SENGER.  That was my next question, would this be part of the Charter?
>
> Mr. FAUNTROY.  Is this part of the Charter?
>
> Mr. DEPUY.  It would be changed through that process.  *It could be changed through that process.*
>
> Mr. FAUNTROY.  I think—
>
> Mr. FRASER.  How do we revise it?  Do you suggest that we add to the language or just leave it the way it has been recommended?
>
> Mr. SENGER.  *Since it is subject to change by the District of Columbia*, I do not think it would be objectionable to leave it the way it was proposed.

1 HOME RULE ACT LEGISLATIVE HISTORY, *supra*, at 522 (emphasis added).[10]  Nothing in the

Home Rule Act suggests that Congress contemplated withdrawing the Charter's budget process

from the District's Charter amendment power.

     *Third*, when the Home Rule Act was passed in 1973, it was considerably more difficult to

amend the Charter.  In the original Home Rule Act, Charter amendments required the *affirmative*

assent of both Chambers of Congress.  *See* Home Rule Act, Pub. L. No. 93–198, § 303(b), 87

Stat. 774, 784 (1973).  Thus, even if Congress was not prepared to grant budget autonomy in

1973, it would not have needed to exclude the issue from the amendment process because, at the

time, no Charter amendment could survive without majority support from both Chambers of

Congress.  But Congress later decided to relax its review of Charter amendments.  In *INS v.

Chadha*, 462 U.S. 919 (1983), the Supreme Court invalidated legislative procedures (like the

original Charter amendment procedure) that involved congressional action without presentment

to the President, thereby necessitating an amendment to the Home Rule Act.  *See* H.R. Rep. No.

98–635 (1984).  Rather than make the Charter amendment process more stringent by requiring

the affirmative assent of both Chambers of Congress and the approval of the President, Congress

instead chose to create a system of passive review under which Charter amendments are

presumptively valid unless both Chambers of Congress and the President *disapprove*.  *See* Act of

Oct. 12, 1984, Pub. L. No. 98–473, § 131(b), 98 Stat. 1837, 1974.

---

    [10] At the time the Home Rule Act was passed, the federal government's fiscal year began on July 1.  Starting with fiscal year 1977, the federal government's fiscal year was changed to begin on October 1.  *See* Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93–344, § 501, 88 Stat. 297, 321.  The new schedule provided Congress with additional time to pass its annual appropriations bills but took the District's budget cycle out of alignment with the school year.  Thus, the Budget Autonomy Act would permit the Council to restore the fiscal year as it existed at the time of the passage of the Home Rule Act.

Here, Congress discharged its responsibility under the Charter amendment process by permitting the Budget Autonomy Act to enter into law.  Defendants are eager to dismiss Congress's failure to disapprove of the Budget Autonomy Act as meaningless.  Opp. 41–43.  But case law suggests that while Congress's inaction is not dispositive, it is surely significant.  *See, e.g.*, *Jackson v. D.C. Bd. of Elections & Ethics*, 559 U.S. 1301, 1302 (2010) (Roberts, Circuit Justice) (finding that while these considerations are not determinative, they should be given some weight); *Barnes v. District of Columbia*, 611 F. Supp. 130, 135 (D.D.C. 1985).

Moreover, whereas Defendants' current position is that Congress's silence was to be expected and should not influence this court, that position stands in sharp contrast to the Attorney General's predictions when he sought to keep the proposed budget autonomy amendment off the ballot.  *See* Statement of Irvin B. Nathan, Att'y Gen. of D.C., Before the D.C. Bd. of Elections 17 (Jan. 7, 2013) ("To put it mildly, it is not likely to be pretty."); *see also id.* at 18 (anticipating "punitive measures" against District in addition to invalidation of the Act).  And while Defendants diminish Congress's *actual* role to review and passively approve Charter amendments, they seek to elevate the nonbinding position—developed after no form of review, formal or informal—of one party of one subcommittee of one Chamber of Congress.  Opp. 4, 6.  Our position is that the history of the amendment process, which is consistent with Congress's goal of delegating additional authority to the District as time passed, should be accorded due weight, as should Congress's decision not to override the amendment at issue in this case.

*Fourth*, the early history of Charter amendments demonstrates that Congress was amenable to Charter amendments as to matters it had considered but rejected in 1973.  *But see* Opp. 32–33 (arguing that Congress could not have intended to permit the District to amend the Charter to achieve budget autonomy because "budget autonomy was considered but not

awarded"). In the debates on the Home Rule Act, "Congress considered including in the Act a provision that would have *directly* conferred on the people of the District the power to propose and enact legislation through an initiative process." *Jackson v. D.C. Bd. of Elections & Ethics*, 999 A.2d 89, 96 (D.C. 2010). But Congress rejected such a provision in the final Act. *Id.* Nevertheless, just a few years later, "[o]n May 17, 1977, the Council exercised its authority under section 303 to pass the Initiative, Referendum, and Recall Charter Amendment Act of 1977." *Id.* Pursuant to the Charter amendment process then in effect, "each House of Congress affirmatively approved [the amendment]" and it became law in 1978. *Id.*; *see also Jackson v. D.C. Bd. of Elections & Ethics*, 559 U.S. 1301, 1302 (2010) (Roberts, Circuit Justice). Those *affirmative* actions demonstrate that Congress understood that the Charter could be amended to override decisions previously made. Thus, the legislative history reinforces the plain textual reading of the statute, that Defendants are not entitled to disregard the Budget Autonomy Act.

### 3. The Budget Autonomy Act has no impermissible federal effect.

Although much of Defendants' brief is dedicated to their atmospheric argument that Congress decided against budget autonomy in 1973, they briefly address the Home Rule Act provisions—Sections 602(a)(3) and 603(a)—on which their refusal to comply with the Budget Autonomy Act is formally based.

In our opening brief, we explained that the Budget Autonomy Act does not implicate Section 602(a)(3) of the Home Rule Act, which prohibits the Council from passing legislation that "concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District" D.C. Code § 1–206.02(a)(3).

Section 602(a)(3) has been interpreted to "withhold from local officials the authority to affect or to control decisions made by federal officials in administering federal laws that are national in scope as opposed to laws that relate solely to the District of Columbia." *District of*

*Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982).  In

*Greater Washington*, the D.C. Court of Appeals found that Section 602(a)(3) did not bar a

locally-passed law concerning a District program that transferred authority to administer the

program from federal officials to local officials.  This case is legally indistinguishable—the

Budget Autonomy Act is a locally passed law concerning the District's local budget, transferring

authority to affirmatively spend local funds to local officials.

Other courts have accepted the *Greater Washington* framework and have acknowledged

that the critical issue is not whether federal actors, agencies, or processes are *affected* by District

regulation—as they always will be—but whether a law of national application is repealed or

amended.  Indeed, this Court found as much in *CSX Transportation, Inc. v. Williams*, 2005 WL

902130, at *22–23 (D.D.C. Apr. 18, 2005) (Sullivan, J.) (applying *Greater Washington* and

identifying "a distinction, for Home Rule Act purposes, between the incidental effects of local

regulation and direct regulation of external conduct"), *rev'd per curiam on other grounds*, 406

F.3d 667 (D.C. Cir. 2005); *see also Techworld Dev. Corp. v. D.C. Preservation League*, 648 F.

Supp. 106, 114–15 (D.D.C. 1986) (applying *Greater Washington* and agreeing that Section

602(a)(3) "is included to ensure that the local government does not encroach on matters of

national concern"), *vacated per curiam as moot*, 1987 WL 1367570 (D.C. Cir. June 2, 1987);

*Am. Council of Life Ins. v. District of Columbia*, 645 F. Supp. 84, 89 (D.D.C. 1986) (finding

District's insurance regulations to be valid under Section 602(a)(3) because they had "no extra-

territorial application").

Later decisions by the D.C. Court of Appeals, applying the *Greater Washington* standard

to invalidate local laws, further illustrate the point.  In *McConnell v. United States*, 537 A.2d 211

(D.C. 1988), the Court of Appeals invalidated an effort to exempt the District from the federal

19

Narcotics Addicts Rehabilitation Act because "in addition to applying to defendants convicted under District of Columbia law," that federal law "applies to federal defendants in every jurisdiction in the United States." *Id.* at 214–15.  And in *Brizill v. D.C. Board of Elections & Ethics*, 911 A.2d 1212 (D.C. 2006), the Court of Appeals invalidated an initiative that sought to override the federal Johnson Act, which "also applies to jurisdictions outside the District of Columbia." *Id.* at 1215.  Here, even when Congress approves the District's budget (affirmatively or passively), its actions are directed at the District, not at other jurisdictions more broadly. Whereas in *McConnell* and *Brizill*, there was "no distinct chapter . . . applicable to the District of Columbia" (*McConnell*, 537 A.2d at 215), here the law at issue is the law originally known as the District of Columbia Self-Government and Governmental Reorganization Act.

In opposition, Defendants dispute the authoritativeness of the legislative history underpinning *Greater Washington*.  Opp. 28 n.19.  But they fail to explain why this Court should disregard the interpretations of the D.C. Court of Appeals (in *Greater Washington* and its progeny) and this Court (in *CSX Transportation*).[11]  They also seek to diminish *Greater Washington* by characterizing the Department of Labor's role as merely "ministerial in nature." Opp. 28.  That is not, in fact, true, given that the Department of Labor was tasked with conducting investigations, holding administrative hearings, and engaging in rulemaking.  *See* 33 U.S.C. §§ 923, 939 (1982).  In any event, nothing in the text of Section 602(a)(3) or the authorities applying the provision have drawn such a distinction.[12]

---

[11] Indeed, even the Office of the Attorney General has embraced the legislative history that Defendants now seek to diminish.  *See* Mem. from Melissa D. Williams, Asst. Att'y Gen., to Gabe Klein, District Dep't of Transp. re Streetcar Project 6–8 (Mar. 5, 2010).

[12] To the contrary, the legislative history makes clear that even the most ministerial functions would be precluded by Section 602(a)(3) if they interfered with federal control over the monuments or the federal government's administrative, legislative, or judicial operations.  *See Greater Wash. Cent. Labor Council*, 442 A.2d at 116.

At core, the problem with Defendants' position is not just that it disregards precedent.  It would also gut the Council's legislative authority.  If Section 602(a)(3) were really designed to encompass any District law with a non-ministerial federal effect—notwithstanding Congress's express intent to "relieve [itself] of the burden of legislating upon essentially local District matters" (Home Rule Act § 102(a), D.C. Code § 1–201.02(a))—then the Council could do virtually nothing.  It could not cut taxes (which would reduce Congress's authority to budget for those revenues).  And it could not amend the local criminal code (which would reduce the Senate-confirmed U.S. Attorney's authority to prosecute those crimes and would alter the budget needs for the federal Department of Justice).  *But cf. District of Columbia v. Sullivan*, 436 A.2d 364, 366 (D.C. 1981) ("That the Council has the authority to classify an act as a crime, or to decriminalize certain behavior, is clear.").

Indeed, even an already existing amendment to the District Charter would be deficient under Defendants' calculus.  Through the Initiative, Referendum, and Recall Charter Amendment Act of 1977, D.C. Law 2–46, the District imposed review requirements on Congress and the President.  *See* D.C. Code § 1–204.105 (requiring legislation approved by initiative to be treated as an act of the Council and submitted for congressional review).  The Initiative Amendment Act specifically contemplated changing the relationships between the District, Congress, and the President *with respect to* certain legislation passed under Section 446.  *See id.* § 1–204.102(b)(1) (citing Sections 404 and *446* and authorizing the D.C. Board of Elections and Ethics to request return of legislation from Congress or the President upon filing of a referendum petition).  Under Defendants' view, that provision would be invalid because it applies to Congress and the President (and, unlike the Budget Autonomy Act, imposes affirmative obligations on them).  But under our position, the procedure for initiatives and referenda applies

to the District (even though it affects Congress and the President) and therefore does not violate Section 602(a)(3).

In our opening brief, we explained the implications of Defendants' interpretation of Section 602(a)(3) for the District's legislative authority.  They offer no response.[13]

Finally, Defendants' brief makes several misstatements about the effect of the Budget Autonomy Act's effect on the balance of power between the District and the Congress that are important to correct.  Defendants state that the Budget Autonomy Act "take[s] authority away from Congress and the President" (Opp. 11) and "unilaterally purports to exempt District funds" from federal requirements (Opp. 17).  Congress has plenary authority over legislation for the District.  *See District of Columbia v. Carter*, 409 U.S. 418, 429–30 (1973)   This fact is broadly recognized.  We do not contend that Congress gave the District "unilateral[]" authority to enact the Budget Autonomy Act, nor was unilateral authority exercised in this case.  Congress reserved for itself the power to reject the Budget Autonomy Act during its 35-day review period.  It also has the power, at any time, to amend or repeal the Budget Autonomy Act, if it so chooses, or to make any changes it likes to the annual District budget.  The Budget Autonomy Act seeks to effectuate Congress's purpose, as stated in the Home Rule Act, to disentangle that body to the greatest extent possible from local matters, while recognizing that Congress always has the ultimate authority.

---

[13] Defendants argue in the alternative that the Budget Autonomy Act cannot be said to apply exclusively to the District because it conflicts with federal budget statutes, including the Anti-Deficiency Act.  Opp. 28–29.  But that merely begs the question at the heart of this litigation.  As explained in our opening brief and *supra*, the Budget Autonomy Act is consistent with the Anti-Deficiency Act, which ensures that no money is obligated or expended beyond the contents of the D.C. General Fund.

#### 4.      Section 603(a) is no obstacle to the Budget Autonomy Act.

Defendants also continue to challenge the Budget Autonomy Act's compliance with Section 603(a) of the Home Rule Act.  As we explained in our opening brief (at 30–33), Section 603(a) reflects Congress's intent in 1973 to leave undisturbed the respective roles of various actors in the budget process, which is different than ensuring they remain undisturbed forever. That interpretation is supported by the provision's text and context: (1) Section 603(a) uses the familiar phrasing of a rule of construction ("nothing in this Act shall be construed as making any change"), whereas neighboring provisions use different language to set prospective limits (*e.g.,* "[t]he Council shall have no authority" "no general obligation bonds . . . shall be issued," "the Council shall not approve," "the Mayor shall not forward");[14] (2) Section 603(a) refers to "this Act," an expressly defined term referring to the 1973 Act; (3) Section 603(a) speaks in the present tense, referring to the changes Congress was, or was not, "making" at the time; and (4) the overall purpose of the Home Rule Act was to provide an expansive legislative power coupled with a broad Charter amendment power.

While this is the only reasonable reading of the text, particularly given the context and legislative purpose, Defendants offer two responses.  *First*, they contend that Section 603(a) must be interpreted as a limitation on the Council's authority because Section 303(d) refers to "limitations specified in sections 601, 602, and 603."  They claim that our position is that "Sections 601, 602, and 603 are not 'limitations' on the Council."  Opp. 15.  But that is not our position.  Our position is that Congress specified limitations in Sections 601, 602, and 603, but that Section 603(a) is not one of them.  *Cf. Jackson*, 999 A.2d at 95 n.5 (enumerating limitations but excluding Section 603(a)); *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 236–37 (D.D.C. 2004)

---

[14] D.C. Code §§ 1–206.02(a), 1–206.03(b), 1–206.03(c), 1–206.03(f)(2).

("The Home Rule Act places certain limitations and reservations on this delegation of authority, which are chiefly contained in sections 1–206.01 and 1–206.02 of the District of Columbia Code."), *aff'd in part and rev'd in part on other grounds sub nom. Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005).

Even Defendants acknowledge that Congress provided "nine express 'limitations' in the [Home Rule Act] on the Council's authority" (Opp. 28), a list that does not include Section 603(a) (*see* Newman & DePuy, *supra* note 7, at 549 & n.72).   Defendants do not (and, under their theory, cannot) explain why Congress used express language of prospective limitation elsewhere but not in Section 603(a), where it used traditional rule of construction language.  *See, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 377 n.5 (1986) ("by stating that nothing in the Act shall be construed to extend FCC jurisdiction to intrastate service, [the Act] provides its own rule of statutory construction.  In other words, the Act itself . . . presents its own specific instructions regarding the correct approach to the statute"); *Terry v. Reno*, 101 F.3d 1412, 1414 (D.C. Cir. 1996) (describing a similarly phrased provision as a statutory "rule[] of construction"); *Assassination Archives & Research Ctr. v. Dep't of Justice*, 43 F.3d 1542, 1544 (D.C. Cir. 1995) (finding that a similarly phrased statutory "[r]ule of construction" "specifie[d] how the Act [wa]s to be integrated into pre-existing law").  Nor can Defendants explain the conflict between their position and the canon that when different terms are used in a single piece of legislation, they are presumed to have different meanings.

*Second*, Defendants argue that Section 603(a) constrains the Charter amendment authority because its reference to "[n]othing in this Act" should be read to limit the Charter amendment provision, which is part of the Act.  Opp. 14.  Defendants also appear to make the flip-side of that argument, which is that Section 603(a)'s reference to "this Act" was

automatically reenacted when the Budget Autonomy Act amended provisions of the 1973 Act. Opp. 16.

However that argument is conceptualized, the ultimate question is the same—whether Section 603(a) was intended to be a rule of construction (explaining how Congress's 1973 compromise was to be construed) or a limitation (proscribing the future amendment authority of the District government).  On that score, that Congress used markedly different language elsewhere in the text to describe limitations and spoke in the present tense demonstrates the error in Defendants' conclusion—as does the Home Rule Act's overarching purpose of expanding local authority, which militates against finding limitations where none are expressly enumerated. And if any ambiguity remains after looking to the text and the purpose, Defendants' interpretation still does not carry the day because the Council's interpretation of its authority under the Home Rule Act is entitled to deference.  *Decatur Liquors, Inc. v. District of Columbia*, 384 F. Supp. 2d 58, 63 (D.D.C. 2005), *rev'd on other grounds*, 478 F.3d 360 (D.C. Cir. 2007); *Tenley & Cleveland Park Emergency Comm. v. D.C. Bd. of Zoning Adjustment*, 550 A.2d 331, 334 n.10 (D.C. 1988).

Moreover, it is a "well-settled" rule of statutory construction that, when a cross-reference incorporates a statute by reference (as with the reference to "this Act"), "[s]uch adoption takes the statute as it exists at the time of adoption and *does not include subsequent additions or modifications* by the statute so taken unless it does so by express intent." *Hassett v. Welch*, 303 U.S. 303, 314 (1938) (question marks omitted); *accord, e.g.*, *Loeffler v. Menifee*, 326 F. Supp. 2d 454, 459–60 (S.D.N.Y. 2004); *United States v. McNinch*, 242 F.2d 359 (4th Cir. 1957), *aff'd in part and rev'd in part*, 356 U.S. 595 (1958).  *See generally* R.J. Fox, *Effect of Modification or Repeal of Constitutional or Statutory Provision Adopted by Reference in Another Provision*, 168

A.L.R. 627 (1947).  Thus, Defendants bear a particularly high burden—one that they simply cannot satisfy—to establish that Section 603(a) prohibits the Budget Autonomy Act.

Indeed, Defendants' position—which finds that Section 603(a) prohibits any future change to the Charter that in any way alters the respective roles of the Congress, President, OMB, or Comptroller General—would prohibit the Council from enacting legislation to change the timeline for submitting requests for federal appropriations to the President.  But such legislation was expressly contemplated by Congress and provided for in the Home Rule Act, which authorized the Council to change the date on which the Mayor starts the budget process.  Home Rule Act § 442(a), D.C. Code § 1–204.42(a).  This stands as further evidence that Congress could not have intended to "limit[]" the Council's authority in the sweeping manner contemplated by Defendants.

Defendants noticeably rely on only one judicial decision in support of their interpretation of Section 603(a).  Quoting a footnote in *Jackson*, they suggest that the D.C. Court of Appeals has determined that "'the District's budget'" is "'off-limits to direct democracy.'"  Opp. 14 (emphasis omitted) (quoting 999 A.2d at 102 n.20).  But the footnote cited by Defendants identifies subject matters for which the *initiative* and *referendum* procedures may not be used.  *See id.* at 102 n.20 ("Section 1–204.101 sets out, *via the expressed exceptions to the definitions of 'initiative' and 'referendum,'* a list of *subject areas* that the Council meant to render off-limits to direct democracy.") (first emphasis added).  Their footnote does not refer to Section 603 at all; nor does it concern Charter amendments.  Rather, D.C. Code § 1–204.101(b) separately prohibits a "referendum" as to an "act[] appropriating funds for the general operation budget."  Thus, because the limitation on "direct democracy" arises only in the provision concerning the citizen-initiated legislation, it plainly does not limit the Council's authority to amend the Charter.  In

fact, as we explained in our opening brief, *Jackson* affirmatively undermines Defendants'
interpretation of Section 603(a) because, elsewhere in the opinion, the court enumerated the
"limitations" referenced by Section 303 but does *not* identify Section 603(a).  999 A.2d at 95
n.5.[15]

*     *     *

At base, Defendants' position is that the Budget Autonomy Act is invalid because
Congress would not have tolerated budget autonomy in 1973. Not only is this point evident and
undisputed, it misunderstands the essential question in this case, which is whether budget
autonomy was legally achieved by amendment in 2013.

Indeed, that Congress in 1973 was not yet prepared for budget autonomy is hardly
surprising. Hard as it is to imagine today, at the time, nearly half of the District's budget came

---

[15] Recognizing that opinions of the Government Accountability Office ("GAO") are not
legally binding, Defendants urge this Court to find persuasive the GAO's opinion letter regarding
the Budget Autonomy Act.  Opp. 34–37.  While the Council acknowledges that a well-reasoned
opinion by GAO may have the power to persuade, we believe that, upon examination, this GAO
opinion is unpersuasive.  Many of the arguments presented to the Court in this case were not
considered by GAO, which dispensed of the complicated legal issues with little more than four
pages of discussion.  *See* Dkt. No. 14–2.

On its merits, GAO's opinion exhibits obvious defects.  In analyzing federal
appropriations statutes, GAO simply assumes without analysis that the Budget Autonomy Act
violates both the Anti-Deficiency Act and the Budget and Accounting Act and then concludes,
citing *McConnell*, that the Budget Autonomy Act has violated Section 602(a)(3) by amending
laws of national applicability.  Dkt. No. 14–2, at 7.  GAO did not consider the fact that the
District's local revenues are not within the U.S. Treasury.  *Id.*  GAO does not appear to credit
Defendants' theory as to Section 602(a)(3).  And it does not reference the leading decisions
interpreting Section 602(a)(3), *Greater Washington* and its progeny.

As to Section 603(a), GAO correctly acknowledges that the Home Rule Act "provides
that it makes no 'change in existing law'" concerning the respective roles of the actors in the
budget process but omits the critical language, "[n]othing in this act shall be construed as
making."  The opinion then concludes, without analysis, that no amendment was permitted.  Dkt.
No. 14–2, at 8.  That is a *non sequitur*.  We submit that a full consideration of the text of Section
603(a), read in context with the Home Rule Act's purpose and history, compels the conclusion
that the GAO's opinion is incorrect.

27

from federal funding.  The District was a new political entity, without any independent track record of fiscal stewardship, and home rule was just being granted.  But while it did not grant budget autonomy, Congress in 1973 contemplated the need for future changes and established a Charter with a broad amendment power.

The Congress of 1973 was correct; times have changed.  While the original Charter amendment process required affirmative action by both Chambers of Congress, Congress subsequently granted greater flexibility to amend and now agreement is presumed unless the law is overridden by both Chambers of Congress and the President.  Now, the vast majority of the District's budget comes from local tax dollars and fees.   The District has an established record of fiscal success.  The congressional role that seemed prudent in 1973 has now proven costly and inefficient.  And nearly everyone—from the President to Members of Congress from both parties to the Mayor—supports budget autonomy.

Defendants invoke the passage of forty years as if this fact supports their position, but it does the opposite.  The Budget Autonomy Act, which would never have been enacted in the 1970s, is the culmination of four decades of change, which included increased legislative empowerment for the District, ample time for the District to demonstrate its fiscal responsibility, and greater popular will behind the amendment, which was passed unanimously in the Council, signed by the Mayor, and ratified by 83% of voters.  It was no longer unreasonable to invoke the Charter amendment process, which explains why no resolution of disapproval as to the Budget Autonomy Act was even introduced in the Congress. That would not have happened in 1973.

The Budget Autonomy Act is now the law.  It complies with all applicable requirements under federal and District law.  It is a proper use of the Charter's amendment authority and it comports with the basic purpose of the Home Rule Act, to relieve Congress, to the greatest

28

extent possible, of the burdens of local governance.  Defendants have no basis on which to refuse to comply.

## II.      IN THE ALTERNATIVE, REMAND IS WARRANTED.

In the alternative, as we explained in our opening brief (at 40–45), remand is warranted because the operative Complaint does not permit an exercise of federal-question jurisdiction.  In opposition, Defendants contend that ¶ 65 of the Complaint "necessarily raises a federal question, because whether [a declaratory judgment] is warranted requires the Court to determine if the Council was authorized by a federal statute, the Charter for the District of Columbia, to amend that Charter as the BAA purports to do, or whether instead the BAA violates federal law."  Opp. 8.

The assertion that *all* causes of action arising under the Charter are federal is disproven by *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360 (D.C. Cir. 2007), and *Dimond v. District of Columbia*, 792 F.2d 179 (D.C. Cir. 1986), cases in which the D.C. Circuit found that claims arising under the District Charter were *not* appropriately heard in federal court.  We explained in our opening brief how to reconcile *Thomas v. Barry*, 729 F.2d 1469 (D.C. Cir. 1984)—which did not arise under the Charter—with *Decatur Liquors* and *Dimond*, but Defendants have chosen not to respond.

Instead, they argue that they are entitled to judgment on the *merits* because a ruling for the Council would subject the District to burdensome litigation "in the Superior Court," where this Court's judgment would not be binding.  Opp. 4–5.  As a merits argument, that is frivolous.  But as a matter of forum selection, Defendants' concern counsels in favor of remand.

## CONCLUSION

The Council's motion for summary judgment should be granted and the Court should award declaratory or injunctive relief.  In the alternative, the case should be remanded to Superior Court.  Defendants' cross-motion should be denied.

Dated: May 5, 2014                                          Respectfully submitted,

                                                            BOIES, SCHILLER & FLEXNER LLP
                                                            MAYER BROWN LLP


By: */s/ Karen L. Dunn (with permission)*          By:   */s/ Brian D. Netter*
     Karen L. Dunn                                          Brian D. Netter
        D.C. Bar No. 1002520                                   D.C. Bar No. 979362
     Alexander I. Platt                                     Breanne A. Gilpatrick
        D.D.C. Bar No. D00396                                  D.C. Bar No. 1018094
     BOIES, SCHILLER & FLEXNER, LLP                         MAYER BROWN LLP
     5301 Wisconsin Avenue, NW                              1999 K Street, NW
     Washington, D.C.  20015                                Washington, D.C.  20006-1101
     Telephone:  (202) 237-2727                             Telephone:  (202) 263-3000
     Facsimile:  (202) 237-6131                             Facsimile:  (202) 263-3300
     Email:  KDunn@bsfllp.com                               Email:  bnetter@mayerbrown.com

*Attorneys for Plaintiff Council of the District of Columbia*