**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| _____ ) | |
| COUNCIL OF THE DISTRICT OF ) | |
| COLUMBIA, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | |
| ) | |
| VINCENT C. GRAY, in his ) | |
| official capacity as Mayor ) Civ. Action No. 14-655 (EGS) | |
| of the District of Columbia, ) | |
| ) | |
|     and ) | |
| ) | |
| JEFFREY S. DeWITT, in his ) | |
| official capacity as ) | |
| Chief Financial Officer for ) | |
| the District of Columbia ) | |
| ) | |
|     Defendants. ) | |
| _____ ) | |

<u>**MEMORANDUM OPINION**</u>

In 2012, the Local Budget Autonomy Act of 2012 (hereinafter "Budget Autonomy Act"), D.C. Law 19-321, 60 DCR 1724, was enacted by the Council of the District of Columbia (hereinafter "Council"), signed by Mayor Vincent C. Gray, and ratified by voters of the District of Columbia (hereinafter "District") in an April 2013 referendum. The law, if upheld, would grant the District the right to spend its local tax and fee revenue without seeking an annual appropriation from Congress. Mayor Gray and Jeffrey S. DeWitt, Chief Financial Officer for the District of Columbia (hereinafter "CFO"), both passionate

advocates for budget autonomy, have refused to implement the
Budget Autonomy Act.  Although they wholeheartedly agree with
the Council as a matter of policy, they do not agree that the
Budget Autonomy Act is valid as a matter of law.  On the basis
of this refusal, the Council has sued the Mayor and the CFO in
their official capacities.  The Council seeks a declaration that
the Budget Autonomy Act is valid, and an injunction compelling
the Mayor and the CFO to comply with the law.

The fight for budget autonomy in the District is not new.
The District has had a measure of control over its own affairs
since the enactment of the Home Rule Act in 1973, and has been
fighting — *unsuccessfully* — for budget autonomy ever since.  In
1981, Congressional Delegate Walter Fauntroy introduced the
District of Columbia Budget Autonomy Act, which would, if
passed, have ended the congressional appropriation requirement
for locally derived funds.  Similar bills have been introduced
in nearly every Congress thereafter.  As recently as 2011 and
2012, bills were introduced in the House and the Senate that
would have provided for local control of the local portion of
the District's budget.[1]  These efforts have continued even after

---

[1] Those bills were withdrawn at the request of District leaders
because they would have altered District law by banning the use
of local funds for abortion, loosening gun control laws, and/or
prohibiting union security agreements.  *See* Mem. of Points and
Authorities of the Bipartisan Legal Advisory Group of the U.S.

the Budget Autonomy Act purportedly became effective.  The President has included budget autonomy for the District in his fiscal year 2013, 2014, and proposed 2015 budgets, and yet another bill was introduced in Congress on April 10, 2014.

Despite this long history of seeking budget autonomy through Congress, the Council now argues that since the Home Rule Act was enacted in 1973, it has possessed the authority to grant itself control over its own local spending.  This argument, which the Council advances for the first time in this litigation, simply cannot withstand judicial scrutiny.  As more fully set forth below, it is contrary to the plain language of the Home Rule Act, which prohibits the Council from changing the role of the federal government in the appropriation of the total budget of the District.  It cannot be reconciled with the legislative history of the Home Rule Act, during which Congress explicitly considered, and rejected, budget autonomy for the District.  And it violates a separate federal statute, the Anti-Deficiency Act, which prohibits District employees from spending public money unless it has been appropriated by Congress.

This case presents a unique situation in which all involved strongly support the policy of budget autonomy for the District of Columbia.  Indeed, the policy arguments advanced by the

_____

House of Representatives as *Amicus Curiae* at 11-13 (citations omitted).

Council are extraordinarily powerful.  As all District residents know, the budget procedure in the Home Rule Act makes for extremely difficult governance in the District.  First, Congress habitually fails to enact a budget by the start of the October 1 fiscal year; it has done so on only three occasions in the last 25 years.  In the remaining 22 years, Congress has either passed a continuing resolution or no budget at all, leading to a shutdown.  Second, because of the lengthy congressional appropriations process, the District budget is necessarily outdated by the time it is enacted by Congress.  Finally, the uncertainty in the congressional appropriations process often negatively impacts assessment of the District's finances by bond rating agencies.  Notwithstanding these challenges, the District has demonstrated an unprecedented track record of fiscal responsibility in recent years, including seventeen balanced budgets, sixteen years of clean financial audits, and a reduction in the federal portion of the District's budget from over 40 percent to only one percent.  The Council makes a compelling argument that the time has come for budget autonomy.

As a native Washingtonian, the Court is deeply moved by Plaintiff's argument that the people of the District are entitled to the right to spend their own, local funds.  Nevertheless, the Court is powerless to provide a legal remedy and cannot implement budget autonomy for the District.

Notwithstanding the sound policy preferences of conscientious District lawmakers, members of Congress, and the President, the Court must interpret and apply the law as enacted. Both Congress and the President have expressed their support for budget autonomy for the District, but have failed to act to achieve that goal. Congress has plenary authority over the District, and it is the only entity that can provide budget autonomy.

In sum, having carefully considered the parties' cross motions for summary judgment, the responses and replies thereto, the submissions by *amici*, the supplemental briefing requested by the Court, the applicable law, the oral argument, and the record as a whole, Plaintiff's motion for summary judgment is **DENIED** and Defendants' cross motion for summary judgment is **GRANTED.** Mayor Vincent C. Gray, CFO Jeffrey S. DeWitt, the Council of the District of Columbia, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are hereby permanently **ENJOINED** from enforcing the Local Budget Autonomy Act of 2012 pending further order of the Court.

**I.    Factual and Procedural Background**

> A.    <u>Local Autonomy in the District of Columbia and the Home Rule Act</u>

The District of Columbia is "an exceptional community . . . established under the Constitution as the seat of the National Government." *District of Columbia v. Murphy*, 314 U.S. 441, 452 (1941).  The Constitution grants Congress the power to "exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square), as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States."  U.S. Const., Art. I, § 8, cl. 17.  Pursuant to that authority, Congress established the District of Columbia in 1801.  *See* District of Columbia Organic Charter Act, ch. 15, 2 Stat. 103 (1801).  The City of Washington was incorporated in 1802, and a local government authorized to provide services was established. Plaintiff's Mem. of Points and Authorities in Support of Motion for Summary Judgment or Remand (hereinafter "Pl.'s MSJ") at 3. From 1802 to about 1871, the local powers of the District were expanded, and there was a trend toward increased self-government.  *Id.; see also* Jason I. Newman & Jacques B. DePuy, *Bringing Democracy to the Nation's Last Colony:  The District of Columbia Self-Government Act*, 24 AM. U. L. REV. 537, 541 (1975) (hereinafter "Newman & DePuy").  In 1871, Washington City,

Georgetown, and Washington County were merged to create the District of Columbia, and Congress granted greater home rule authority to the District. During that time, the Organic Act provided for a District Governor, appointed by the President, and a legislature that could exercise limited power. *See District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 104-05 (1953). However, this gradual increase was temporary, and in 1874 Congress imposed a commission system to govern the District. *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 n. 19 (D.D.C. 2000), *aff'd*, 531 U.S. 941 (2000). In 1878, Congress repealed the home rule provisions of the Organic Act and disbanded the territorial government entirely; the District was henceforth to be governed by a three-person commission appointed by the President. *Id.* Under this system of Government, "[l]egislative powers . . . ceased, and the municipal government [was] confined to mere administration." *Metro R.R. Co. v. District of Columbia*, 132 U.S. 1, 7 (1889). From 1878 to the 1970s, Congress exercised its plenary power through direct legislation for the District, with very little input from District residents. *Banner v. United States*, 303 F. Supp. 2d 1, 4 (D.D.C. 2004), *aff'd*, 428 F.3d 303 (D.C. Cir. 2005).

This continued until 1973, when Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973)

(codified as amended at D.C. Off. Code § 1-201.01 *et seq.*), now
known as the "Home Rule Act."  Pl.'s MSJ at 4.  The Home Rule
Act was a compromise, granting "the people of the District of
Columbia an opportunity in exercising their rights once more and
yet with adequate safeguards for the Federal interest
component."  Home Rule for the District Columbia, 1973-1974:
Background and Legislative History of H.R. 9056, H.R. 9682, and
Related Bills Culminating in the District of Columbia Self-
Government and Governmental Reorganization Act, at 2106 (1974).
Nevertheless, with the Home Rule Act, Congress expressed the
intent to relieve itself to "the greatest extent possible, . . .
of the burden of legislating upon essentially local District
matters."  D.C. Off. Code § 1-201.02(a).  The grant of
legislative authority to the District in the Home Rule Act is
broad, *id.* § 1-203.02, but Congress included several
restrictions to that authority in Sections 601, 602, and 603.
These included congressional authority to veto District
legislation and the authority to legislate for the District on
any matter.  *Id.* § 1-206.01.  The Council of the District of
Columbia, the main legislating body created by the Act, was
prohibited from legislating in nine enumerated areas,[2] and

---

[2] The District may not impose any tax on federal or state
property; lend public credit for a private undertaking; enact or
amend any law that concerns the functions of the federal
government or does not apply exclusively to the District;

Congress retained broad authority over borrowing, spending, and budgeting for the District. *Id.* §§ 1-206.02, 1-206.03. Congress also retained ultimate legislative authority over the District by providing that local legislation passed by the District government becomes law only after review by Congress.

Title IV of the Home Rule Act sets forth the District of Columbia Charter, which established the "means of governance of the District" upon ratification by District voters. D.C. Off. Code § 1-203.01. The Charter 1) establishes a municipal structure similar to a state constitution that would take precedence over other locally-enacted legislation; 2) provides a clear statement regarding the structure of the new government; and 3) provides the procedure for and limitations to the District's ability to amend the Charter. Newman & DePuy, 24 Am. U. L. Rev. at 576-77. The Charter also establishes a tripartite form of government for the District comprised of the Mayor, the Council, and the judiciary, and "the basic governmental structure within which [those entities] operate." *Id.* at 576.

The Charter sets forth the process for the enactment of local legislation. Most legislation becomes law after it is approved by a majority of the Council after two readings 13 days

---

regulate the federal or District of Columbia Courts; impose a personal income tax on nonresidents; permit the construction of buildings that do not comply with height restrictions; or regulate the Commission on Mental Health. D.C. Off. Code §§ 1-206.02(a)(1)-(a)(8).

apart, signed by the Mayor (or approved over his or her veto), and sent to Congress for passive review.  If, after 30 days (or 60 days for changes to criminal laws), Congress does not affirmatively disapprove of the legislation, it becomes law. D.C. Off. Code §§ 1-204.04(e); 1-206.02(c)(1).

The District budget, by contrast, requires the active review of Congress.  The process for the enactment of the budget is set forth in Section 446 of the Act, which is included in the District Charter.  Section 446 provides that the Mayor must present a budget, which includes both locally derived and federal funds, to the Council.  The Council must hold a hearing and adopt a budget within 56 days of the transmittal from the Mayor.  The Mayor must sign the budget, or it must be approved over his or her veto, within 30 days.  The Mayor then transmits this budget, called the Budget Request Act, to the President to submit to Congress as part of the national budget.  Congress must enact affirmative legislation to appropriate expenditures in the District.  D.C. Off. Code § 1-204.46.  Further, the fiscal year of the District is identical to that of the federal government.  Section 446 also provides that "[n]otwithstanding any other provision . . . , the Mayor shall not transmit any annual budget or amendments or supplements thereto, to the President of the United States until the completion of the budget procedures" outlined in Section 446.  *Id.*  It also

fundamentally enshrines the role of Congress in the budget process, stating that "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by an Act of Congress, and then only according to such Act." *Id.*

The District Charter also created the General Fund of the District of Columbia in Section 450 of the Home Rule Act. D.C. Off. Code § 1-204.50. This section transferred revenue collected from local sources from the Treasury, where they were held prior to the enactment of the Home Rule Act, to the D.C. General Fund. *Id.* The Act also empowered the Council to "establish such additional special funds as may be necessary for the efficient operation of the government of the District." *Id.* In 1995, the Home Rule Act was amended by Congress to create the Office of the Chief Financial Officer. *See* District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104-8, 109 Stat. 97, 142 (1995). The CFO and the Mayor are tasked with the responsibility for administering the District's finances.

Like a state constitution, the Charter can be amended subject to a three-prong process delineated in Section 303 of the Home Rule Act. D.C. Off. Code § 1-203.03. The Charter is the only part of the Home Rule Act subject to amendment; "non-charter provisions are 'off-limits' to the local government."

Brief of *Amici Curiae* Jacques B. DePuy, Daniel M. Freeman, Jason I. Newman and Linda L. Smith in Support of Defendants Vincent C. Gray and Jeffrey S. DeWitt (hereinafter "DePuy Amicus") at 4. The Charter amendment procedure outlined in Section 303 is outside of the Charter, thus it is not subject to amendment. To amend the Charter, the Council must first pass a proposed amendment. Second, the amendment must be ratified by a majority of eligible District voters. Finally, the Chairman of the Council must submit the amendment to the Speaker of the House and the President of the Senate for a 35-day period of passive review. *Id.* § 1-203.03(a). The amendment becomes law unless Congress passes a joint resolution disapproving of the proposed amendment within the review period. *Id.* § 1-203.03(b). The Council's amendment authority is not absolute – it is subject to "the limitations specified in sections 601, 602, and 603 [of the Home Rule Act]." *Id.* ¶ 1-203.03(d).

   B.   The Local Budget Autonomy Act of 2012

   The Council of the District passed the Local Budget Autonomy Act of 2012, which amends "the District of Columbia Home Rule Act to provide for local budget autonomy." D.C. Law 19-321. This Act purports to amend Section 446 of the Home Rule Act, which sets forth the procedure for appropriation of the District's budget by Congress. The amended section changes the procedure for locally derived funds; it does not alter the

process for the federal portion of the District's budget. Compl. ¶ 50. Pursuant to the Budget Autonomy Act, the budget process for the local portion of the District's budget has been modified so that it is similar to that for most other District legislation – *i.e.*, it is subject to passive review by Congress after approval by the Council. Pl.'s MSJ at 8. If Congress does not pass a joint resolution disapproving of the budget within 30 days, it becomes law. The Budget Autonomy Act writes the President and the Mayor out of the local budget process, providing that "the local portion of the annual budget shall be submitted by the Chairman of the Council to the Speaker of the House of Representatives." Budget Autonomy Act § 2(e).

The Budget Autonomy Act also alters the timeline in which the Council must pass the budget. The Council is required to adopt the budget for the District "within 70 calendar days . . . after receipt of the budget proposal from the mayor." Budget Autonomy Act § 2(e). There are to be two readings of the proposed budget, and those readings must be at least 13 days apart. Pl.'s MSJ at 8. The Act also amends Section 441(a) of the Home Rule Act to authorize the Council to change the fiscal year of the District so that it runs from July to June rather than October to September. Budget Autonomy Act § 2(d).

The Budget Autonomy Act was unanimously passed by the Council and was signed into law by Mayor Gray on February 15,

2013.  Pl.'s MSJ at 9; Defs.' Mem. of Points and Authorities in Support of Their Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (hereinafter "Defs.' MSJ") at 5.  In a letter sent to the Council prior to signing the Budget Autonomy Act, Mayor Gray stated that while he "fully and passionately support[ed] the goal of securing budget autonomy for the District of Columbia as soon as possible[,]" he believed that the Budget Autonomy Act as written would violate the Home Rule Act.  Defs.' MSJ, Ex. 1 at 1.  He reiterated these concerns in a signing statement that accompanied the Budget Autonomy Act.  Defs.' MSJ, Ex. 1, Signing Statement. The Budget Autonomy Act was then submitted to the D.C. Board of Elections and Ethics for inclusion on the April 2013 ballot and the Council filed a Notice of Public Hearing on the ballot language. District of Columbia Attorney General Irvin Nathan responded to the notice with a letter expressing his "serious reservations about the legality of the amendment" and recommended that it be excluded from the April 2013 ballot.  Pl.'s MSJ, Declaration of V. David Zvenyach (hereinafter "Zvenyach Decl."), Exhibit A, January 4, 2013 Letter from Irvin B. Nathan, at 1.  At the conclusion of the public hearings and after considering the arguments presented, the Board of Elections found no basis to reject the Budget Autonomy Act and included it on the ballot. Pl.'s MSJ at 9.  The Budget Autonomy Act was ratified by 83% of

voters in a special election in April 2013 (approximately 9% of the District electorate of 505,698 registered voters). Defs.' Answer ¶ 5. Congress took no action to affirmatively disapprove of the Budget Autonomy Act, thus it became law on July 25, 2013 and became effective on January 1, 2014. *See* Pl.'s MSJ at 9.

After the Budget Autonomy Act became effective, Congressman Ander Crenshaw (R-FL), asked the Government Accountability Office (hereinafter the "GAO") to opine on its validity. Pl.'s MSJ at 9. On January 30, 2014, the GAO returned its opinion, concluding "that provisions of the Budget Autonomy Act that attempt to change the federal government's role in the District's budget process have no legal effect." Defs.' MSJ, Ex. 2, January 30, 2014 GAO Opinion, at 2.

C.    The Instant Dispute

On April 8, 2014, the Attorney General issued a formal opinion advising the Mayor that he should not implement the Budget Autonomy Act and "advise Executive Branch officials and employees not to do so absent a binding judicial decision to the contrary." Pl.'s MSJ, Zvenyach Decl., Ex. B, Opinion of the D.C. Attorney General, at 9. On April 11, 2014, both the Mayor and the CFO advised the Council in separate letters that they would decline to implement the Budget Autonomy Act. Pl.'s MSJ at 10; Compl. ¶ 52. Specifically, the Mayor notified the Council of the steps he would take:

> First, I will direct all subordinate agency District
> officials not to implement or take actions pursuant to
> the Act, which contravenes our Home Rule Charter and
> other federal law.  Second, I will veto any FY 15
> budget transmitted by the Council that is not
> inclusive of both the local and federal portions of
> the budget, as required under the Home Rule Act.
> Third, as noted, to achieve compliance to the extent I
> am able with the Home Rule Act, I will transmit to the
> Congress and President the full District budget as it
> stands after the 56th day following transmission to
> you of the budget, whether or not the Council has
> taken a second vote.

Compl., Ex. C, April 11, 2014 Letter of Mayor Vincent Gray, at

3.  The CFO mirrored the Mayor's statements in his letter to the

Council, noting that he would not enforce the Budget Autonomy

Act absent a judicial determination of its validity:

> Absent such [determination], I will not make or
> authorize any payment pursuant to a budget that was
> approved in conformance with the Act.  I will also
> direct OCFO employees not to certify contracts or make
> payments under this budget given the potential civil
> and criminal penalties to which they, as individuals,
> would be subject under the federal Anti-Deficiency
> Act.

Compl., Ex. D, April 11, 2014 Letter of CFO Jeffrey S. DeWitt,

at 2.

In response to these letters announcing the Mayor and CFO's

intention not to enforce the Budget Autonomy Act, the Council

brought suit in the Superior Court of the District of Columbia

on April 17, 2014.  It filed a Motion for a Preliminary

Injunction on that same date.  Defendants immediately removed

the action to this Court.  Plaintiff filed a motion to remand

the action to the Superior Court, arguing that jurisdiction was lacking in this Court. At a preliminary status hearing on April 22, 2014, with the consent of the parties, the Court consolidated the motion for preliminary injunction with a determination on the merits, including jurisdictional arguments, pursuant to Federal Rule of Civil Procedure 65(a)(2). The parties have filed motions for summary judgment, and five groups of concerned individuals have filed *amicus* briefs to aid the Court in its determination of the important issues presented. The Court ordered the parties to file supplemental memoranda to respond to arguments made by *amici* in support of Defendants. The Court heard oral argument on the parties' cross motions on May 14, 2014. Those motions are now ripe for determination by the Court.

## II.  Standard of Review

Summary judgment is appropriate in situations where the moving party has shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not

genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975). That a factual dispute exists is not sufficient to bar summary judgment, rather, the dispute must be regarding a "material fact." *See* Fed. R. Civ. P. 56(a). For the purposes of summary judgment, "[a] fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Moreover, the factual dispute must be "genuine," such that there is sufficient admissible evidence for a reasonable trier of fact to find for the non-moving party. *Anderson*, 477 U.S. at 255. The moving party bears the burden of demonstrating the absence of any genuine issues of material fact. *See Celotex*, 477 U.S. at 323.

All parties to the instant dispute concur that there are no genuine issues of material fact before the Court. Summary judgment is particularly appropriate in situations where, as here, a pure question of law that is ripe for decision is before the Court. *See Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 7 (D.D.C. 2001); *see also Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996).

**III. Discussion**

    A.   <u>This Court has Jurisdiction</u>

Federal courts are courts of limited jurisdiction, *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994), and a case must be remanded to state court "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). Section 1331 confers on District Courts jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States, or where the controversy presents a "federal question." 28 U.S.C. § 1331. A case is only properly in federal court on the basis of a well-pleaded complaint; it "may not be removed to federal court on the basis of a federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (internal citations omitted).

Federal courts also lack jurisdiction over claims that pertain only to the District of Columbia. "[F]or the purposes of [28 U.S.C. § 1331], references to the laws of the United States or Acts of Congress do not include laws applicable exclusively to the District of Columbia." 28 U.S.C. § 1366. Thus, "[w]hen Congress acts as the local legislature for the

District of Columbia and enacts legislation applicable only to the District of Columbia and tailored to meet specifically local needs, its enactments should – absent evidence of contrary congressional intent – be treated as local law." *Roth v. District of Columbia Courts*, 160 F. Supp. 2d 104, 108 (D.D.C. 2001) (internal citations and quotation marks omitted).

Plaintiff argues that this case should be remanded to the Superior Court for the District of Columbia because this Court lacks jurisdiction over its claims, which it describes as exclusively local. Pl.'s MSJ at 40. Because Plaintiff contends that the Charter is applicable only in the District, it claims "federal question jurisdiction is unavailable." *Id.* at 41. Moreover, Plaintiff contends that the only bases for federal jurisdiction presented by Defendants are defenses, which further counsels in favor of remand.

The Court is persuaded by Defendants' arguments that this case unequivocally presents a federal question – whether the Council can unilaterally amend the District Charter to fundamentally alter the roles of the President and Congress with respect to the locally funded portion of the District's budget. This case is similar to *Thomas v. Barry*, 729 F.2d 1469 (D.C. Cir. 1984), where the Circuit considered a Home Rule Act challenge raised by employees of the District of Columbia Department of Employment Services who had been transferred from

the Department of Labor.  The District Court dismissed their

claims on the grounds that federal jurisdiction was lacking.

729 F.2d at 1470.  On appeal, the Circuit noted that while the

Home Rule Act applied to the District, it did not do so

exclusively because "[m]any of the Act's sections apply directly

to the federal not District government" and it was "thus a

hybrid statute."  *Id.* at 1471.  The section of the Home Rule Act

at issue was not exclusively local, according to the Court,

because it impacted the "actual structure of the Department of

Labor."  *Id.*

Plaintiff argues that this case is distinguishable from

*Thomas*, because its "claim to relief is premised on the local

obligations of local officials, as triggered by the budget

process for local funds in the District Charter."[3]  Pl.'s MSJ at

43.  However, the budget process for the District necessarily

includes federal entities, namely the President and Congress,

the latter of which has an active role in appropriating the

District budget.  The Budget Autonomy Act is thus far from the

type of purely local legislation that the D.C. Circuit has found

does not confer federal jurisdiction.  *See, e.g.*, *Decatur*

_____

[3] At the oral argument on May 14, 2014, the Court questioned
Plaintiff regarding its argument that *Thomas* is distinguishable
from the instant matter.  While Plaintiff did not concede that
this Court has jurisdiction, it did explain its position that
"if the Court were to rely on [*Thomas*], . . . it's an open
question whether there's jurisdiction and that would certainly
be one way to resolve it."  Transcript of Hearing at 10:25-11:2.

*Liquors, Inc. v. District of Columbia*, 478 F.3d 360 (D.C. Cir.
2007) (finding that the District Court could not exercise
supplemental jurisdiction over a claim that all parties agreed
was local, whether the legislation was invalid because the
Council failed to read it twice before voting on it, as required
by the Home Rule Act); *Dimond v. District of Columbia*, 792 F.2d
179, 187-88 (D.C. Cir. 1986) (holding that a challenge to the
District's No Fault Insurance Law on the grounds that it changed
the jurisdiction of the District of Columbia Courts and thus
violated the Home Rule Act did "not fall within the traditional
federal question jurisdiction" because the relevant sections of
the Home Rule Act dealing with the District of Columbia Courts
applied "exclusively to the District of Columbia").
Accordingly, the Court concludes that federal question
jurisdiction exists over Plaintiff's claims.[4]

---

[4] Though not dispositive, the D.C. Circuit's decision in *Bliley
v. Kelly*, 23 F.3d 507 (D.C. Cir. 1994), is instructive. There,
several members of Congress sought a declaratory judgment that
would have required the Council to resubmit the Assault Weapon
Manufacturing Strict Liability Act to Congress for review
pursuant to its authority to review District legislation under
the Home Rule Act. 23 F.3d at 509-10. The District Court
dismissed the action on the grounds that plaintiffs had failed
to state a claim under 42 U.S.C. § 1983. *Id.* at 510. The
Circuit reversed. In ruling on the merits, the Court considered
the D.C. Court of Appeals' interpretation of the Home Rule Act,
under which the congressional review period for District
legislation would not be suspended by intervening legislation to
repeal the legislation awaiting review. *Id.* at 511. The Court
held that while it must defer to the D.C. Court of Appeals on
interpretations of purely local law, it was not required to do

B.    <u>The Local Budget Autonomy Act of 2012 is Unlawful</u>

Plaintiff contends that the Budget Autonomy Act is a valid exercise of its authority to amend the District Charter by the procedure outlined in the Home Rule Act.  Defendants argue to the contrary that the Budget Autonomy Act is an unlawful exercise of the Council's Charter amendment authority pursuant to Section 303(d) of the Home Rule Act, which provides that the "amending procedure [in Section 303(a)] may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the *limitations* specified in sections 601, 602, and 603."  D.C. Off. Code § 1-203.03(d) (emphasis added).  Defendants contend that the Budget Autonomy Act's purported amendments to Section 446 violate Section 303(d) for three independent reasons, each of which would be sufficient for the Court to find that it is unlawful.  Defs.' Reply at 6.  First, Defendants argue that the Budget Autonomy Act is a violation of Section 603(a) of the Home Rule

---

so on matters of federal law.  *Id.*  The Court reasoned that it was "self-evident" that such deference was not warranted in the matter at hand because "questions regarding Congress's reserved right to review District legislation before it becomes law concerns an exclusively federal aspect of the Act."  *Id.*  As Defendants persuasively argue, the Circuit's conclusion in *Bliley* "mandates the conclusion that the Council's claim of authority" to change the respective roles of Congress and the President with respect to the locally funded portion of the District budget "is likewise one of federal law."  Defs.' Reply in Support of Their Cross-Motion for Summary Judgment (hereinafter "Defs.' Reply") at 5.

Act, which prevents the Council from amending the Charter to change the respective roles of Congress, the President, and the Office of Management and Budget in the enactment of the District's total budget.  Second, Defendants argue that the Budget Autonomy Act violates Section 603(e) of the Home Rule Act because its amendments to Section 446 relating to the locally derived portion of the District's budget no longer comply with the Anti-Deficiency Act.  Finally, Defendants argue that the Budget Autonomy Act is unlawful under Section 603(a)(2) because it purports to amend the Anti-Deficiency Act, which is a federal law that is "not restricted in its application exclusively in or to the District."  D.C. Off. Code § 1-206.02(a)(3).

The Court is again persuaded by Defendants' arguments. Although the Home Rule Act grants authority to the Council to amend the District Charter, that authority is subject to the limitations in Sections 601, 602, and 603.  Plaintiff concedes that its ability to amend the District Charter is subject to the limitations in those sections; however, it argues that only some portions of Sections 601, 602, and 603 are limitations. Sections 603(a) and (e), according to the Council's theory, are instead rules of construction that were intended to guide the interpretation of the Home Rule Act as enacted in 1973.  This argument is contrary to the plain language of Section 303(d); the legislative history of Sections 601, 602, and 603; the

experience of almost 40 years of Home Rule; and common sense.

Plaintiff also argues that Section 450 of the Home Rule Act is a

permanent appropriation that meets the requirements of the Anti-

Deficiency Act without requiring an appropriation from Congress.

This argument is likewise contrary to the plain language of

Sections 450 and 446 and federal appropriations law.  Because

the amendments to Section 446 in the Budget Autonomy Act

independently violate sections 603(a), 603(e), and 602(a)(3),

they are unlawful and must be enjoined.

    1.   <u>Section 603(a)</u>

Defendants argue that the Budget Autonomy Act is unlawful

because it violates the limitations in Section 303(d), which

prevent the Council from amending the District Charter to

conflict with Section 603(a).  Section 603(a) provides:

> Nothing in this act shall be construed as making any
> change in existing law, regulation, or basic procedure
> and practice relating to the respective roles of the
> Congress, the President, the federal Office of
> Management and Budget, and the Comptroller General of
> the United States in the preparation, review,
> submission, examination, authorization, and
> appropriation of the *total* budget of the District of
> Columbia government.

D.C. Off. Code § 1-206.03(a) (emphasis added).  Section 303(d)

unequivocally refers to Section 603 as a "limitation[]" on the

Council's amendment authority and does not specify that only

certain provisions of that section are to be treated as

limitations.  Defendants therefore argue that Section 303(d) can

only be read to treat the entirety of Section 603 as a limitation.  Defs.' MSJ at 15.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purposes."  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985).  Here, the text of both Sections 303(d) and 603(a) is clear – Section 603(a) is intended to be a limitation on the Council's amendment authority.  The word "limitation" is generally defined to mean "something that controls how much of something is possible or allowed" or "the act of controlling the size or extent of something:  the act of limiting something."  Merriam-Webster Dictionary, available at http://www.merriam-webster.com/dictionary/limitation (last visited May 18, 2014); *see also Limitation*, CONCISE OXFORD AM. DICTIONARY at 516 (2006 Ed.) ("a limiting rule or circumstance; a restriction").  The text is also clear that Section 603(a) does not make a distinction between the locally and federally funded portions of the District's budget, but instead refers to the "total" budget of the District, which is comprised of both components.  Accordingly, "the most logical reading of the phrase 'limitations specified in sections 601, 602, and 603' in § 303(d) is that it treats the sections *as a whole* as limitations on the Council's authority, not just to the extent

that they explicitly state they are 'limitations.'"  Defs.' MSJ
at 15-16 (emphasis in original).  And the most logical reading
of Section 603(a) is that it prevents changes to the role of
Congress and the President with respect to six areas related to
the District's budget – preparation, review, submission,
examination, authorization, and appropriation.

Where, as here, the statutory text is clear, there is no
need for the Court to resort to legislative history.  *See, e.g.,*
*Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *Barnhill*
*v. Johnson*, 503 U.S. 393, 401 (1992).  However, the legislative
history of the Home Rule Act confirms the plain meaning of
Section 603(a) and demonstrates the flaw in Plaintiff's
interpretation of the statute.  *See Hessey v. District of*
*Columbia Bd. of Elections and Ethics*, 601 A.2d 3, 8 n.6 (1991)
(*en banc*) ("The legislative history of the Self-Government Act
makes clear that the Self-Government Act left in place the pre-
existing Congressional appropriations process for the District
government.").  Though the Senate had passed several home rule
bills in the years leading up to the enactment of the Home Rule
Act, the House did not seriously consider such legislation until
1973.  DePuy Amicus at 7.  The initial bill drafted by the House
District of Columbia Committee (hereinafter "Committee Bill")
included budget autonomy for the District; however, the
Committee Bill faced considerable resistance, especially from

Congressmen on the Subcommittee on District of Columbia
Appropriations of the House Appropriations Committee, who were
intimately involved in District affairs generally and the budget
process in particular. *Id.* at 7-8. After it became clear that
there was very little chance that the Committee Bill would pass,
Congressman Charles Diggs, Chairman of the House Committee on
the District of Columbia, took the unusual step of abandoning
the original Committee Bill and offering a comprehensive
substitute. *Id.* at 8-9. This substitute was referred to as the
"Diggs Compromise." As Congressman Diggs explained in a "Dear
Colleague" letter:

> The Committee substitute contains six important
> changes which were made after numerous conversations
> and sessions with Members of Congress and other
> interested parties. These changes clarify the intent
> of [the bill] and accommodate major reservations
> expressed since the bill was reported out.

Letter from Charles C. Diggs, *et al.* to Members of the House of
Representatives (*reprinted in* 119 Cong. Rec. 33353 (Oct. 9,
1973)).

The main concession in the Committee Substitute Bill was
the first change listed in the letter: "1. Budgetary process.
Return to the Existing Line Item Congressional Appropriation
Role." *Id.* It was understood by home rule supporters in
Congress that this concession was a necessary condition for the
passage of any bill. DePuy Amicus at 9-10; *see also id.*, Ex. A

28

(Docket No. 28-1), Jack Kneece, *Ford Insists Hill Run D.C. Budget*, WASHINGTON STAR-NEWS, Oct. 16, 1973, at B-2 (quoting the Vice President-designate as saying that "[i]n my view, this particular provision of the bill is non-negotiable in the House-Senate Conference"); *id.*, Ex. B (Docket No. 28-1), Jack Kneece, *Diggs Ready to Deal on Home Rule Bill*, WASHINGTON STAR-NEWS, Oct. 5, 1973, at B-1 (noting that Congressman Diggs was "prepared to continue detailed congressional oversight and control over the D.C. budget as a means of 'reaching an accommodation' with home rule foes"); *id.*, Ex. C (Docket No. 28-1), Editorial, *Home Rule at Last*, WASHINGTON STAR-NEWS Oct. 11, 1973, at A-18 (describing the process required to get powerful Congressmen on the District Appropriations subcommittee to sign off on the Committee Substitute Bill and stating that the "high price was ultimate congressional control over the city's budget"); *id.*, Ex. F (Docket No. 28-1), Editorial, *Home Rule:  One More Step to Go!*, WASHINGTON STAR-NEWS, Dec. 2, 1973, at G-1 (explaining the changes made by the Diggs Compromise, and stating that the Committee Substitute Bill "falls far short of what . . . home rule advocates had sought" but struck "a balance between the conflicting desires of Congress to give District residents a meaningful further measure of control over their own affairs while at the same time retaining strong measures of

congressional oversight").[5]  As Congressman Thomas Rees explained

during the floor debate on the bill, the budget process in the

Committee Substitute Bill would not change the existing budget

process for the District:

> Really the relationship, if this legislation is
> passed, will be the same relationship that Congress
> now has with the District of Columbia budget, that no
> money can be spent by the District of Columbia. . . .
> This was the major compromise . . . so that we have no
> change at all on budgetary control when we are
> discussing who will run the budget of the District of
> Columbia.

119 Cong. Rec. 33390 (Oct. 9, 1973).

The Committee Substitute Bill was eventually approved in

the House after extensive debate.  DePuy Amicus at 10.  In

addition to the reservation of active congressional authority

over the District's budget, the Committee Substitute Bill also

added Sections 603 (a) and (e).  These sections are entitled

"Budget Process; limitations on borrowing and spending" and,

critically, appear in a portion of the Home Rule Act that cannot

be amended by a Charter Amendment.  *Id.* at 11-12.

The introductory language of Section 603(a) mirrors the

language of Section 602(b), which also begins with "[n]othing in

---

[5]  The Court may take judicial notice of newspaper articles that
explain the prevailing views on congressional retention of
budget authority and the importance of the Diggs Compromise to
the ultimate passage of the Home Rule Act.  *See Wash. Post v.
Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (noting that the
court could take judicial notice of newspaper articles
publicizing a criminal prosecution in deciding whether a plea
agreement should be sealed).

this Act shall be construed as . . . ." D.C. Off. Code § 1-206.02(b). Section 602(b) provides that "[n]othing in this Act shall be construed as vesting in the District government any greater authority over" the National Zoo, the National Guard of the District, the Washington Aqueduct, the National Capital Planning Commission, or any federal agency. *Id.* While there is no legislative history for Section 603(a), there is legislative history explaining Section 602(b) of the original Committee Bill, which remained largely unchanged between the Committee Bill, the Committee Substitute Bill (implementing the Diggs Compromise), and the Home Rule Act as enacted. The legislative history of that section, therefore, is particularly instructive, especially as it "appears clear that, when Congress realized in October 1973 that it needed language implementing the Diggs Compromise's provisions on budgeting, it used in § 603 of the Committee Substitute familiar language borrowed from § 602 of the Committee Bill." DePuy Amicus at 13.

The legislative history of Section 602 makes clear that Congress intended for the entire section, not just the enumerated limitations in Section 602(a), to serve as a prohibition on Council action. *See* H.R. REP. No. 93-482 at 36-37 (Sept. 11, 1973). In describing the specific areas listed in Section 602(a) in which the Council could not legislate, the Report notes that "[t]his section lists specific *prohibitions*

against the District Council's legislative authority, which include *prohibitions* against [the listed activities]." *Id.* at 36-37 (emphasis added). The Report further describes Section 602(b) as follows: "Subsection (b) *prohibits* the Council from exceeding its present authority over the National Zoological Park, the District National Guard, the Washington Aqueduct, the National Capital Planning Commission, or any other Federal agency." *Id.* at 37 (emphasis added). Congress used the word "prohibition" to describe both sections despite the fact that Section 602(b) begins with the phrase "[n]othing in this Act shall be construed as," and the legislative history leaves no doubt that the limitations in the section are intended to be prospective. Thus, the identical language in Section 603(a) must also be read as a prospective prohibition on the Council's authority. It is a well-known canon of statutory construction that the same phrase "appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf*, 510 U.S. at 143. The legislative history of the Home Rule Act provides no basis for the Court to depart from this well-established canon of statutory construction.

Despite the very clear language of Section 603(a) and the legislative history that reinforces that clear language, the Council nonetheless argues that Section 603(a) is a rule of construction, not a substantive limitation. Plaintiff contends

that Section 603(a) explains only how the Home Rule Act was to be construed in 1973 and does not prohibit the amendments to Section 446 made in the Budget Autonomy Act. Pl.'s MSJ at 30-31; Pl.'s Consolidated Reply Mem. in Support of Pl.'s Motion for Summary Judgment or Remand and Mem. in Opposition to Defs.' Cross-Motion for Summary Judgment (hereinafter "Pl.'s Reply") at 26. According to Plaintiff, because Congress was explicit elsewhere in the Act when delineating areas in which the Council could not legislate, it could not have intended for Section 603(a) to impose limitations on the Council's ability to amend the budget process outlined in Section 446, which is located in the amendable Charter. Pl.'s MSJ at 31. This is the only reasonable reading of the text, according to Plaintiff, because "the overall purpose of the Home Rule Act was to provide an expansive legislative power coupled with a broad Charter amendment power."[6] Pl.'s Reply at 23.

---

[6] Plaintiff devotes a significant portion of its Reply to a discussion of the legislative history of the amendment provisions of the Home Rule Act. *See* Pl.'s Reply at 11-18. Plaintiff explains that the Senate and House versions of the Home Rule Act contained very different amendment provisions – the Senate version provided for limited amendment authority, while the amendment authority in the House version was much broader. *Id.* at 12. The House version eventually made it into the final bill. *Id.* at 13. Ultimately, this discussion is irrelevant. Nor is it directly relevant that Congress later amended the Home Rule Act to relax the requirements for amending the Charter – from active review by both houses of Congress to passive review – after the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919 (1983), which invalidated the legislative

The Council's argument, put simply, is not persuasive. Plaintiff's own counsel, V. David Zvenyach, has referred to Section 603(a) as a limitation, stating during testimony before the Committee of the Whole on November 9, 2012, that of the "*limitations* [in Section 303(d)], the most difficult hurdle is Section 603(a)." Docket No. 38-1, November 9, 2012 Testimony of V. David Zvenyach, Public Hearing on Bill 19-993, at 3 (emphasis added). He noted that there were two possible interpretations of Section 603(a):

> It could be read as a bright-line prohibition of the ability of the Council to affect the budget process. Or it could be read as a declaration that Congress maintains ultimate authority with respect to the budget, and that the Home Rule Act as originally approved meant to leave the budget process intact. In my view, the latter reading is preferable and consistent with both the plain language and the overall purposes of the Home Rule Act.

*Id.* (emphasis in original). While the Council's reading of Section 603(a) may indeed be "preferable" from a policy perspective, it is inconsistent with the plain language of the statute, the rules of statutory construction, and the legislative history of the Home Rule Act. Section 603(a) is a

---

veto. *See* Pl.'s Reply at 16. Even assuming, *arguendo*, that the Council has broad authority to amend the District Charter, the only issue for the Court is whether the Charter amendment procedures allow the changes that the Council has made with respect to the local portion of the District's budget.

limitation that prohibits the very change the Budget Autonomy Act purports to make.[7]

## 2. Section 603(e)

Defendants also argue that the Budget Autonomy Act violates Section 603(e) of the Home Rule Act and thus contravenes the limitations to its Charter amendment authority in Section 303(d). Section 603(e) provides that "[n]othing in this Act shall be construed as affecting the applicability to the District government of the provisions of . . . the [] Anti-Deficiency Act." D.C. Off. Code § 1-206.03(e). The Anti-Deficiency Act precludes "[a]n officer or employee . . . of the District of Columbia government" from spending public monies unless Congress makes "the amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. §

---

[7] At the oral argument on May 14, 2014, Plaintiff argued that Congress's silence and failure to pass a joint resolution disapproving of the Budget Autonomy Act could signify tacit approval of the changes the Budget Autonomy Act makes to Section 446 of the Home Rule Act. However, congressional inaction does not make a law immune to judicial review. *See, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 121 (1994)(noting that in the context of congressional approval of administrative regulations, "congressional silence lacks persuasive significance, particularly where administrative regulations are inconsistent with the controlling statute") (internal quotation marks and citations omitted). Plaintiff points to dicta in the Supreme Court's denial of a stay in *Jackson v. D.C. Bd. of Elections and Ethics*, 559 U.S. 1301 (2010), as evidence of a contrary position. However, in *Jackson* the Court stated that while congressional inaction counseled in favor of denying a stay, those "considerations are of course not determinative of the legal issues." *Id.* at 1302-03.

1341(a).  As enacted, Section 446 of the Home Rule Act mandates

the procedure by which the District could comply with the Anti-

Deficiency Act by prohibiting the obligation and expenditure of

funds unless the spending has been "approved by an Act of

Congress."  D.C. Off. Code § 1-204.46.

For the reasons set forth in Section III.B.1 *supra*, Section

603(e) is also a prospective limitation on the Council's

authority to amend the District Charter pursuant to Section

303(d).  Like Section 603(a), Section 603(e) is not included in

the District Charter and cannot be amended.  Though the Budget

Autonomy Act only explicitly amends Section 446, it also

effectively amends Section 603(e) by reading compliance with the

Anti-Deficiency Act, which was previously included in Section

446, out of the Home Rule Act entirely.

Defendants argue that the Budget Autonomy Act can only be

valid if the Court accepts Plaintiff's argument that Section 450

of the Home Rule Act, which establishes the D.C. General Fund,

is an appropriation that satisfies the requirements of the Anti-

Deficiency Act.  Defendants urge the Court not to accept that

interpretation because it is contrary to both the plain meaning

of Section 450 and federal appropriations law.  Defendants

contend that Section 450 does nothing more than move funds from

the Treasury to the D.C. General Fund subject to requirements in

Sections 446 and 603(e) that those funds be appropriated and

comply with the Anti-Deficiency Act.  Thus, Defendants argue

that the Budget Autonomy Act is unlawful.

All public funds are subject to the appropriations process.

*See Am. Fed. of Gov't Empls., AFL-CIO, Local 1647 v. Fed. Labor*

*Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (hereinafter

"AFGE").  An appropriation has been made only "[i]f the statute

contains a specific direction to pay and a designation of the

funds to be used." 1 Office of General Counsel, United States

General Accounting Office, Principles of Federal Appropriations

Law (3d ed. 2004) (hereinafter "Principles of Appropriations

Law") at 2-16.[8]  While there are no magic words to signify that

an appropriation has been made, the statutory text must be clear

that funds are being appropriated.  Indeed, "[a] law may be

construed to make an appropriation . . . only if the law

specifically states that an appropriation is made."  31 U.S.C. §

1301(d).  Accordingly, an appropriation cannot be inferred.  *See*

Principles of Appropriations Law at 2-16.

---

[8] The parties disagree as to the level of deference that should
be given to GAO opinions.  The Court regards the GAO as an
expert, one whose opinions it will "prudently consider," but
that it has "no obligation to defer" to.  *Delta Data Systems
Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984).  Even
though GAO opinions are not binding, the Court will "give
special weight to [those] opinions due to [the GAO's]
accumulated experience and expertise in the field of government
appropriations."  *Nevada v. Dep't of Energy*, 400 F.3d 9, 16
(D.C. Cir. 2005) (internal quotation marks and citations
omitted).

Congress can make exemptions to the appropriations requirement through various means. *See AFGE*, 388 F.3d at 409. Congress can establish a revolving fund, which is "replenished by moneys from the public [and] constitutes an on-going appropriation which does not have to be renewed each year." *United Biscuit Co. v. Wirtz*, 359 F.2d 206, 212 (D.C. Cir. 1965) (internal citations omitted). Examples of such funds are a "stock fund" in the Treasury to fund military commissary purchases, *id.*, and the Postal Service Fund, which establishes a revolving fund in the Treasury that "shall be available to the Postal Service without fiscal-year limitation to carry out the purposes, functions, and powers [of the Postal Service]," 39 U.S.C. § 2003(a). Congress may also create a permanent appropriation, which is one that "is always available for specified purposes and does not require repeated action by Congress to authorize its use." Principles of Appropriations Law at 2-14.

Moreover, Congress may create a nonappropriated fund instrumentality (hereinafter "NAFI"), through which it makes the decision "not to finance a federal entity with appropriations." *See AFGE*, 388 F.3d at 409. A NAFI is instead funded "primarily from [its] own activities, services, and product sales." *Id.* (quoting *Cosme Nieves v. Deshler*, 786 F.2d 445, 446 (1st Cir. 1986). The fact that an organization receives money from its

own activities is not sufficient for designation as a NAFI; as "long as 'under the [] authorizing legislation Congress could appropriate funds if necessary,'" appropriations are still required. *Id.* at 409-10 (quoting *L'Enfant Plaza Props., Inc. v. United States*, 668 F.2d 1211, 1212 (Ct. Cl. 1982)). In determining whether a fund or entity is a NAFI, the Federal Circuit "has adopted a clear statement test," pursuant to which funds should be treated as requiring an appropriation unless there is "a clear expression by Congress" to the contrary. *Id.* at 410 (internal quotation marks omitted).

Plaintiff argues that the Budget Autonomy Act is lawful because Section 450 is a permanent or continuing appropriation that meets the requirements of the Anti-Deficiency Act. Alternatively, the Council suggests that the creation of the D.C. General Fund took District generated revenues out of the public fisc, thereby obviating the need for appropriation. Pl.'s MSJ at 20. Though Congress maintained what Plaintiff refers to as a "second-level requirement" that "expenditures out of the D.C. General Fund be affirmatively approved by Congress," that requirement was located in the District Charter and, according to Plaintiff, was subject to amendment. *Id.* at 16.

The Council offers no statutory, legal, or other support for this novel theory, nor can the Court find any. While Section 450 "gave the District authority to collect and deposit

local revenues, it did *not* give the District the ability to obligate or expend those funds."  Defs.' Supp. Mem. at 4 (emphasis in original).  Indeed, the weight of authority, and the text of the statute itself,[9] suggests that the creation of the D.C. General Fund did not constitute a permanent appropriation.  The location of public money is not dispositive of this inquiry; whether public money is held in a separate fund in the Treasury or removed from the Treasury entirely, that money is still subject to the Anti-Deficiency Act.  Simply removing funds from the Treasury does not satisfy the requirements of the Anti-Deficiency Act, which is silent regarding the location of public money (and does not even contain the word "Treasury").

---

[9] As Defendants point out, the Council's interpretation of the Home Rule Act would render it internally inconsistent, as the congressionally enacted versions of Sections 446 and 603(e) specifically note that all funds for the District – regardless of whether they are locally or federally generated – are subject to congressional appropriation.  *See* D.C. Off. Code §§ 1-204.46 and 1-206.03(e).  "It is a familiar canon of statutory construction that, 'if possible,' [the court is] to construe a statute so as to give effect to 'every clause and word.'"  *Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)).  Plaintiff's reading of Section 450 would not only make the Home Rule Act internally inconsistent, but it would also render Sections 446 and 603(e) as enacted superfluous because the transfer of District collected revenues from the Treasury to the D.C. General Fund alone constituted an appropriation.  There is no reason to read the statute in that way, especially when its plain meaning and legislative history support an alternative reading that gives effect to each section.

The D.C. General Fund also cannot be considered a NAFI or revolving fund that would constitute an appropriation for the purposes of the Anti-Deficiency Act. While Section 450 takes District generated revenues out of the Treasury and deposits them into the D.C. General Fund, nothing in that section (or elsewhere in the Home Rule Act) is a clear expression by Congress that the D.C. General Fund was not subject to appropriations. *See L'Enfant Plaza*, 668 F.2d at 1212. Nor is there any indication in the Home Rule Act that Congress could not appropriate funds for the District if necessary. *See id.* The Home Rule Act in fact suggests the opposite. It is a clear statement that Congress intended the D.C. General Fund to be appropriated. *See* D.C. Off. Code §§ 1-204.46, 1-206.03(e).

This Circuit's decision in *Nevada v. Dep't of Energy*, 400 F.3d 9 (D.C. Cir. 2005), mandates the conclusion that Section 450 does not constitute an appropriation. The Court considered whether Section 116 of the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270 (hereinafter "NWPA"), which created a Nuclear Waste Fund, was a continuing appropriation. 400 F.3d at 13. The Nuclear Waste Fund was a "separate fund" in the Treasury created to finance the development of a nuclear waste repository and was funded with payments by regulated entities. *Id.* at 11. After Yucca Mountain in Nevada was selected as the location of the repository, the NWPA was amended to provide financial

assistance to the state of Nevada out of the Nuclear Waste Fund.
*Id.* (citing 42 U.S.C. § 10136(c)(1)).  Nevada interpreted the
statute as providing a continuing appropriation, relying on
language in the statute "that the Secretary shall make grants to
the State of Nevada," *id.* at 13 (citing 42 U.S.C. § 10136(c)),
and a provision specifying that such grants "shall be made out
of amounts held in the Waste Fund," *id.* (citing 42 U.S.C. §
10136(c)(5).  Like the Council here, the State argued that "the
mandatory phrase 'shall make grants' amount[ed] to a 'specific
direction to pay,'" one that the GAO would treat as an
appropriation.  *Id.* at 13.  The Court held that the Nuclear
Waste Fund did not constitute a continuing appropriation because
another section of the statute made "expenditures from the Waste
Fund, including [] grants, 'subject to appropriations.'"  *Id.*
In making this determination, the Court explained that it had
found no authority to suggest that "a statute creating a funding
source and ordering payment 'subject to appropriations' amounts
to a continuing appropriation."  *Id.* at 14; *see also id.*
("[N]either Nevada nor we have identified any authority
suggesting that a continuing appropriation exists when Congress
creates a special fund but makes spending from it 'subject to
appropriations.'").

The Council argues that *Nevada* is inapposite because it
involved a special fund in the Treasury of the United States and

because the case did not arise under the Anti-Deficiency Act. Pl.'s Reply at 6 n.3. However, Plaintiff's attempts to distinguish *Nevada* fail. The Circuit held that a permanent appropriation is not statutorily created when another provision in the *same* statute makes funds subject to appropriations. The location of the fund is irrelevant. The D.C. General Fund, like the fund at issue in *Nevada*, has not been permanently appropriated because another section of the Home Rule Act, Section 446, requires that the Fund be appropriated. It is, therefore, still subject to the requirements of the Anti-Deficiency Act. Such a reading of Sections 450 and 446 also comports with the "broader principle that one should not lightly presume that Congress meant to surrender its control over public expenditures by authorizing an entity to be . . . outside the appropriations process." *AFGE*, 388 F.3d at 410. The Budget Autonomy Act, which removes the provisions in Section 446 that provide for compliance with the Anti-Deficiency Act, thus runs afoul of the limitations in Section 603(e) and the Anti-Deficiency Act.

### 3. Section 602(a)(3)

Defendants argue that the Budget Autonomy Act is invalid for the additional reason that it violates Section 602(a)(3) of the Home Rule Act, which places another limitation on the Council's amendment authority under Section 303(d). Section

602(a)(3) provides that the Council has no authority to "enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District."  D.C. Off. Code § 1-206.02(a)(3).  Defendants contend that the Budget Autonomy Act impermissibly amends an Act of Congress that is not restricted in its application exclusively to the District, namely the Anti-Deficiency Act.  Defs.' MSJ at 28-29.  Because the Budget Autonomy Act purports to change the procedure for the local portion of the District's budget to authorize spending without a congressional appropriation, it necessarily seeks to enact or amend an Act of Congress that is not restricted exclusively to the District of Columbia.  By its very terms, the Anti-Deficiency Act applies to the federal government and to the District.  *See* 31 U.S.C. § 1341.

For the reasons explained in Section III.B.2 *supra*, the Budget Autonomy Act does not comply with the requirements of the Anti-Deficiency Act, and the Council's attempts to characterize the D.C. General Fund as a permanent appropriation fail.  Because the Council cannot amend the District Charter to exempt the local portion of the District's budget from the Anti-Deficiency Act pursuant to the limitations in Sections 602(a)(3)

and 603(e), the Budget Autonomy Act is unlawful by its terms and as an exercise of the Council's amendment authority.[10]

---

[10] Defendants also argue that the Budget Autonomy Act violates the first part of Section 603(a)(2) because it concerns functions of the United States. Defs.' Reply at 6-7. According to Defendants, "[b]udgeting and appropriations are unquestionably 'functions' of Congress." Defs.' Reply at 7. To support their claim, Defendants cite to two cases in which budgeting and appropriations are referred to in dicta as functions of the government. *See, e.g. Gross v. Winter*, 876 F.2d 165, 171 n.10 (D.C. Cir. 1989) (explaining that in the context of determining whether an official has immunity from a Section 1983 suit, budget decisions are "traditional legislative functions"); *Hessey v. D.C. Bd. of Elections & Ethics*, 601 A.2d 3, 17 (D.C. 1991) (*en banc*) (referring generally to appropriations as a function of the legislature). Because the Budget Autonomy Act purports to change the role of the President and Congress with respect to the locally funded portion of the District budget, Defendants assert that it "is exactly the type of change to a federal function, *i.e.,* a change to how responsibilities are divided between federal and local officials, that the limitation was intended to guard against." Defs.' Reply at 7.

The Council argues that this reading of Section 603(a)(2) would "gut [its] legislative authority" because it encompasses "any District law with a non-ministerial federal effect." Pl.'s Reply at 21. Plaintiff contends it would be prevented from cutting taxes or amending the criminal code, and that even the Initiative, Referendum, and Recall Charter Amendment Act of 1977 would be unlawful. *Id.* However, Plaintiff's dramatic reading of Section 602(a)(3) has no basis in law or fact. Cutting taxes would impact the total amount of District funds available for Congress to appropriate, but it would not alter its function in appropriating those funds. Nor would changing the criminal code alter the function of the U.S. Attorney in prosecuting crimes. Indeed, the District Charter already provides that the Council can amend the District's substantive and procedural criminal law subject to a 60-day, as opposed to 30-day, passive review period by Congress. *See* D.C. Off. Code § 1-206.02(c)(2); *In re Crawley*, 978 A.2d 608, 610-11 (D.C. 2009). While such actions by the Council "might alter the background against which federal officials act, neither would change federal officials'

45

## IV.  Conclusion

Although the Council of the District of Columbia, the
Mayor, and this Court are powerless to grant to the residents of
the District of Columbia the full budget autonomy that *they* have
demanded for almost forty years to spend *their* revenue collected
from *their* local taxes and fees, the United States Congress and
the President of the United States are — without a doubt —
empowered to do so.

In view of the foregoing, the Court concludes that the
Budget Autonomy Act is unlawful.  Plaintiff's Motion for Summary
Judgment is hereby **DENIED** and Defendants' Cross Motion for
Summary Judgment is hereby **GRANTED**.[11]  Mayor Vincent C. Gray, CFO
Jeffrey S. DeWitt, the Council of the District of Columbia, its

---

*functions*, *i.e.*, those officials' roles, tasks, or
responsibilities."  Defs.' Reply at 10 (emphasis in original).

The District of Columbia Court of Appeals came to the same
conclusion in *In re Crawley*.  There, the Court considered
whether the Procurement Reform Amendment Act of 1998 (the
District's false claims act) impermissibly transferred
prosecutorial authority from the U.S. Attorney to the Office of
the Attorney General.  978 A.2d at 609-10.  The Court considered
the legislative history of the Home Rule Act and determined that
any law passed by the Council concerning the jurisdiction of the
U.S. Attorney was to be understood as one that concerned the
functions of the United States, and thus subject to Section
602(a)(3).  *Id.* at 615.  Likewise, the Budget Autonomy Act
impermissibly affects a function of the United States.

[11] At the motions hearing on May 14, 2014, the Council
represented that it would not seek a stay even if it sought an
appeal.  Transcript of Hearing at 124:20-24.  In the absence of
any request for a stay, the Court will not stay its order.

officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are hereby permanently **ENJOINED** from enforcing the Local Budget Autonomy Act of 2012 pending further order of this Court.  An appropriate order accompanies this Memorandum Opinion.

      **SO ORDERED.**

**Signed:**     **EMMET G. SULLIVAN**
             **United States District Judge**
             **May 19, 2014**